FILED

2018 Sep-11  AM 11:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ROCHE DIAGNOSTICS CORPORATION and
ROCHE DIABETES CARE, INC.,

                Plaintiffs,

    v.

PRIORITY HEALTHCARE CORPORATION
D/B/A PRIORITY CARE; PRIORITY CARE
PHARMACY, LLC; AMORY PRIORITY CARE
PHARMACY, LLC; PRIORITY CARE
PHARMACY SERVICES, LLC; PRIORITY CARE
MEDICAL SUPPLY, LLC; PRIORITY CARE
PHARMACY SOLUTIONS, LLC; AMORY
DISCOUNT PHARMACY, LLC; PRIORITY CARE
PHARMACY AT COTTON GIN POINT, LLC;
PRIORITY CARE PHARMACY 2, LLC; JASPER
EXPRESS CARE PHARMACY, LLC; VINCENT
PRIORITY CARE PHARMACY, LLC D/B/A THE
MEDICINE CHEST; VINCENT EXPRESS CARE
PHARMACY, LLC; VICKERS PRIORITY CARE
PHARMACY, LLC; CARBON HILL EXPRESS
CARE PHARMACY, LLC; BOWIE'S PRIORITY
CARE PHARMACY, LLC D/B/A/ BOWIE'S
DISCOUNT PHARMACY; BOWIE'S EXPRESS
CARE PHARMACY, LLC; B&K PRIORITY CARE
PHARMACY, LLC; B&K EXPRESS CARE
PHARMACY, LLC; TOMBIGBEE PHARMACY,
LLC; MAIN STREET DRUGS, LLC; MEDICAL
PARK PHARMACY, INC.; MEDICAL PARK
DISCOUNT PHARMACY, LLC; BURNS
DRUGSTORE, INC.; BURNS DISCOUNT DRUG
STORE LLC; BURNS DISCOUNT DRUG STORE
LLC; OZARK FAMILY PHARMACY LLC;
OZARK FAMILY PHARMACY LLC; MEDPOINT
ADVANTAGE, LLC; MEDPOINT PHARMACY
BENEFIT MANAGERS, LLC D/B/A MEDPOINT
PHARMACY, KONIE MINGA; PHILLIP
ANTHONY MINGA; WESLEY MINGA;
CHRISTOPHER DANIEL KNOTTS; DANIEL
BAKER; WILLIAM H. AUSTIN; SAMUEL
PHILLIP CARSON; KIMBERLY P. CARSON;
GENEVA OSWALT; MELISSA "MISSY"
SHEFFIELD; AND ASHLEY TIGRETT,

                Defendants.

Civil Action No. __

Related Cases:
Civil Action Nos. 2:18-00521-AKK,
2:18-00522-AKK, 2:18-00523-AKK

## COMPLAINT

Plaintiffs Roche Diagnostics Corporation and Roche Diabetes Care, Inc. (together, "Roche"), for their Complaint against Defendants, hereby allege as follows:

## INTRODUCTION

1.      Roche, a manufacturer of medical equipment and diagnostic supplies for patients with diabetes, brings this action in an effort to put a halt to a massive insurance-fraud enterprise that is being carried out by the Defendants.

2.      Defendants are a network of pharmacies located primarily in Alabama and Mississippi, as well as the individuals that control and operate the network.  Although the pharmacies appear to operate independently, and some of them maintain local storefronts that sell a variety of medical and consumer products over the counter, these pharmacies serve as fronts for a centralized mail-order enterprise and insurance billing mill located in Amory, Mississippi, that specializes in diabetes care.  Because many (though not all) of the  pharmacies have "Priority Care" in their name, and because they are all affiliated directly or indirectly with Defendant Priority Healthcare Corporation, this enterprise will be referred to here as the "Priority Care" enterprise.

3.      As alleged further below, the Priority Care enterprise is engaged in a nationwide scheme to carry out insurance fraud related to diabetes care supplies, specifically the test strips used to monitor the level of glucose in the blood.  The Priority Care enterprise bills insurance companies multiple millions of dollars annually for blood-glucose test strips that are either not shipped to patients at all, or are different from—and priced much higher than—the products that patients actually receive.

4.      In order to conceal this fraud, the Priority Care enterprise continually shifts its billing volume away from pharmacies whose suspicious billing practices attract attention and

opens up new ones whose affiliation with Priority Care cannot be easily identified.  In this way, the Priority Care enterprise as a whole is able to perpetuate its fraudulent practices even after individual pharmacies within the network are discovered and cut off by insurance companies, by their pharmacy benefit managers ("PBMs"), or by manufacturers such as Roche.

5.      As a result of Defendants' fraudulent billing practices, Roche from January 1, 2013 through the end of the first quarter of 2018 paid out more than $37.5 million dollars' worth of unwarranted rebates to insurance companies and their PBMs for blood-glucose test strips that were either not shipped to patients or are different from those that patients received.  And because of Defendants' ongoing efforts to introduce new  pharmacies, Roche continues to be defrauded by Defendants, paying millions of dollars per quarter in unwarranted rebates to PBMs and insurance companies on the basis of false information supplied by Priority Care pharmacies.

6.      The Priority Care enterprise is controlled by the individual Defendants, chief among them Defendants Phillip Anthony Minga and Konie Minga.  Phillip Minga has previously been convicted of criminal insurance fraud and has been banned by the federal government from providing mail-order diabetes care supplies to Medicare patients.

7.      Because of his criminal history, Phillip Minga keeps his involvement in the Priority Care enterprise hidden.  Phillip Minga's wife, Konie Minga, is the nominal owner of Priority Healthcare Corporation and a number of its affiliate pharmacies, and Phillip Minga's name does not appear on any of the enterprise's official documents.  Priority Care pharmacists, however, have testified that Phillip Minga is personally involved in the Priority Care enterprise and is the "brains behind" the operation.

8.      In a separate action brought by Roche in the U.S. District Court for the Southern District of Indiana, Roche learned that Priority Care entities purchased fraudulently diverted not-for-retail-sale product and served nonparty subpoenas on several Priority Care-affiliated

pharmacies and individuals in that action.  Priority Care ignored the subpoenas until after a Court

in this District issued an order compelling a response and later held Priority Care entities in

contempt for failing to obey that order.  The subpoenaed Priority Care entities finally produced

documents to Roche on June 27, 2018.

9.     Based on the information that Priority Care produced after being held in

contempt, Roche has ascertained that the vast majority of the Priority Care enterprise's insurance

claims for Roche retail blood-glucose test strips are fraudulent in that Priority Care purchased

only a small fraction of the Roche products it claims to have dispensed.

10.     The full extent and nature of the Priority Care enterprise's fraudulent activities

remain unknown.  In particular, despite being ordered to produce documents and having four of

its witnesses deposed by Roche, the Priority Care enterprise has failed to explain what, if

anything, it is actually dispensing to the patients it falsely represents as receiving Roche retail

test strips.

11.     Documents obtained by Roche show that some of Priority Care's patients are

receiving Roche-branded products that have different product codes (and different prices) than

the ones for which Priority Care submitted insurance claims.  However, Priority Care's

fraudulent switching of one Roche product for a different one explains only a small portion of

the discrepancy between the number of Roche products Priority Care has purchased and the

number of insurance claims Priority Care has submitted for Roche products.  Priority Care has

submitted hundreds of thousands more insurance claims for Roche's retail test strips than the

total number of Roche products that Priority Care's records (or Roche's records) document that

Priority Care actually purchased.  These hundreds of thousands of insurance claims for Roche

retail strips are completely unaccounted for.

12.     Priority Care's inability to account for hundreds of thousands of insurance claims

raises critical questions about what patients are actually receiving.  Priority Care may be sending patients expired, damaged, or otherwise tainted products for which it is unwilling or unable to provide invoices.  Patients may be receiving generic test strips that are not manufactured by Roche.  Some of the Priority Care enterprise's insurance claims may be completely fabricated, with insurance companies being billed for Roche retail strips and the patients receiving nothing at all.

13.     Every day that the Priority Care enterprise is permitted to continue submitting fraudulent insurance claims for Roche's blood-glucose test strips, Roche is being defrauded and diabetes patients are receiving expired or damaged products, different products than what was prescribed for them, and/or a different product than that which they are entitled to receive. Immediate action is necessary to expose and put an end to the Priority Care enterprise's fraud.

## PARTIES

14.     Plaintiff Roche Diagnostics Corporation is a corporation organized under the laws of the State of Indiana, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.

15.     Plaintiff Roche Diabetes Care, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 9115 Hague Road, Indianapolis, Indiana 46250.  Roche Diagnostics Corporation included Roche's U.S. commercial diabetes business until November 2015, when the U.S. commercial diabetes business was transferred to a separate legal entity, Roche Diabetes Care, Inc.  Roche Diabetes Care, Inc. is engaged in the business of manufacturing and marketing blood glucose test strips.

16.     Defendant Priority Healthcare Corporation d/b/a Priority Care ("PHC") is a corporation organized under the laws of the State of Delaware, with a mailing address at an Alabama Post Office Box and a principal place of business at 1006 Third Street North, Amory,

Mississippi 38821.  PHC is a holding company that is sole owner of at least one of the Priority
Care pharmacy entities.

17.     Defendant Priority Care Pharmacy, LLC ("Priority Care Pharmacy") is a limited
liability company organized under the laws of the State of Delaware, with its principal place of
business at 1600 Highland Drive, Amory, Mississippi 38821.  Priority Care Pharmacy is owned
by or otherwise affiliated with PHC.

18.     Defendant Priority Care Pharmacy Services, LLC ("Priority Care Pharmacy
Services") is a limited liability company organized under the laws of the State of Delaware, with
its principal place of business at 1600 Highland Drive, Amory, Mississippi 38821.  Pharmacy
Services is owned by or otherwise affiliated with PHC.

19.     Defendant Amory Priority Care Pharmacy, LLC ("Amory Priority Care") is a
limited liability company organized under the laws of the State of Delaware, with its principal
place of business at 1600 Highland Drive, Amory, Mississippi 38821.  Amory Priority Care is
owned by or otherwise affiliated with PHC.

20.     Defendant Priority Care Medical Supply, LLC ("Priority Care Medical Supply")
is a limited liability company organized under the laws of the State of Delaware, with its
principal place of business at 1600 Highland Drive, Amory, Mississippi 38821.  Priority Care
Medical Supply is owned by or otherwise affiliated with PHC.

21.     Defendant Priority Care Pharmacy Solutions, LLC ("Priority Care Pharmacy
Solutions") is a limited liability company organized under the laws of the State of Delaware,
with its principal place of business at 211 10th Avenue North, Amory, Mississippi 38821.
Priority Care Pharmacy Solutions is owned by or otherwise affiliated with PHC.

22.     Defendant Amory Discount Pharmacy, LLC ("Amory Discount Pharmacy") is a
limited liability company organized under the laws of the state of Mississippi, with its principal

place of business at 60379 Cotton Gin Port Road Suite B, Amory, Mississippi 38821.  Amory Discount Pharmacy is owned by or otherwise affiliated with PHC.

23.     Defendant Priority Care Pharmacy at Cotton Gin Point, LLC ("Priority Care Pharmacy at Cotton Gin Point") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 1506 Highway 278 East Suite G, Amory, Mississippi 38821.  Priority Care Pharmacy at Cotton Gin Point is owned by or otherwise affiliated with PHC.

24.     Defendant Vickers Priority Care Pharmacy, LLC ("Vickers Priority Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 31040 Northeast First Avenue Suite 5, Carbon Hill, Alabama 35549.  Vickers Priority Care Pharmacy is owned by or otherwise affiliated with PHC.

25.     Defendant Carbon Hill Express Care Pharmacy, LLC ("Carbon Hill Express Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 31040 Northeast First Avenue Suite 5, Carbon Hill, Alabama 35549.  Carbon Hill Express Care Pharmacy is owned by or otherwise affiliated with PHC.

26.     Defendant Vincent Priority Care Pharmacy, LLC d/b/a The Medicine Chest ("Vincent Priority Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 42747 Highway 25, Vincent, Alabama, 35176.  Vincent Priority Care Pharmacy is owned by or otherwise affiliated with PHC.

27.     Defendant Vincent Express Care Pharmacy, LLC ("Vincent Express Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 42747 Highway 25, Vincent, Alabama, 35176.  Vincent Express Care Pharmacy is owned by or otherwise affiliated with PHC.

28.     Defendant Priority Care Pharmacy 2, LLC ("Priority Care Pharmacy 2") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 4330 Highway 78 East 109, Jasper, Alabama 35501.  Priority Care Pharmacy 2 is owned by or otherwise affiliated with PHC.

29.     Defendant Jasper Express Care Pharmacy, LLC ("Jasper Express Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 4330 Highway 78 East 109, Jasper, Alabama 35501. Jasper Express Care Pharmacy is owned by or otherwise affiliated with PHC.

30.     Defendant Bowie's Priority Care Pharmacy, LLC d/b/a Bowie's Discount Pharmacy ("Bowie's Priority Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 5100 Curry Highway, Jasper, Alabama 35503.  Bowie's Priority Care Pharmacy is owned by or otherwise affiliated with PHC.

31.     Defendant Bowie's Express Care Pharmacy, LLC ("Bowie's Express Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 5100 Curry Highway, Jasper, Alabama 35503.  Bowie's Express Care Pharmacy is owned by or otherwise affiliated with PHC.

32.     Defendant B & K Priority Care Pharmacy, LLC ("B & K Priority Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 6735 Deerfoot Parkway Suite 101, Pinson, Alabama 35126.  B & K Priority Care Pharmacy is owned by or otherwise affiliated with PHC.

33.     Defendant B & K Express Care Pharmacy, LLC ("B & K Express Care Pharmacy") is a limited liability company organized under the laws of the State of Delaware,

with its principal place of business at 6735 Deerfoot Parkway Suite 101, Pinson, Alabama

35126. B & K Express Care Pharmacy is owned by or otherwise affiliated with PHC.

34. Defendant Tombigbee Pharmacy, LLC ("Tombigbee Pharmacy") is a limited

liability company organized under the laws of the State of Delaware, with its principal place of

business at 100 Main Street North, Amory, Mississippi 38821. Tombigbee Pharmacy is owned

by or otherwise affiliated with PHC.

35. Defendant Main Street Drugs, LLC ("Main Street Drugs") is a limited liability

company organized under the laws of the State of Delaware, with its principal place of business

at 417 Main Street South, Amory, Mississippi 38821. Main Street Drugs is owned by or

otherwise affiliated with PHC.

36. Defendant Medical Park Pharmacy, Inc. ("Medical Park Pharmacy") is a

corporation organized under the laws of the State of Alabama, with its principal place of business

at 1623 21st Court, Phenix City, Alabama 36867. Medical Park Pharmacy is affiliated with

PHC.

37. Defendant Medical Park Discount Pharmacy, LLC ("Medical Park Discount

Pharmacy"), is a limited liability company organized under the laws of the State of Alabama,

with its principal place of business at 1623 21st Court, Phenix City, Alabama 36867. Medical

Park Pharmacy is owned by or otherwise affiliated with PHC.

38. Defendant Burns Drugstore, Inc. ("Burns Drugstore") is a corporation organized

under the laws of the State of Arkansas, with its principal place of business at 615 W

Commercial Street, Ozark, Arkansas 72949. Burns Drugstore is affiliated with PHC.

39. Defendant Burns Discount Drug Store LLC ("Burns Discount Drug Delaware") is

a limited liability company organized under the laws of the State of Delaware, with its principal

place of business at 615 W Commercial Street, Ozark, Arkansas 72949.  Burns Discount Drug

Delaware is owned by or otherwise affiliated with PHC.

40.     Defendant Burns Discount Drug Store LLC ("Burns Discount Drug Arkansas") is

a corporation organized under the laws of the State of Arkansas, with its principal place of

business at 615 W Commercial Street, Ozark, Arkansas 72949.  Burns Discount Drug Arkansas

is owned by or otherwise affiliated with PHC.

41.     Defendant Ozark Family Pharmacy LLC ("Ozark Family Pharmacy Delaware") is

a limited liability company organized under the laws of the State of Delaware, with its principal

place of business at 101 South 7th Street, Ozark, Arkansas 72949.  Ozark Family Pharmacy

Delaware is owned by or otherwise affiliated with PHC.

42.     Defendant Ozark Family Pharmacy LLC ("Ozark Family Pharmacy Arkansas") is

a limited liability company organized under the laws of the State of Arkansas, with its principal

place of business at 101 South 7th Street, Ozark, Arkansas 72949.  Ozark Family Pharmacy

Arkansas is owned by or otherwise affiliated with PHC.

43.     Defendant Medpoint Advantage, LLC ("Medpoint Advantage") is a limited

liability company organized under the laws of the state of Delaware, with its principal place of

business at 1006 Third Street North, Amory, Mississippi 38821.  Medpoint Advantage is

affiliated with PHC.

44.     Medpoint Pharmacy Benefit Managers, LLC d/b/a Medpoint Pharmacy

("Medpoint Pharmacy") was a limited liability company organized under the laws of the state of

Alabama, with its principal place of business at 211 10th Avenue North, Amory Mississippi

38821.  Medpoint Pharmacy was managed by Defendants Konie Minga and Kimberly Carson.

Medpoint Pharmacy merged into Defendant Priority Care Pharmacy Solutions, LLC on July 1,

2014.

45.     The Defendants identified in paragraphs 16-44 above will be referred to as the "Corporate Defendants."

46.     Defendant Konie Minga is a Mississippi citizen residing in Amory, Mississippi. Konie Minga is President and CFO of Priority Healthcare Corporation and the owner and President of record of most of the Priority Care pharmacies.  Konie Minga is married to Defendant Phillip Anthony Minga.

47.     Defendant Phillip Anthony Minga is a Mississippi citizen residing in Amory, Mississippi.  Phillip Minga is Marketing Director at Medpoint Advantage and oversees, supervises, and/or directs the affairs of PHC and the Priority Care enterprise.  Phillip Minga is married to Defendant Konie Minga.

48.     Defendant Wesley Minga is a Mississippi citizen residing in Saltillo, Mississippi. Wesley Minga oversees, supervises, and/or directs shipping and warehousing operations at PHC. Wesley Minga is a son of Defendants Phillip Minga and Konie Minga.

49.     Defendant Christopher Daniel Knotts is a Mississippi citizen residing in Amory, Mississippi.  Mr. Knotts oversees, supervises, and/or directs shipping and warehousing operations at PHC.  Mr. Knotts is a son-in-law of Defendants Phillip Minga and Konie Minga.

50.     Defendant Daniel Baker is an Alabama citizen residing in Hoover, Alabama.  Mr. Baker is the Director of Amory Discount Pharmacy.  Mr. Baker is the son-in-law of Defendants Phillip Minga and Konie Minga.

51.     Defendant William H. Austin is a Mississippi citizen residing in Tupelo, Mississippi.  Mr. Austin is the Director of Pharmacy Services at PHC.  Mr. Austin is also identified as the Director of Amory Priority Care Pharmacy, Jasper Express Care Pharmacy, Carbon Hill Express Care Pharmacy, Bowie's Priority Care Pharmacy, Bowie's Express Care Pharmacy, B & K Express Care Pharmacy, Tombigbee Pharmacy and Main Street Drugs.

52.     Defendant Samuel Phillip Carson is a Mississippi citizen residing in Aberdeen, Mississippi.  Mr. Carson was Director of Pharmacy Services at Priority Healthcare Corporation until 2015.  Mr. Carson is identified as Pharmacist/Director of Pharmacy for Priority Care Pharmacy, LLC, the Director of Pharmacy Services for Priority Care Pharmacy Solutions,, and the Pharmacist/Manager for Medpoint Pharmacy.  Mr. Carson is married to Defendant Kimberly P. Carson.

53.     Defendant Kimberly P. Carson is a Mississippi citizen residing in Aberdeen, Mississippi.  Kimberly Carson co-founded PHC and served as its Vice President and Treasurer. Kimberly Carson is or was the Managing Member of Priority Care Medical Supply.  Kimberly Carson is married to Defendant Samuel Phillip Carson.

54.     Defendant Geneva Oswalt is a Mississippi citizen residing in Smithville, Mississippi.  Ms. Oswalt is Chief Operations Officer of Medpoint Advantage and the Director of Burns Discount Drug Store Arkansas and Ozark Family Pharmacy Arkansas.

55.     Defendant Melissa "Missy" Sheffield is a Mississippi citizen residing in Mantachie, Mississippi.  Ms. Sheffield is the Chief Operating Officer of PHC.

56.     Defendant Ashley Tigrett is a Mississippi citizen residing in Van Buren, Mississippi.  Ms. Tigrett is the Director of Quality Assurance, Licensing, and Credentialing at PHC.

## JURISDICTION AND VENUE

57.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1).

58.     The amount of damages at issue exceeds $75,000, exclusive of interest and costs.

59.     The Court has personal jurisdiction over the Defendants because Defendants have their principal place of business in Alabama; own or exercise control over businesses operating

in Alabama; perpetrate fraudulent activities in, and through businesses operating in, Alabama; and/or knowingly participate in a fraudulent scheme employing pharmacies and pharmacists operating in Alabama.

60.     Venue is proper in the Northern District of Alabama pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims occurred in this district, and Defendants are subject to personal jurisdiction in this district.

### FACTS COMMON TO ALL CLAIMS

**Roche's Blood Glucose Test Strips and How They Are Paid For**

61.     Roche is one of the leading manufacturers of blood-glucose test strips. Millions of people with diabetes depend on Roche's test strips to monitor their blood sugar. Diabetes patients use Roche's test strips by placing a drop of blood on a strip and inserting the strip into a meter, which provides a blood glucose reading.

62.     The vast majority of Roche's blood-glucose test strips dispensed in the United States are covered by health insurance or government programs. In the U.S., there are two major ways that health insurance pays for test strips. A very common type of insurance for test strips is pharmacy benefit insurance, the same type of coverage used for prescription drugs. Pharmacy benefit insurance covers retail test strips. The other major way insurers cover test strips is through a medical benefit, sometimes known as durable medical equipment (DME) benefit, the type of insurance used to cover medical devices such as wheelchairs and catheters. Retail pharmacies do not dispense test strips covered by non-governmental medical benefits. Rather, test strips covered by non-governmental medical benefits are distributed by providers, typically mail-order distributors, under special contracts with Roche. As explained below, Roche's pricing for its retail strips varies from its pricing for test strips covered by a medical benefit.

63.     Roche test strips that are intended for sale at retail pharmacies are distinct products, with different packaging and product identifying codes, than test strips that are intended for sale by mail order, or otherwise not-for-retail sale, to medical-benefit beneficiaries. The practice of having distinct packaging and product codes for retail and not-for-retail-sale test strips is common throughout the diabetes care industry.

64.     Roche does not ordinarily sell its retail (*i.e.*, pharmacy-bound) blood-glucose test strips directly to independent pharmacies, but rather sells them to wholesalers.  The wholesalers sell them to pharmacies, who in turn dispense them to diabetes patients.  When the strips are dispensed to patients in a retail pharmacy setting, they are almost always paid for by health insurance under a pharmacy benefit.

65.     Pharmacies that dispense test strips to patients receive reimbursement directly from the payer, such as a health insurance company or its pharmacy benefit manager (PBM).  In order to receive payment from an insurance company or PBM for a box of test strips that it has dispensed, a pharmacy must submit an insurance claim.  The processing of insurance claims for covered products is known as adjudication.

66.     Insurance claims must include sufficient information to show that the patient that received the box, and the product they received, are both covered by the relevant insurance policy under a pharmacy benefit.  Insurance claims include information about the patient, the prescriber, the pharmacy that dispensed the product, the date on which the product was dispensed, and the specific product that the patient received.  The product that is dispensed is identified by a unique code, known as a National Drug Code (NDC).  Roche's retail blood-glucose test strips, intended for sale in pharmacies, have different NDC numbers than their not-for-retail-sale test strips, intended for sale to patients with medical-benefit insurance.

67.     The prices that wholesalers pay to Roche for retail test strips, and the

13

reimbursement rates that insurance companies pay to the pharmacies under pharmacy-benefit insurance plans, are substantially higher than the net price Roche receives for the test strips.  The difference is made up by rebates and administrative fees that Roche pays to the health insurance companies that pay for the strips (or to their PBMs).  This system is not unique to Roche.  Most major manufacturers of name-brand test strips provide sizeable back-end rebates to insurance companies and PBMs for test strips paid for by pharmacy-benefit plans.

68.     In order to process rebates, Roche receives detailed information from PBMs and insurers about the insurance claims that pharmacies submit for its retail products.  For every box of Roche-brand test strips that is adjudicated by a pharmacy, Roche receives information from the insurance company or PBM that paid for the retail test strips.  Upon receiving this adjudication information, Roche pays rebates in accordance with the terms of its contracts with insurance companies and PBMs.

69.     Roche does not receive adjudication data from payers in real time.  Rather, payers provide this information to Roche in batches, typically months after the insurance claims are submitted and reimbursements paid.

70.     Roche's boxes of mail order and other not-for-retail-sale test strips have unique NDC numbers and sell to wholesalers under contract.  Roche does not pay rebates to insurance companies for not-for-retail-sale test strips.

**Insurance Fraud in the Test-Strip Market**

71.     As alleged above, the practice of paying rebates to PBMs and insurers is widespread in the blood-glucose test strip industry.  Unfortunately, dishonest pharmacies that are willing to commit fraud can take advantage of this practice to reap tremendous illegitimate profits.

72.     One way to exploit this practice through fraud is by dispensing blood-glucose test

strips that are not intended for retail sale and then submitting them for reimbursement as retail strips.  Not-for-retail-sale test strips are not eligible for rebates from PBMs and insurers and therefore sell for lower prices that do not reflect the rebates paid for retail test strips.  By dispensing these not-for-retail-sale test strips and submitting false insurance claims for retail strips, unscrupulous pharmacies can receive the higher insurance reimbursement rates for retail strips without paying the correspondingly higher price to obtain the strips.

73.     Another means by which dishonest pharmacies can reap fraudulent profits is by obtaining cheaper non-Roche-brand blood-glucose test strips at wholesale prices that are substantially lower than the pre-rebate list prices for name-brand retail test strips such as Roche's.  A pharmacy that is willing to dispense a cheaper non-Roche-brand product to the patient but submit a false insurance claim for a Roche product can gain large profits on every sale of test strips.  ]

74.     Pharmacies may also realize illegitimate profits by submitting a claim for and receiving reimbursement for a sale of a box or boxes of brand-name retail test strips when in fact they have dispensed no test strips at all.  Similarly, a pharmacy may submit a false insurance claim for a larger number of retail test strips than it actually dispenses to a patient, thereby inflating the amount of reimbursement it receives.  In either case, the pharmacy is committing fraud.

**The Priority Care Enterprise**

75.     Priority Care is an association of pharmacies with overlapping ownership and officers that are located—either physically or nominally—in Alabama or Mississippi, with a recent outpost in Arkansas.  The Priority Care enterprise encompasses both brick-and-mortar storefront pharmacies, which service local patients and walk-in customers, as well as entities whose business exists only on paper, only nominally occupying a physical address.

15

76.     Defendant Priority Healthcare Corporation (PHC)—a Delaware holding company wholly owned by Defendant Konie Minga—lies at the heart of the Priority Care enterprise.  PHC employs senior officers and supervisors, and owns or is affiliated with the Priority Care pharmacies that submit insurance claims.  PHC was founded in 2014 by Defendants Konie Minga and Kimberly Carson, who were its initial co-owners.

77.     Neither Konie Minga nor Kimberly Carson had any prior business experience or relevant background, education, or expertise in the health care, pharmaceutical, or insurance industries.  Their husbands, Defendants Phillip Minga and Samuel Phillip Carson, did have experience in these industries, and actively participated in the management of PHC, but chose not to affiliate their names with the company.  Konie Minga now directly or indirectly owns most of the entities constituting the Priority Care enterprise.

78.     Although the registered address of PHC is 1678 Montgomery Highway Suite 344, Birmingham, Alabama 35216, a mailbox rented by Konie Minga at a strip-mall UPS Store, PHC actually operates out of offices and an adjacent mail-order storage and fulfillment complex located in Amory, Mississippi.  Its officers, employees, and decision-makers, including many of the individual Defendants, maintain or maintained offices and workplaces there.

79.     In addition to PHC, the Priority Care enterprise includes a number of storefront pharmacies, as well as shell pharmacies that have only a corporate form, a mailing address, and a license to dispense blood-glucose test strips.  As described in more detail below, the storefront pharmacies and the shell entities both serve as fronts for a massive mail-order operation and insurance billing mill that operates out of the Amory, Mississippi premises of PHC.

**Priority Care's Storefront Pharmacies**

80.     Beginning in 2014, PHC and/or Konie Minga purchased existing, but generally unsuccessful, brick-and-mortar storefront pharmacies in Mississippi and Alabama.  PHC's

16

officers exercise ultimate supervisory authority over pharmacists and other employees at these storefront pharmacies.   Despite common ownership and shared officers, each Priority Care pharmacy is a separate and distinct limited liability company or corporation.

81.     The Priority Care storefront pharmacies are set up to resemble independent pharmacies.  Each has a separate bank account.  Each places its own orders for prescription drugs and retail products it sells over the counter, and purchases them from distributors of its choosing. Each receives its own shipments, and—with the exception of diabetes supplies—each manages its own inventory.  Each has its own relationships with PBMs and a distinct customer base, to which it tailors its selections of products.

82.     The Priority Care storefront pharmacies were ordinary independent pharmacies serving local communities before they were acquired by Konie Minga and/or PHC and absorbed into the Priority Care enterprise.  For example, what is now Vincent Priority Care Pharmacy operated as "Vincent Pharmacy, Inc.," an Alabama corporation, from 1996 until 2015, when it was acquired by PHC and/or Konie Minga.  Likewise, "Bowie's Discount Pharmacy," an Alabama sole proprietorship, had operated in Jasper, Alabama for almost forty years before being acquired by PHC in 2016 and reorganized as Bowie's Priority Care Pharmacy.  Similarly, "Vickers Pharmacy, Inc.," an Alabama corporation, operated in Jasper, Alabama from 1987 until 2016, when its pharmacy was acquired and became Vickers Priority Care Pharmacy.

83.     Unlike legitimate pharmacy networks, which typically seek co-promotional and synergistic benefits by advertising the scope of their network, there is nowhere publicly available a list of Priority Care storefront pharmacies, let alone a longer list of all the Priority Care enterprise's affiliates.  The website associated with the Priority Care Network, "prioritycarerx.net," is "Under Construction," and there is no record of any content having ever been hosted there.  While many of the Priority Care pharmacies have individual Facebook pages,

none advertises their affiliation with the other pharmacies, and the individual pharmacies' websites all display error messages.

84.    The reason the Priority Care storefront pharmacies do not hold themselves out as a network of pharmacies is that their true purpose is to operate as surreptitious fronts for the mail-order and billing operation of PHC in Amory, Mississippi.  Although the storefront pharmacies do sell products to local customers, their everyday pharmacy business is not profitable.  The way they earn their profits is by signing off on thousands of prescriptions for blood-glucose test strips supplied to them by the Priority Care enterprise's headquarters in Mississippi.

85.    In sworn testimony, pharmacists from Alabama-based Priority Care pharmacies estimated that, on an average day, they dispense approximately 100 to 120 total prescriptions to local customers.  This number is for the aggregate total of all prescriptions, including prescription drugs.  It includes only a negligible number of blood-glucose test strips.

86.    Meanwhile, however, each of the Priority Care storefront pharmacies allows its name to be used on thousands of insurance claims for blood-glucose test strips that are prepared and submitted from Amory, Mississippi.  The pharmacists at the local Priority Care pharmacies never see what, if any, products are actually shipped to patients under their name, and have no way of verifying what those products are.

87.    The amount of local business conducted by the Priority Care pharmacies pales in comparison to amount of business they transact through the Priority Care enterprise.  For example, in 2014, what was then Vincent Pharmacy, Inc. purchased 28 boxes of Roche's retail test strips from authorized distributors and adjudicated claims for 20 boxes of retail strips.  In 2015, after being acquired by Priority Care, the newly christened Vincent Priority Care Pharmacy adjudicated claims for nearly *28,000* boxes of Roche's retail test strips—over a

thousand-fold increase in adjudications, and a number 14 times the population of Vincent, Alabama.

88.     Three Alabama-based Priority Care pharmacists deposed by Roche described the procedure that their pharmacies followed with respect to test strips.  Defendants' test strip scheme relies upon a practice they call "central filling."  Amory-based PHC pharmacy technicians upload digitized copies of test-strip prescriptions to a centralized database.  These employees then transmit by e-mail or fax a list of mail-order prescriptions to Priority Care pharmacists for each pharmacist to "check" by accessing the database.

89.     The storefront pharmacists do little more than review the uploaded prescription to verify that the information entered in Amory appears complete.  Lewis Hobbs, pharmacist at Defendant Vincent Priority Care Pharmacy, considered this process "quality control."  Once the review is complete, the pharmacists indicate in the database that they have checked and approved the prescription.  The pharmacists' approval confirms only that the data appears superficially correct.  At no time do the pharmacists independently verify the identity of the patients or doctors on the prescriptions, nor do they verify what, if anything, is ultimately shipped to the patients.

90.     Once the pharmacists approve a prescription, pharmacists and/or pharmacy technicians in PHC's Amory fulfillment facility individually affix a label to the box or boxes of test strips to be shipped to the patient.  Although the test strips shipment is packaged in and shipped from Amory, the PHC employees apply labels showing the reviewing storefront pharmacist's initials and the storefront pharmacy's name and address, and apply a return address label with the storefront pharmacy's address.  Pharmacists Keith Hobbs and Lisa Waters reported that, for this reason, Vincent Priority Care Pharmacy and Vickers Priority Care Pharmacy would receive returned test strip shipments when patients refused orders or were not home at the time of

delivery.  They testified that they would typically return these boxes to Mississippi without opening them.

91.     Despite the fact that the storefront pharmacists did little more than eyeball digitized documents sent to them from the Priority Care enterprise's Mississippi headquarters, the claims submitted to insurance companies (and later provided to Roche) indicate that the prescriptions are filled by the individual Priority Care pharmacies.  The claims give no indication that PHC or Priority Care's Amory, Mississippi operation is involved in any way.

92.     It is unknown what the boxes packaged and shipped from Amory, Mississippi actually contained.  As set forth below, however, it is clear that the vast majority of patients whose insurance was billed for Roche retail test strips did not in fact receive those test strips and a substantial majority apparently did not receive any Roche test strips at all.

93.     The process of distributing lists of prescriptions from Amory, Mississippi to the Priority Care storefront pharmacies and fulfilling those prescriptions from Amory is formally overseen, supervised, and/or directed by PHC's Director of Pharmacy Services.  Defendant Samuel Phillip Carson was PHC's Director of Pharmacy Services until 2015.  Defendant William Austin is the PHC's current Director of Pharmacy Services.  Defendant Melissa "Missy" Sheffield assists in the above-described process.

**Priority Care's Shell Pharmacies**

94.     In addition to using storefront pharmacies as fronts for its mail-order adjudications, the Priority Care enterprise also uses shell pharmacies with no independent existence to fuel its Amory, Mississippi billing mill and conceal the scope of its fraudulent scheme.

95.     PHC periodically establishes new Delaware limited liability companies and—as it does with its storefront pharmacies—registers them as health care providers with the Center for

Medicare and Medicaid Services (CMS), thereby obtaining for each a unique National Provider Identifier (NPI). Each of these companies is registered with an NPI taxonomic code indicating the category of health care provider. None is registered as a "mail-order pharmacy," although such a code exists. Priority Healthcare also registers shell companies with the National Council for Prescription Drug Programs (NCPDP), obtaining a unique NCPDP ID number.

96.     NPI and NCPDP numbers are used to identify health care providers in their interactions with insurance companies and claims processors, including when adjudicating claims. Manufacturers like Roche also use these numbers to identify entities that acquire and dispense their products.

97.     A number of the companies established by Priority Care have their own NPI and/or NCPDP numbers, but are in fact shell entities with no on-the-ground business presence. For example, a single building located at 1600 Highland Drive in Amory, Mississippi is the registered address of four entities within the Priority Care enterprise, each with its own NPI and NCPDP numbers: Defendants Priority Care Pharmacy, Priority Care Pharmacy Services, and Amory Priority Care Pharmacy, as well as Priority Express Care Pharmacy, LLC.[1] Although that structure is not subdivided into suites, two of the entities, Priority Care Pharmacy Services and Priority Express Care Pharmacy, are registered as occupying "1600 Highland Drive, _Suite A_."

98.     Similarly, two different Priority Care entities, B & K Priority Care Pharmacy and B & K Express Care Pharmacy have registered addresses of "6735 Deerfoot Parkway, Suite 101" and "6735 Deerfoot Parkway, Suite _A_-101," respectively. Likewise, Vickers Priority Care Pharmacy and Carbon Hill Express Care Pharmacy have NPI registered addresses of "31040

---

[1] One of the entities located at 1600 Highland Drive does not appear to exist as an independent legal entity. Although it has registered NPI and NCPDP numbers and submits insurance claims for test strips, Priority Express Care Pharmacy, LLC does not exist as a valid limited liability company or corporate entity of any state.

Northeast First Avenue NE Ste 5" and "31040 First Avenue NE Ste _A_-5"; and Vincent Priority Care Pharmacy and Vincent Express Care Pharmacy have NPI registered addresses of "42747 Highway 25" and "42747 Highway 25, _Ste A_."

99.     Roger Hall, pharmacist at Priority Care Pharmacy 2—which has an address of 4330 Hwy 78 E 109 in Jasper, Alabama—testified that he has never heard of Jasper Express Care Pharmacy, which nominally operates at 4330 Highway 78 E Ste 109_A_.  A third Priority Care entity, Priority Care Medical Supply, is also registered with the Alabama Board of Home Medical Equipment with the address of 4330 Highway 78 East, Ste 109, despite having an NPI registered at a Mississippi address—1600 Highland Drive _Suite B_, Amory, Mississippi.

100.    The mailing address of Priority Care Pharmacy Solutions, another Priority Care entity that has submitted insurance claims for retail test strips, is in fact the address of PHC's mail-order storage and fulfillment center: 211 10th Avenue North in Amory, Mississippi.  This was also the registered address of Defendant Medpoint Pharmacy until it was merged into Priority Care Pharmacy Solutions.  Konie Minga, the nominal owner of PHC, admits that there is not and never has been a pharmacy at that location.  Yet Priority Care Pharmacy Solutions is registered with the NPI taxonomic code corresponding to a "Retail/Community Pharmacy," defined as "a pharmacy where pharmacists store, prepare, and dispense medicinal preparations and/or prescriptions for a local patient population[,] . . . counsel patients and caregivers; administer vaccinations; and provide other professional services associated with pharmaceutical care such as health screenings . . . and education classes."

**Medpoint Advantage LLC**

101.    Although it is impossible to ascertain without discovery exactly how the Priority Care enterprise obtains the prescriptions that it fraudulently fulfills, Defendant Medpoint Advantage, a Priority Care-affiliated company, appears to be involved in obtaining patients for

the Priority Care enterprise.

102.    The Amory offices occupied by PHC are also used by Medpoint Advantage, which has its own employees and officers.  The signs in front of those offices and the adjacent mail-order fulfillment facility say "Medpoint."

103.    Medpoint Advantage maintains a website offering a "$0 Premium Special Needs Diabetic Plan Available in ALL States, in ALL Counties!"  The website advertises, *inter alia*, "no cost to enroll in the plan," "no plan premiums," "no up-front cost for supplies," "no cost for shipping," "no deductibles," "no co-insurance," and "no out of pocket cost."  The only eligibility requirements are that the patient, "by doctors orders, [is] required to check their blood glucose level and [has] Medicare or Medicaid," but of course those with "Medicare Advantage Plans and private insurance are also eligible to enroll."  Signing up for Medpoint Advantage requires little more than providing basic prescription and insurance information and a prescribing doctor's name and contact information.  Medpoint Advantage also maintains a toll-free telephone number staffed by live operators.

104.    None of the Priority Care pharmacists Roche deposed were able to identify where the thousands of diabetes test strips prescriptions purportedly filled daily by the Priority Care pharmacies actually came from.  Even Konie Minga—the owner, President and CFO of PHC and most of its related entities—was unable to say where they came from.  None were aware of print, radio, or television advertising or recruiting campaigns aimed at either patients or prescribers.

105.    Upon information and belief, at least some of the prescriptions filled and fraudulently adjudicated by the Priority Care enterprise are the result of Medpoint Advantage's recruitment efforts.

**The Priority Care Enterprise's Fraudulent Insurance Claims**

106.    Using the names and credentials of its storefront and shell pharmacies, the

Priority Care enterprise has submitted hundreds of thousands of false insurance claims for Roche blood-glucose test strips.

107.   Since 2013, entities within the Priority Care enterprise have submitted insurance claims for more than 779,000 fifty-count equivalent[2] boxes of retail blood-glucose test strips manufactured by Roche.  The claims were prepared, reviewed, or submitted from Alabama and Mississippi, to insurance companies or PBMs located in a number of different U.S. States.

108.   In each insurance claim, the Priority Care enterprise represented that a box or boxes of Roche-made retail test strips had been dispensed to a patient with insurance.  The claims identified the specific product that had been dispensed according to its unique NDC code. In reliance on these representations, various insurance companies and PBMs reimbursed Priority Care according to their reimbursement rate for retail test strips.  In most cases, Roche then proceeded to rely on Priority Care's representations by paying rebates to the insurance companies and PBMs.

109.   Through the first quarter of 2018, Roche paid more than $37.5 million in rebates to insurance companies and PBMs in reliance on insurance claims submitted by the Priority Care enterprise.  On information and belief, Priority Care received insurance reimbursements for Roche test strips totaling substantially more than that during the same time period.

110.   Unfortunately, the vast majority of the Priority Care enterprise's insurance claims were fraudulent.  As set forth in more detail below, Priority Care recently produced all of its invoices, from any source, for the purchase of Roche test strips.  Although Priority Care represented to insurance companies that its affiliated pharmacies had dispensed nearly 800,000 fifty-count boxes of retail test strips, Priority Care's records indicate that it purchased fewer than

_____

[2] Some of the boxes were 100-count boxes, which cost about twice as much as a 50-count box.  For simplicity, 100-count boxes will be treated as two 50-count-equivalent boxes.  For the remainder of the complaint, 50-count equivalent boxes will simply be referred to as 50-count boxes.

70,000 fifty-count boxes of retail strips.

111.     In other words, available data indicates that approximately 700,000 of the insurance claims the Priority Care enterprise made for Roche retail strips are fraudulent.  With respect to those claims, Priority Care represented that it dispensed Roche's retail strips, but in fact it never had any such products to dispense.

112.     Roche does not know exactly what, if anything, was actually dispensed to patients in connection with Priority Care's false insurance claims.  As set forth below, some patients apparently received not-for-retail-sale Roche products, which have different packaging from and bear different NDC numbers than retail strips.  The adjudication of not-for-retail-sale Roche test strips as retail test strips constitutes fraud because it requires falsely representing to insurance companies or to PBMs that a product bearing a retail NDC number has been dispensed.

113.     But the false adjudication of not-for-retail-sale Roche test strips as retail test strips explains only a fraction of Priority Care's retail adjudications.  Priority Care submitted substantially more insurance claims for retail Roche test strips than its total purchases of Roche test strips of any kind—retail or not-for-retail-sale.  Hundreds of thousands of Priority Care's insurance claims for Roche test strips remain completely unexplained.

**Roche's Subpoenas and Investigation Into Priority Care's Fraud**

114.     In May, June, and August-2017, in connection with the separate action filed in Indiana federal court, Roche served third-party subpoenas *duces tecum* on a number of Priority Care entities seeking records of their purchases and sales of Roche test strips.  Specifically, the entities served were PHC, Vickers Priority Care Pharmacy, Vincent Priority Care Pharmacy, Priority Care Pharmacy, Priority Care Pharmacy Services, Priority Care Pharmacy Solutions, Priority Care Pharmacy 2, and Priority Care Pharmacy at Cotton Gin Point. None of these entities responded to Roche's subpoenas.

115.    After a series of follow-up letters, Roche finally received from each pharmacy entity an identical letter stating that the entity "[d]oes not have a contract, agreement or documents to produce with regards to [a defendant in the Indiana Action], Roche Diagnostics Corp., or Roche Diabetes Care, Inc."  These letters were unresponsive to the subpoenas, as Roche's subpoenas were not limited to documents evidencing a direct relationship between Priority Care and the Indiana defendants.

116.    Roche served a second set of subpoenas on February 8, 2018 seeking sales records and correspondence, noting that the Priority Care entities' previous response was "irrelevant and unacceptable."  Priority Care pharmacists Keith Hobbs and Roger Hall testified that they received these subpoenas and promptly sent them to Defendants William Austin, Melissa "Missy" Sheffield, and/or Phillip Minga.  Nonetheless, Roche received no response to the subpoenas.

117.    After notifying the subpoenaed entities of its intention to do so, again with no response, Roche moved on April 4, 2018 to compel compliance with its subpoenas in this Court and the Northern District of Mississippi.  The Priority Care entities did not respond to Roche's motions.  The motions were granted as to the Alabama entities by the Court's Orders of April 4 and 7, 2018, and the Alabama entities were compelled to produce documents by April 17, 2018.  After the entities failed to comply with these Orders, Roche moved for contempt, and the Court set a show-cause hearing date of May 10, 2018.[3]

118.    In response to the order to show cause, the subpoenaed Alabama Priority Care entities submitted letters to the Court postmarked May 1, 2018, which they asserted had been "mailed on April 10, 2018."  The Priority Care entities did not state to whom the letters had

---

[3] The Mississippi entities were directed by the Mississippi court to respond to Roche's motion to compel, but never did so.  Roche's motion to compel against those entities was subsequently granted by that court.

allegedly been mailed and Roche has no record of receiving them.  These letters stated:

"Respectfully in response to the Order, [the relevant Priority Care entity] has researched all

records and does not have any documents to produce relating to Roche Diagnostic Corp., Roche

Diabetes Care, Inc., [or the Indiana Action defendants].  [The Indiana Defendants] are unknown

to [the relevant Priority Care entity] which does not have any contract or agreement with Roche

Diagnostic Corp., or Roche Diabetes Care, Inc."  The Alabama-based pharmacies' letters were

sent to the Court in envelopes with each pharmacy's Alabama return address, but all were

postmarked Tupelo, Mississippi.  The Priority Care entities then failed to appear at the May 10,

2018 contempt hearing.

119.    Noting that the second statement was "non-responsive to the actual request

covered by the subpoena . . . despite the court's order directing it to respond" and that "Priority

Care failed to appear for the show cause hearing, . . . cho[osing] instead to again ignore the

court's order," the Court granted Roche's motion for sanctions on May 11, 2018, imposing a

daily fine of $1,000 and awarding attorney's fees incurred in prosecuting the Alabama motions.

Priority Care pharmacists Keith Hobbs, Roger Hall, and Lisa Waters all confirmed that they

received a copy of this Order, and that they promptly forwarded it to individual Defendants

William Austin, Melissa "Missy" Sheffield, and/or Phillip Minga.

120.    Nevertheless, it was not until June 27, 2018 that Defendants made a production of

documents sought by the subpoena, providing invoices reflecting Priority Care's purchases of

Roche test strips.  To date, the Priority Care entities have still not fully complied with the

subpoenas.  They have produced invoices but have produced no records of their sales or their

correspondence, as they were ordered to do.

**Priority Care's Invoices Account for Only a Small Fraction of Their Insurance Claims**

121.    The invoices produced by the Priority Care entities demonstrate that the Priority Care enterprise purchased only a small fraction of the Roche-brand retail products for which it submitted insurance claims.

122.    The invoices show that between July 2014 and the present, the Priority Care enterprise purchased only 67,479 fifty-count boxes of retail blood-glucose test strips.[4]  From July 2014 through the first quarter of 2018, Priority Care submitted insurance claims for more than 771,000 fifty-count boxes of Roche retail products.

123.    In addition to invoices for Roche's retail test strips, Priority Care also produced invoices for Roche's not-for-retail-sale test strips, and for test strips that did not indicate whether they were retail or not-for-retail-sale.  In particular, Priority Care produced invoices indicating that since July 2014 it purchased 45,080 fifty-count boxes of Roche not-for-retail-sale test strips, and 32,013 boxes of Roche test strips that were not designated as retail or not-for-retail-sale.

124.    In total, the invoices produced by Priority Care indicate that it purchased a total of 144,572 fifty-count boxes of Roche test strips of any kind between July 2014 and the present— retail (67,479), not-for-retail-sale (45,080), or unknown (32,013).

125.    As alleged above, dispensing not-for-retail-sale strips but submitting insurance claims for retail strips constitutes fraud, because it requires falsifying the NDC number of the product that was dispensed.  Even if all the not-for-retail-sale or unspecified test strips were adjudicated as retail strips, however, there is a still a very large discrepancy between the number of retail strips Priority Care adjudicated and the total number of Roche strips it purchased.  More than 600,000 retail adjudications cannot be explained by the invoices Priority Care produced.

---

[4] Data in Roche's possession indicate that Priority Care also purchased approximately 6,000 25-count boxes of retail test strips (3,000 50-count equivalents) during that time period.  However, Priority Care submitted only a negligible number of insurance claims—fewer than 10—for 25-count boxes.

**Priority Care's Direct Mail-Order Purchases from Roche**

126.    In addition to having a number of pharmacies, the Priority Care enterprise also has what it holds out as a mail-order test strip business, believed to be run through Defendant Priority Care Medical Supply.  Pursuant to a contract negotiated by Defendant Phillip Minga and signed in March 2016 by Defendant Konie Minga on behalf of PHC, Roche shipped approximately 157,680 boxes of not-for-retail-sale test strips to Priority Care in 2016.  These test strips were not included in the invoices that Priority Care produced pursuant to Roche's subpoenas.

127.    Upon information and belief, Priority Care falsely adjudicated some or all of these not-for-retail-sale test strips as retail test strips.  Even if Priority Care submitted false insurance claims for all of these not-for-retail-sale test strips, however, the majority of its retail adjudications would still remain unexplained.

128.    In order to prevent pharmacies from purchasing not-for-retail-sale, mail-order test strips and falsely adjudicating them as retail strips, Roche does not offer mail-order test strips for sale on an unrestricted basis.  Rather, Roche sells these products only to authorized customers (e.g. distributors) pursuant to contracts that strictly prohibit them from reselling or providing the products to anyone not approved by Roche.

129.    Roche's mail-order test strip contract with PHC was such a contract.  The contract required PHC to distribute mail-order, not-for-retail-sale test strips exclusively by mail to patients with insurance that covered test strips through a medical benefit.  It strictly prohibited selling the not-for-retail-sale test strips through pharmacies or dispensing them to patients whose insurance paid for test strips through a pharmacy benefit.

130.    In March 2016, soon after the execution of the contract, Roche reinforced to Defendant Phillip Minga the importance of selling not-for-retail-sale products only to medical-

benefit patients by mail order and not through retail pharmacies.  Phillip Minga responded that the understood the importance to Roche of "maintaining a separation" between not-for-retail-sale mail-order and retail product.

131.    Roche's mail-order test strip contract with PHC required PHC to submit detailed utilization reports to Roche.  Pursuant to the contract, PHC submitted data to Roche indicating that it had sold approximately 146,000 fifty-count boxes of mail-order test strips to patients covered by medical benefit insurance.  This constituted the vast majority of the 157,000 mail-order boxes that PHC purchased from Roche.

132.    Based on recently discovered information about the immense discrepancies between Priority Care's retail adjudications and its purchases of Roche test strips, it now appears that all or some of the mail-order products that Priority Care purchased directly from Roche in 2016 were falsely adjudicated as retail test strips.  Although Priority Care submitted data to Roche indicating otherwise, that data may have been falsified.

133.     Even if all the mail-order test strips purchased directly from Roche in 2016 were falsely adjudicated as retail strips, there is a still a very large discrepancy between the number of retail strips Priority Care adjudicated and the total number of Roche strips it purchased.  Priority Care's approximately 158,000 direct purchases of not-for-retail-sale mail-order test strips, added to the approximately 145,000 purchases of retail, not-for-retail-sale, or unknown test strips accounted for in its invoices, amount to a grand total of less than 303,000 Roche test strips purchased since July 2014.  But Priority Care submitted insurance claims for more than 771,000 retail Roche test strips during that time.

134.    Thus, if Priority Care gave fake data to Roche, and in fact falsely adjudicated all the mail-order test strips it purchased as retail test strips, more than 468,000 retail adjudications would still remain unaccounted for.  If, on the other hand, the mail-order products Priority Care

purchased directly from Roche were properly sold to patients with medical-benefit insurance, then those purchases do not explain Priority Care's retail adjudications, and the discrepancy between Priority Care's retail adjudications and its purchases of Roche products is even larger. Either way, Priority Care has engaged in massive fraud.

**Priority Care's Efforts to Hide Its Fraud**

135.    Beyond the massive discrepancy between the number of insurance claims it has submitted and the number of Roche products it has purchased, there are many additional indicators that Priority Care enterprise is involved in a massive insurance fraud scheme.  One of these is Priority Care's practice of continually phasing out old billing entities and opening new ones in an effort to hide its fraudulent activities from PBMs and Roche.

136.    In recent years, members of the Priority Care enterprise have been audited by major PBMs such as CVS/Caremark, OptumRx, and Humana.  As a result of discrepancies revealed by those audits, these PBMs have cut off those pharmacies, ceasing to reimburse them for prescriptions adjudicated at those locations.  Roche itself has also withheld rebates in connection with insurance claims submitted by known Priority Care affiliates.

137.    For example, in late 2017 and early 2018, CVS/Caremark's audit of claims adjudicated between October 1, 2016 and November 30, 2017 and attributed to Bowie's Priority Care Pharmacy discovered "[m]ember(s) [who] denied having received prescriptions billed to CVS Caremark Plan Sponsors" and "[b]illing for claims that are being compounded and dispensed out of a different location."  The audit found, all told, nearly $3.1 million in discrepant claims.

138.    Similarly, a pharmacist at a different Priority Care pharmacy, Roger Hall, testified that every PBM that had audited his pharmacy, Priority Care Pharmacy 2, cut off the pharmacy as a result of their findings.  He understood that they did not do so because of misconduct

involving, or discrepancies in, the prescriptions he had personally dispensed and filled at the brick-and-mortar location.  Rather, the PBMs' primary concern was "the mail-order business"— the dispensing of test strips out of Amory, Mississippi in the name of Priority Care Pharmacy 2.

139.     As a result of PBMs' audits, a number of Priority Care pharmacies, such as Vincent Priority Care Pharmacy, can no longer fill *any* prescriptions covered by pharmacy-benefit insurance plans that are serviced by Caremark, OptumRx, or Humana.  Losing the ability to fill prescriptions may mean that the pharmacy loses the business of local patients covered under those plans, and those patients lose the ability to shop at their preferred community pharmacy.

140.     Unlike the local patients serviced by Priority Care pharmacies, the much larger population of diabetes patients whose insurance is actually billed through Priority Care's Amory, Mississippi location but attributed to the pharmacies generally do not stop receiving supplies when a PBM cuts off a given pharmacy.  Instead, Priority Care simply assigns that patient to a different Priority Care pharmacy and continues to submit false insurance claims for that patient's test strips.

141.     Adjudication records that Roche receives from PBMs illustrate how claim submissions shift from Priority Care pharmacy to Priority Care pharmacy in a cat-and-mouse game with PBMs, and with Roche.  After Bowie's Priority Care Pharmacy was cut off by CVS/Caremark, and after Vickers Priority Care Pharmacy suffered a similar steep drop in the test strip prescriptions it billed, for example, the rate of adjudications at another Priority Care pharmacy, B & K Priority Care Pharmacy, skyrocketed.  Similarly, preliminary data from 2018 indicates that a steep drop in adjudications from B & K Priority Care Pharmacy was immediately followed by a surge in adjudications from Tombigbee Pharmacy, Main Street Drugs, and Medical Park Discount Pharmacy.

142.     Priority Care also appears to have switched billing entities in response to inquiries from Roche.  In late 2016, Roche ceased selling mail-order test strips to PHC based on concerns about Priority Care pharmacies' large number of retail adjudications.  These concerns were communicated to Priority Care.  On February 9 and 16, 2017, Roche sent letters challenging these adjudications to seven Priority Care entities: Priority Care Pharmacy, Priority Care Pharmacy Services, Priority Care Pharmacy Solutions, Priority Care Pharmacy 2, Priority Care Pharmacy at Cotton Gin Point, Vickers Priority Care Pharmacy, and Vincent Priority Care Pharmacy.  In these letters, Roche asserted that it believed that these entities were fraudulently adjudicating not-for-retail test strips as retail test strips.  Roche expressly informed Priority Care that it paid rebates to insurers and PBMs in connection with insurance claims for retail test strips, and that the fraudulent adjudication of retail test strips directly harmed Roche.

143.     Priority Care failed to respond to Roche's letters.  Around the same time, however, Priority Care created new billing entities to replace the entities that Roche had challenged.  A Delaware Certificate of Formation for Amory Priority Care Pharmacy was filed on February 10, 2017.  An NPI number had been established for Amory Priority Care Pharmacy on January 27, 2017, and one was established for "Priority Express Care Pharmacy, LLC" on February 15, 2017.  NCPDP numbers for both were created in March 2017.

144.     In April and May 2017, Priority Care Pharmacy Services and Priority Care Pharmacy LLC, both located at 1600 Highland Drive, Amory, Mississippi, ceased submitting insurance claims for retail test strips.  Immediately thereafter, in May 2017, the two recently-created entities, Amory Priority Care Pharmacy and Priority Express Care Pharmacy, LLC, both nominally located at the exact same address, began adjudicating claims at comparable volume.

145.     In an effort to perpetuate its fraud, Priority Care continues to add new billing entities to its enterprise that have not yet been targeted by PBMs or Roche.  This is an enterprise-

wide strategy.  In August 2017, Roger Hall was told by Defendant William Austin that PHC was "planning on expanding" its network of entities and was "actively pursuing new stores to purchase."

146.    In its recent expansions, Priority Care has begun taking measures to make it more difficult for investigators to ascertain that new Priority Care entities are associated with Priority Care.  Whereas most Priority Care pharmacies used to include the term "Priority Care" in their names, the most recently opened ones do not.  For example, in or about March 2018, Priority Care acquired yet another long-established storefront pharmacy, Medical Park Pharmacy, Inc., in Phenix City, Alabama, and redubbed it "Medical Park Discount Pharmacy."  This new pharmacy announces no affiliation with "Priority Care."

147.    Similarly, Priority Care's most recent shell pharmacies, created on December 19, 2017, were given names falsely suggesting that they are actual retail pharmacies: "Main Street Drugs" and "Tombigbee Pharmacy."   In fact, these entities are shell companies with no on-the-ground business.  They exist only to submit insurance claims processed by the Priority Care enterprise at its headquarters.

148.    In an additional move to avoid detection, Priority Care has assigned these shell corporations their own addresses, rather than using the same address as an existing Priority Care pharmacy.  For example, the address registered for Main Street Drugs (which is in fact a shell company) is 417 Main Street, Amory, Mississippi, which is not associated with any other Priority Care entity.  This address, however, is a vacant strip mall storefront that is not open for business.  The owner of these entities, Defendant Konie Minga, conceded at her deposition that Main Street Drugs and Tombigbee Pharmacy have no actual business and that there is no one on the PHC payroll associated with them.

149.     Nevertheless, NPI and NCPDP numbers were established for these entities in December and January 2018.  Although there are no pharmacists at those locations to perform even cursory checks of the prescriptions, Main Street Drugs and Tombigbee Pharmacy began submitting insurance claims for Roche retail test strips in March 2018 and have continued to do so in high volume.

150.     In addition to using deceptive names and unique addresses, the Priority Care enterprise has recently begun registering new entities in the names of individuals other than Konie Minga.  On April 24, 2018, a Mississippi Certificate of Formation was filed for "Amory Discount Drugs, LLC."  The Certificate identifies the filer as "Kristen Knotts," a "Member" of the LLC.  Kristen Knotts is the daughter of Defendants Phillip and Konie Minga and the wife of Defendant Christopher Daniel Knotts.  The Certificate gives her address as 1006 Third Street North in Amory—*i.e.,* the PHC offices.  And the "business email" address associated with the application is "**pminga@att.net**."

151.     The NPI and NCPDP numbers for Amory Discount Pharmacy were created in June and July 2018, and the NPI database identifies as the Director Defendant Daniel Baker—who is married to Defendants Phillip and Konie Minga's other daughter Heather.

152.     Because of the time lag before it receives adjudication information from payers, Roche does not yet know whether Amory Discount Drugs has submitted any insurance claims for retail strips.  Clearly, however, that was the purpose of opening up this new entity.

153.     Priority Care pharmacist Roger Hall also testified that pharmacies in Tennessee and Arkansas, including a "Burns Pharmacy," were part of or otherwise affiliated with the Priority Care enterprise.  Indeed, in late June 2018, new Arkansas and Delaware limited liability companies—Defendants Burns Discount Drug Store and Ozark Family Pharmacy—were established in Ozark, Arkansas, home of the existing "Burns Drugstore, Inc."

154.    One of these new entities was registered with an address corresponding to the existing Burns Drugstore; the other with an address at the exact same intersection, but corresponding to the building's position on the cross-street.  An NPI number for Ozark Family Pharmacy LLC was established soon after.  The incorporator and director identified for Burns Discount Drug Store Arkansas and Ozark Family Pharmacy Arkansas is Defendant Geneva Oswalt.

**Phillip Minga's History of Fraud**

155.    Another indicator that Priority Care is engaged in fraud is that its *de facto* leader, Defendant Phillip Minga, has an extensive history of illegal business practices and insurance fraud—including a felony conviction and, most recently, a citation for health insurance fraud in connection with sales of diabetes care products.

156.    For example, in 1997, Phillip Minga, at that time an insurance agent, was discovered selling unregistered promissory notes in violation of the Mississippi Securities Act. Minga twice failed to pay administrative penalties for the offense, and indeed continued to sell unregistered promissory notes in violation of a cease-and-desist order, using fraud and deceit to induce purchase of the notes.

157.    In 2008, Phillip Minga was indicted in the Northern District of Mississippi on sixteen counts of mail fraud, wire fraud, and monetary-instrument laundering in connection with a separate scheme to fraudulently inflate the price of in-state and out-of-state businesses' workers' compensation insurance policies.  He pleaded guilty to one count of wire fraud in 2010.

158.    Most recently, in late 2016, the Office of Inspector General of the U.S. Department of Health and Human Services reported that:

> On October 17, 2016, Phillip A. Minga, the owner of a durable medical equipment (DME) company, agreed to be excluded from participation in all Federal health care programs for a period of ten years under 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7(b)(16).

OIG's investigation revealed that Minga knowingly caused claims to be submitted to Medicare for diabetes supplies that were not delivered, were the result of unsolicited Medicare beneficiary contact, in violation of the Social Security Act's DME Telemarketing Provisions and not covered by applicable exceptions, or were the result of a kickback.  OIG's investigation further revealed that Minga knowingly retained or caused the retention of an overpayment owed to the Center for Medicare and Medicaid Services as a result of a Medicare Benefit Integrity Post-Payment Review conducted by Zone Program Integrity Contractor AdvanceMed.

OIG's investigation also revealed that Minga knowingly made or caused to be made an omission or misrepresentation of a material fact in the applications of a DME company and its affiliates to participate or enroll as a supplier under Medicare, including organizations under Part C and D, when: (a) Minga was omitted as a managing employee; and (b) as a managing employee, Minga was not disclosed as having been convicted of a felony offense within the 10 years preceding enrollment or revalidation of enrollment.

159.    Presumably because of this history, Phillip Minga does not officially own any Priority Care pharmacies or hold any official title in them.  As described below, however, the evidence of his involvement in the enterprise is extensive.

160.    For her part, Defendant Konie Minga, who was deposed by Roche on June 27, 2018, professes to know very little about the Priority Care business.

**The Individual Defendants' Role in the Priority Care Enterprise's Fraud**

161.    Each individual Defendant is or has been an officer, supervisor, or employee at PHC or another member of the Priority Care enterprise.  As such, they were personally involved in running the Priority Care enterprise and actively participated in and approved of the fraud that accounted for a large portion of PHC's and its affiliated entities' profits.

162.    Defendant Konie Minga is the co-founder, owner, President, and Chief Financial Officer of PHC, and is the President and direct or indirect owner of most of the Priority Care entities.  Among other things, she reviews and pays invoices for the Roche not-for-retail-sale test strips that Priority Care orders from gray-market diverters and fraudulently seeks reimbursement for as retail strips.

163.    Defendants Wesley Minga and Christopher Daniel Knotts oversee, direct, and/or supervise the receipt and storage of diabetes treatment products, including Roche not-for-retail-sale test strips, at the PHC mail-order fulfillment center.  Mr. Knotts is the addressee on numerous Roche not-for-retail-sale strip purchase invoices, and has also provided assistance on-site at Vincent Priority Care Pharmacy.

164.    As the named Director of Amory Discount Pharmacy, Defendant Daniel Baker operates one of the Priority Care enterprise's false-front pharmacies.  He thereby operates and actively participates in the fraudulent activities of the Priority Care enterprise.

165.    Defendant Samuel Phillip Carson was PHC's Director of Pharmacy Services until 2015, prior to which he served in a similar capacity with respect to Medpoint's pharmaceutical sales.  In that position, he oversaw, supervised, and/or directed the practice of fraudulently submitting insurance claims for retail test strips while shipping not-for-retail-sale test strips or other unknown products to patients.  Konie Minga testified that the founding of PHC was, at least in part, on Mr. Carson's initiative.  According to his public LinkedIn profile, Mr. Carson had been a pharmacist or manager of retail pharmacies since at least 2009.

166.    Defendant Kimberly Carson is the co-founder and former co-owner of PHC.  She also served as the initial Vice President and Treasurer of PHC.  In that capacity, Kimberly Carson was responsible for operating, managing, and actively participating in PHC's fraud.

167.    Defendant William Austin is currently PHC's Director of Pharmacy Services.  He oversees, supervises, and directs the Priority Care enterprise's practice of fraudulently submitting insurance claims for retail test strips while shipping not-for-retail test strips or other unknown products to patients.  In addition, along with Defendant Phillip Minga, he has interviewed in Alabama at least one pharmacist job applicant for a pharmacy—Priority Care Pharmacy 2—located in Alabama.  According to his public LinkedIn profile, Mr. Austin had been a pharmacist

in charge at several retail pharmacies—where he "processed and dispensed written, oral, and electronic prescriptions" and "verified [the] accuracy and completeness of [the] information on prescription and refill requests"—for over 25 years before taking the Priority Care position.

168.    Defendant Geneva Oswalt serves as the director of Burns Discount Drug Store Arkansas and Ozark Family Pharmacy Arkansas.  In that capacity, she actively participates in the Priority Care enterprise's fraudulent practices, including the opening of false-front pharmacies to conceal the fraud.

169.    Defendant Melissa "Missy" Sheffield is Chief Operations Officer of PHC.  She oversees, supervises, and/or directs the fraudulent adjudication of insurance claims with retail strip NDC numbers.  She also communicates with PBMs concerning audits and has attended audits at Priority Care pharmacies.  According to her public LinkedIn profile, Ms. Sheffield was previously Chief Executive Officer at Mantachie Rural Health Clinic, Inc., a full-service outpatient medical clinic.

170.    Defendant Ashley Tigrett is Director of Quality Assurance, Licensing, and Credentialing at PHC.  In that capacity, she actively participates in operationalizing the Priority Care enterprise's fraudulent activities.  Among other things, Ms. Tigrett manages the Priority Care enterprise's credentialing with PBMs.  Furthermore, although she is based in Amory, her email address—atigrett@prioritycarerx.net—is listed as the NCPDP database "physical location" contact for various Priority Care entities, including Priority Care Pharmacy Solutions, which is falsely designated a retail/community pharmacy.

171.    Although he has no formal title, Defendant Phillip Minga has been and remains intimately involved in directing the affairs of PHC and directing and carrying out the Priority Care enterprise's fraud. .

172.     Recent testimony from Priority Care pharmacists makes clear that Phillip Minga plays an instrumental role in running the business.  Pharmacist Roger Hall testified that Phillip Minga was the "brains of" the Priority Care enterprise and that he and William Austin were the only two Priority Care representatives conducting Roger Hall's August 2017 job interview in Jasper, Alabama.  In early 2018, Phillip Minga also reached out to Hall to intercede in and help resolve a personnel dispute with a pharmacy technician at Priority Care Pharmacy 2.  Tellingly, along with Defendant Melissa "Missy" Sheffield, Phillip Minga was one of two people Mr. Hall notified when Priority Care Pharmacy 2 received a third-party subpoena from Roche.  And Phillip Minga accompanied pharmacist Keith Hobbs, along with Konie Minga, to scout potential new locations for Vincent Priority Care Pharmacy.

173.     According to his LinkedIn profile, Phillip Minga has been and remains the Marketing Director of Medpoint Advantage, and testimony indicates he regularly uses an office at Priority Healthcare's Amory headquarters.  Furthermore, Medpoint Advantage website content is hosted on a server with the address of "https://hosting.callactive.com/**~pminga**" and the email address "**pminga**@att.net" was provided as the "business email" of Amory Discount Pharmacy on its Certificate of Formation.  In April 2014, that email address was used, in explicit association with Phillip Minga and PHC, to register a number of defunct domain names such as "prioritycarerx.us" and "prioritycarepharmacy.us."

**The Financial Harm Caused by Priority Care's Fraud**

174.     The Priority Care enterprise's fraud has caused, and continues to cause, great financial harm to Roche.

175.     Between 2013 and the first quarter of 2018, the Priority Care enterprise submitted reimbursement claims for over 779,000 fifty-count boxes of Roche's retail test strips.  But as detailed above, the number of retail test strips that Priority Care actually shipped to patients was

just a small fraction of this number.  The vast majority of Priority Care's retail adjudications were fraudulent.  Although Priority Care represented in each insurance claim that a diabetes patient had received a box of Roche retail test strips, retail test strips were not dispensed in connection with hundreds of thousands of insurance claims.

176.    Every time Priority Care submitted a claim for pharmacy benefit insurance and was reimbursed for a box of retail test strips, a patient should have received a retail box of Roche test strips, but did not due to Priority Care's fraud.  Roche therefore suffered lost-profits damages in an amount to be determined at trial.

177.    In addition to losing sales of retail test strips as a result of Priority Care's fraud, Roche also paid unwarranted rebates to pharmacy-benefit insurance plans and PBMs as a direct result of Priority Care's fraud.  Between 2013 and the end of the first quarter of 2018, Roche paid more than $37.5 million in rebates and fees in connection with insurance claims for retail test strips by Priority Care.  The majority of these rebates and fees should not have been paid as they did not correspond to actual sales of Roche retail products.

**The Irreparable Harm Caused by Priority Care's Fraud**

178.    The harm Defendants are causing Roche is ongoing, practically impossible to stop without resort to litigation, and impossible to remedy by money damages.  Furthermore, because it is unknown what products, if any, Priority Care is actually dispensing to patients, Priority Care's fraud poses potential risks to the diabetes care patients that Priority Care claims to serve.

179.    As described above, Defendants are actively pursuing expansion of the Priority Care enterprise by acquiring new storefront pharmacies and establishing new shell pharmacies. The extent of Defendants' holdings is unknown, as is their capacity to conceal or transfer their assets among unknown entities.

180.    In addition, due to the lag time between when pharmacies submit reimbursement

claims to insurers and when Roche receives adjudication data from payers seeking rebates, several months and hundreds of thousands of dollars of claims can take place before Roche is even notified of them.  For example, in the first quarter of 2018 alone, Priority Care's B & K Priority Care Pharmacy fraudulently adjudicated claims for reimbursement for over 52,000 retail boxes of Roche test strips.

181.    Roche does not yet have complete data for the second or third quarters of 2018, making it likely that Priority Care has already submitted tens of thousands of additional fraudulent insurance claims that Roche does not yet know about.  In August 2018, however, Roche obtained some data for the second quarter of 2018.  This data demonstrates that Priority Care continues to carry out fraud on a massive scale through new entities that Roche had no way of identifying in advance.

182.    As alleged above, Priority Care created Defendant Medical Park Discount Pharmacy in March 2018 to assume the operations of the already-existing Medical Park Pharmacy.  Between 2011 and 2017, before its acquisition by Priority Care, Medical Park Pharmacy submitted insurance claims for between twenty and fifty-three 50-count boxes of Roche test strips per year.  In the first quarter of 2018, Medical Park Pharmacy submitted twenty-two claims for Roche test strips.  In the second quarter of 2018, however, after its acquisition by Priority Care, the pharmacy submitted claims for at least 10,627.40 fifty-count boxes—an annualized rate of over 42,000 boxes per year.  This represents an increase of approximately one-thousand-fold from previous years.

183.    Similarly, the Priority Care enterprise created the shell pharmacies Main Street Drugs and Tombigbee Pharmacy in early 2018.  In the first quarter of 2018, while they were in the process of being set up, these entities submitted insurance claims for fifty-four and forty-eight 50-count boxes of Roche test strips, respectively.  Recently obtained data shows, however,

that in the second quarter of 2018, Tombigbee Pharmacy submitted claims for at least 17,028.16 50-count boxes of Roche test strips, while Main Street Drugs submitted claims for at least 11,193.24 50-count boxes of Roche test strips.

184.    Given the Priority Care enterprise's extensive history of obscuring the true nature of its activities and the identities of the individuals that control its business; Defendant Phillip Minga's extensive history of fraud and recidivism; the dishonesty Defendants have displayed during Roche's investigation of their conduct; and the extent of Roche's damages, it is highly unlikely that Roche will be able to obtain and execute a damages judgment that provides full compensation for its financial losses.

185.    The Priority Care enterprise's fraud has also caused, and continues to cause, non-monetary harm to Roche and, potentially, to the diabetes patients it claims to serve.  On hundreds of thousands of occasions, the Priority Care enterprise has billed insurance companies for Roche retail test strips that it did not in fact distribute to the patient whose insurance company was billed.  Although it is unknown what, if anything, these patients actually received, there is a real possibility that the patients received expired or damaged product, product of inferior quality, or nothing at all.  Some patients serviced by Priority Care may not be receiving the high-quality diabetes care products to which they are entitled.

186.    There is evidence that patients are frustrated with the Priority Care enterprise's business practices.  On March 16, 2016, patient Chuck Johnson, whose Facebook profile indicates he lives in Minnesota, posted on the Facebook page for "Priority Care Pharmacy Amory," one of the four entities occupying 1600 Highland Drive in Amory:

> I have responded and said I do not need!!!  And they keep sending & sending… I already have enough for about 4-5 [years] and they keep sending???  How in the hell do you stop them from sending?  Now I need to figure out how to send back like 3 boxes worth.  This is a waste of my time!!!  Piss[es] me off… REALLY!

187.    On January 29, 2018, a "self-verified patient" posted a review of B & K Express

Care Pharmacy on the website vitals.com, asserting that the pharmacy was a "Fr[au]d" and explaining, "Received unordered RX medical supplies with Doctors name evidently forged on prescriptions.  Billed to and paid by insurance.  Pharmacy very uncooperative and hostile when contacted.  Beware!!!"

188.    In addition to potentially causing harm to patients, Priority Care's practice of shipping non-Roche products to patients that expect Roche products causes intangible harm to Roche's goodwill.  Patients frustrated by Priority Care's shipping and billing practices for Roche test strips may associate Priority Care's wrongdoing with Roche.

189.    Roche is also likely losing long-term customers to Priority Care's fraud.  Roche's blood-glucose test strips are intended for use with Roche's blood glucose meters, which are durable products that patients can use for an extended time.  If patients with Roche meters that regularly use Roche test strips begin receiving different products as a result of Priority Care's fraud, then Roche loses not only the immediate sale, but additional future sales from that patient.

190.    The Priority Care enterprise's fraud is also causing harm to Roche's business relationships with payers such as insurance companies and PBMs.  These payers are extremely important to Roche's business, paying for the large majority of the diabetes products that Roche sells in the United States.  In an effort to mitigate its losses from Priority Care's large-scale fraud, however, Roche has withheld some rebate payments from payers.  This has put Roche in an adversarial relationship with some of its important business partners.  That is a detriment to Roche's business that is difficult or impossible to quantify in monetary terms.

191.    For the above reasons, Roche is not only entitled to compensation for the losses caused by the Priority Care enterprise's massive fraud, it is also entitled to injunctive relief putting an immediate stop to the Priority Care enterprise's ongoing fraudulent activities.

## FIRST CLAIM FOR RELIEF

### Violation of Federal RICO, 18 U.S.C. § 1962(c)
### (Against PHC and the Individual Defendants)

192.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 191 above as if set forth fully herein.

193.    At all relevant times, Roche Diagnostics Corporation and Roche Diabetes Care, Inc. were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) & 1964(c).

194.    At all relevant times, PHC and each individual Defendant (collectively the "RICO Defendants") were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) & 1962(c).

195.    The RICO Defendants formed an association-in-fact for the purpose of obtaining medical products, including blood-glucose test strips, as cheaply as possible; selling them at maximum profit, regardless of legality; and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers like Roche.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).  The RICO Defendants organized their RICO enterprise into a continuing and cohesive unit with specific and assigned responsibilities.  This enterprise comprises PHC as well as:

A.    Priority Care's individually operating storefront pharmacies (including Priority Care Pharmacy, LLC; Priority Care Pharmacy at Cotton Gin Point, LLC; B&K Priority Care Pharmacy, LLC; Vickers Priority Care Pharmacy, LLC; Vincent Priority Care Pharmacy, LLC d/b/a The Medicine Chest; Medical Park Discount Pharmacy, LLC) (the "Storefront Pharmacies");

B.    Priority Care's shell pharmacies (including Tombigbee Pharmacy, LLC; Main Street Drugs, LLC; Priority Care Pharmacy Services, LLC; Amory Priority Care Pharmacy, LLC; Priority Express Care Pharmacy, LLC;

Priority Care Pharmacy Solutions, LLC; Jasper Express Care Pharmacy, LLC; Carbon Hill Express Care Pharmacy, LLC; Vincent Express Care Pharmacy, LLC; and B & K Express Care Pharmacy, LLC) (the "Shell Pharmacies"); and

C.    Medpoint Advantage, LLC.

196.    The RICO Defendants participated in the operation and management of the enterprise.  At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

197.    Each RICO Defendant, by engaging in the acts set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) & (5), in violation of RICO, 18 U.S.C. § 1962(c).

198.    The RICO Defendants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered across state lines by commercial interstate carrier shipments of products that were represented to be Roche retail blood-glucose test strips but in fact were different products.  The RICO Defendants' purchase and receipt by interstate carrier of Roche or other blood-glucose test strips was also integral to the operation and maintenance of the scheme. These acts constituted violations of the federal mail fraud statute, 18 U.S.C. § 1341.

199.    The RICO Defendants, on multiple occasions and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343.  Specifically, each false insurance reimbursement claim  was transmitted by means of wire

communication in interstate or foreign commerce and constituted a separate violation of 18

U.S.C. § 1343, and a separate act of racketeering.  The RICO Defendants' use of interstate wire

communications to continually upload, transmit, and receive information regarding prescriptions

to and from Priority Care entities; to create and maintain NPI and NCPDP database entries

regarding the Priority Care entities; and/or to establish additional Priority Care entities was also

integral to the scheme and the operation and maintenance of the enterprise.

200.    Each RICO Defendant committed and/or aided and abetted the commission of

two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, and/or 1343.  In fact,

Defendants' racketeering acts were and are multiple, repeated, and continuous.

201.    These multiple racketeering acts were related and constituted a "pattern of

racketeering activity" within the meaning of 18 U.S.C. § 1961(5).  The acts alleged were related

to each other by virtue of common participants; common victims (Roche and the insurance

companies covering those products); a common method of commission; and the common

purpose and common result of defrauding Roche and insurers, and of enriching the RICO

Defendants while concealing their fraudulent activities.  The pattern of racketeering activity

continues to date.

202.    Roche was directly and proximately injured by the RICO Defendants' pattern of

racketeering activity because Defendants' fraudulent adjudication data was passed directly from

pharmacy-benefit insurance companies and PBMs to Roche and served as the basis and

justification for Roche's payment of rebates to those pharmacy-benefit insurance companies and

PBMs.

203.    As a result of their misconduct, the RICO Defendants are liable to Roche for these

injuries.

204.    Roche continues to be injured by the RICO Defendants' ongoing racketeering

activities and conspiracy to further such activities.  Their fraudulent enterprise continues to defraud third-party payers and continues to cause irreparable and monetary harm to Roche.

205.    Furthermore, the scope of the RICO Defendants' fraudulent enterprise is not known, and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may seek to perpetuate their scheme through entities as yet unknown, and to conceal or dissipate their assets before a judgment can be secured.

206.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.  Pursuant to 18 U.S.C. § 1964(a), Plaintiffs are entitled to an order permanently enjoining the RICO Defendants and other members of the enterprise from engaging in the unlawful behavior described above and from dissipating any assets heretofore acquired from fraudulent adjudications of Roche products.

## SECOND CLAIM FOR RELIEF

### Conspiracy to Violate Federal RICO, 18 U.S.C. § 1962(d)
### (Against all Defendants)

207.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 206 above as if set forth fully herein.

208.    At all relevant times, Roche Diagnostics Corporation and Roche Diabetes Care, Inc. were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) & 1964(c).

209.    At all relevant times, each Defendant was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) & 1962(c).

210.    Each Defendant was associated with the Priority Care enterprise described above, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962(d).  Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and

to affect the objects thereof, including but not limited to the acts set forth above.

211.    Defendants' scheme depended upon, among other things, (a) the Priority Care pharmacies knowingly "checking" prescriptions that would be filled and fraudulently adjudicated centrally in Mississippi; (b) the Priority Care pharmacies' willingly serving as false fronts to which fraudulent adjudications could be attributed; and (c) the submission of fraudulent insurance claims to insurers and PBMs for the purposes of obtaining undeserved reimbursements.

212.    Roche was directly and proximately injured by Defendants' pattern of racketeering activity because Defendants' fraudulent adjudication data was passed directly from pharmacy-benefit insurance companies and PBMs to Roche and served as the basis and justification for Roche's payment of rebates to those pharmacy-benefit insurance companies and PBMs.

213.    As a result of their misconduct, Defendants are liable to Roche for these injuries.

214.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

### THIRD CLAIM FOR RELIEF

**Common Law Fraud**
**(Against the Corporate Defendants, Konie Minga, Phillip Minga, Samuel Philip Carson, William Austin, and Melissa "Missy" Sheffield)**

215.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 214 above as if set forth fully herein.

216.    The Corporate Defendants and Defendants Konie Minga, Phillip Minga, Samuel Philip Carson, William Austin, and Melissa "Missy" Sheffield (collectively the "Fraud Defendants") knowingly and intentionally made and caused to be made hundreds of thousands of false insurance reimbursement claims to insurance companies and PBMs.  These insurance

reimbursement claims falsely stated that Defendants had sold Roche's retail blood-glucose test strips to patients when in fact they had not.  The Fraud Defendants knowingly and intentionally deprived Roche of sales of retail test strips, and also caused the insurance companies to submit rebate claims to Roche based on fraudulent insurance claims.

217.    The Fraud Defendants made or caused to be made those false representations with the intent to defraud.  Specifically, these Defendants made or caused to be made those false representations in order to profit from the high insurance reimbursement rates that result from the rebates Roche pays to insurers for retail test strips.

218.    Defendants Konie Minga, Phillip Minga, Philip Carson, William Austin, and Melissa "Missy" Sheffield, as owners, officers, and/or employees of the Corporate Defendants, were personally involved in and approved of the fraudulent schemes.  These Defendants had actual knowledge of, and substantially assisted in, the fraudulent schemes to fraudulently obtain reimbursements from insurance companies and PBMs.

219.    Roche and the insurance companies and PBMs justifiably relied on the Fraud Defendants' misrepresentations and were unaware of Defendants' fraud.

220.    Defendants' fraud was gross, oppressive, and malicious, and as a result of the Fraud Defendants' conduct, Roche was injured in an amount to be determined at trial.

221.    Furthermore, Roche continues to be injured by the Fraud Defendants' conduct, which continues to defraud third-party payers and Roche and continues to cause irreparable and monetary harm to Roche.

### FOURTH CLAIM FOR RELIEF

**Statutory Fraud and Deceit Under Ala. Code §§ 6-5-101 and 6-5-104**
**(Against the Corporate Defendants, Konie Minga, Phillip Minga, Philip Carson, William Austin, and Melissa "Missy" Sheffield)**

222.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 221 above

as if set forth fully herein.

223.    The Fraud Defendants knowingly and intentionally made and caused to be made hundreds of thousands of false insurance reimbursement claims to insurance companies.  These insurance reimbursement claims falsely stated that Defendants had sold Roche's retail blood-glucose test strips to patients when in fact they did not.  The Fraud Defendants knowingly and intentionally deprived Roche of sales of Roche's retail test strips, and also caused the insurance companies to submit rebate claims to Roche based on fraudulent insurance claims.

224.    The Fraud Defendants made or caused to be made those false representations with the intent of defrauding Roche.  Specifically, the Fraud Defendants made or caused to be made those false representations in order to profit from the high insurance reimbursement rates that result from the rebates Roche pays to insurers.

225.    Defendants Konie Minga, Phillip Minga, Philip Carson, William Austin, and Melissa "Missy" Sheffield, as owners, officers, and/or employees of the Corporate Defendants, were personally involved in and approved of the fraudulent schemes.  These Defendants had actual knowledge of, and substantially assisted in, the fraudulent schemes to fraudulently obtain reimbursements from insurance companies and PBMs.

226.    Plaintiffs and the Pharmacy Plans justifiably relied on the Fraud Defendants' misrepresentations and were unaware of Defendants' fraud.

227.    The Fraud Defendants' fraud was gross, oppressive, and malicious, and as a result of Defendants' conduct, Roche was injured in an amount to be determined at trial.

228.    Furthermore, Roche continues to be injured by Defendants' conduct, which continues to defraud third-party payers and Roche and continues to cause irreparable and monetary harm to Roche.

## FIFTH CLAIM FOR RELIEF

### Civil Conspiracy to Commit Fraud
### (Against All Defendants)

229.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 228 above as if set forth fully herein.

230.    The Defendants unlawfully, knowingly, and willfully combined, conspired, confederated and agreed together to defraud Plaintiffs and the insurance companies.  All Defendants adopted the goal of furthering and facilitating this conspiracy.

231.    Defendants each committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to achieve the objects thereof, including but not limited to the acts set forth above.

232.    Defendants' scheme depended upon, among other things, (a) the Priority Care pharmacies knowingly "checking" prescriptions that would be filled and fraudulently adjudicated centrally in Mississippi; (b) the Priority Care pharmacies' willingly serving as false fronts to which fraudulent adjudications could be attributed; and (c) the submission of fraudulent insurance claims to insurers and PBMs for the purposes of obtaining undeserved reimbursements.

233.    Roche and the insurers and PBMs justifiably relied on Defendants' misrepresentations and were unaware of Defendants' fraud.

234.    As a result of Defendants' conduct, Roche was injured in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### Negligent Misrepresentation
### (Against All Defendants)

235.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 234 above

as if set forth fully herein.

236.    Defendants misrepresented and caused to be misrepresented to insurers and PBMs that they were selling Roche's retail blood-glucose test strips when in fact they were not.  These statements of fact and material omissions were false and misleading.

237.    These statements and omissions were negligent because Defendants did not exercise reasonable care in verifying the accuracy of these statements or in ensuring that they did not fail to make material disclosures, yet represented that they knew the statements to be true. Indeed, Defendants made these statements recklessly, without regard to their truth or falsity.

238.    Defendants did not take any affirmative steps to correct their materially false statements or material omissions.

239.    Defendants had a duty to provide the insurance companies and PBMs with accurate information because they knew and intended the insurance companies and PBMs would rely on their false representations and material omissions in providing reimbursements to Defendants.  Defendants further knew and intended Roche would rely on Defendants' false representations and material omissions in providing rebates to insurance companies and PBMs.

240.    The insurance companies and PBMs and Roche reasonably relied upon Defendants' misrepresentations and material omissions and were unaware that they were false.

241.    As a result of Defendants' conduct, Roche was injured in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against All Defendants)

242.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 241 above as if set forth fully herein.

243.    As set forth above, Defendants misrepresented, caused to be misrepresented, and/or conspired to misrepresent to insurance companies and PBMs that they were selling Roche's retail blood-glucose test strips, when in fact they were not.  These misrepresentations were passed along by the insurance companies to Roche, directly causing Roche to pay the insurers millions of dollars in unwarranted rebates.

244.    As a result of these false representations and material omissions, all Defendants wrongfully obtained a monetary benefit to which they were not legally entitled.

245.    Defendants have no right to retain these unjust gains.

246.    If Defendants are permitted to keep this monetary benefit, it would be manifestly unjust.

247.    Roche is therefore entitled to the remedies of disgorgement and restitution in the amount by which Defendants were unjustly enriched, or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent Defendants' enjoyment of that benefit. Roche is also entitled to an order temporarily restraining and preliminarily enjoining Defendants from dissipating any profits or benefits heretofore received and which continue to be received from fraudulent adjudications of Roche products insofar as such profits and benefits are rightfully Roche's.

## EIGHTH CLAIM FOR RELIEF

### Money Had and Received
### (Against All Defendants)

248.    Roche hereby repeats and realleges the allegations in paragraphs 1 to 234 above as if set forth fully herein.

249.    For the reasons stated above, all Defendants have profited from the fraudulent misrepresentations that the Defendants made and caused to be made and conspired to make to insurance companies and PBMs and Roche.

250.     In equity and good conscience, Defendants ought not to retain those profits because in justness and fairness they belong to Roche.

251.     Roche is therefore entitled to the remedies of disgorgement and restitution in the amount of money Defendants have received at Roche's expense or the imposition of a constructive trust over Defendants' assets to that extent in order to prevent Defendants' enjoyment of the money so received.  Plaintiffs are also entitled to an order temporarily restraining and preliminarily enjoining Defendants from dissipating any profits or benefits heretofore received and which continue to be received from fraudulent adjudications of Roche products, insofar as such profits and benefits are rightfully Roche's.

## PRAYER FOR RELIEF

WHEREFORE, Roche demands judgment against all Defendants as follows:

(a)  an order entering judgment in favor of Roche against Defendants, jointly and severally;

(b)  an order temporarily restraining, and preliminarily and permanently enjoining Defendants from engaging in the unlawful behavior described above;

(c)  an order awarding Roche damages in an amount to be determined;

(d)  an order awarding Roche trebling of damages;

(e)  an order awarding Roche pre-judgment and post-judgment interest;

(f)  an order awarding Roche punitive damages;

(g)  an order awarding Roche reasonable attorneys' fees and other costs; and

(h)  for such additional relief as the Court finds just, equitable, and appropriate.

DATED:        Birmingham, Alabama
              September 11, 2018

Respectfully submitted,

*/s/ David J. Canupp*
David J. Canupp
J. Bradley Emmons
Lanier Ford Shaver & Payne, P.C.
P. O. Box 2087
2101 West Clinton Avenue,  Suite 102 (35805)
Huntsville, AL 35804
Tel: 256-535-1100
Fax: 256-533-9322
djc@LanierFord.com
jbe@LanierFord.com

*/s/ Geoffrey Potter*
Geoffrey Potter, Esq.  (*pro hac vice* application pending)
Aron Fischer, Esq. (*pro hac vice* application pending)
Timothy Gray (*pro hac vice* application pending)
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Tel: 212-336-2000
Fax: 212-336-2222
gpotter@pbwt.com
afischer@pbwt.com
tgray@pbwt.com

*Attorneys for Plaintiffs*
*Roche Diagnostics Corporation and*
*Roche Diabetes Care, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 10th day of September, 2018, I caused to be delivered by Federal Express overnight mail to all Defendants copies of the Complaint; Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery; Proposed Order to Show Cause for Temporary Restraining Order and Preliminary Injunction; Memorandum of Law in Support of Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery; and the Declarations of Kelly Clawson, Robert E. Haley III, Kerry McAleavey, Kimberly Ober, and Geoffrey Potter.  In addition, I caused to be delivered copies of the same documents by electronic mail to counsel for the Defendants known to be represented by counsel.

/s/ *Geoffrey Potter*
Geoffrey Potter