## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ROCHE DIAGNOSTICS CORP., et al.,⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiffs,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀**Case No. 2:18-CV-01479-KOB**
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
PRIORITY HEALTHCARE CORP.,⠀⠀⠀)
et al.,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀⠀)

## MEMORANDUM OPINION

"Oh! what a tangled web we weave, when first we practice to deceive." SIR WALTER SCOTT, MARMION: A TALE OF FLODDEN FIELD, canto VI, XVII (1808).

In this case, Plaintiffs attempt to untangle a deceptive web of pharmacies woven by a Mississippi family that allegedly spun its gossamer threads throughout Mississippi, Alabama, and Arkansas. Plaintiffs contend that this web of inter-related but inscrutable entities, including 29 corporations and 11 individuals, operates an insurance fraud enterprise involving Plaintiffs' diabetes test strips. (Doc. 90.) Specifically, Plaintiffs allege that Defendants bill insurance companies for millions of dollars in claims for blood-glucose test strips that have different product codes, different price structures, and different eligibilities for insurance reimbursement than the products Defendants actually sell to patients.

Plaintiffs Roche Diagnostics Corporation and Roche Diabetes Care Inc. (collectively "Roche") filed an Amended Complaint that includes eight counts: (1) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c); (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (3) common law fraud; (4) statutory fraud and deceit under

Ala. Codes §§ 6-5-101, 6-5-104; (5) civil conspiracy to commit fraud; (6) negligent misrepresentation; (7) unjust enrichment; and (8) money had and received.

This matter now comes before the court on Defendants' twelve motions to dismiss. (Docs. 103–114.) The Corporate Defendants[1] seek dismissal of the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Defendants contend that (1) Roche failed to plead with plausibility or particularity that Defendants violated § 1962(c); (2) Roche failed to plead sufficient facts suggesting that anyone identified in the complaint unlawfully conspired with anyone else; (3) Roche's claims for common law fraud, statutory fraud and deceit, civil conspiracy to commit fraud, and negligent misrepresentation fail as a matter of law; (4) Roche's claim for negligent misrepresentation fails because no underlying claim exists and the intracorporate conspiracy doctrine negates the multiplicity-of-actors requirement; (5) Defendants do not have possession of Roche's money, so the claims for unjust enrichment and money had and received fail; and (6) the complaint is a shotgun pleading that violates Federal Rule of Civil Procedure 8.

---

[1] The Corporate Defendants include the following entities: Priority Healthcare Corporation; Priority Care Pharmacy LLC; Amory Priority Care Pharmacy LLC; Priority Care Pharmacy Services LLC; Priority Express Care Pharmacy LLC; Priority Care Pharmacy Solutions LLC; Amory Discount Pharmacy LLC; Priority Care Pharmacy at Cotton Gin Point LLC; Priority Care Pharmacy 2 LLC; Jasper Express Care Pharmacy LLC; Vincent Priority Care Pharmacy LLC; Vincent Express Care Pharmacy LLC; Vickers Priority Care Pharmacy LLC; Carbon Hill Express Care Pharmacy LLC; Bowie's Priority Care Pharmacy LLC; Bowie's Express Care Pharmacy LLC; B&K Priority Care Pharmacy LLC; B&K Express Care Pharmacy LLC; Tombigee Pharmacy LLC; Main Street Drugs LLC; Yellowhammer Pharmacy Services Corporation; Medical Park Discount Pharmacy LLC; Burns Discount Drug Store LLC; Ozark Family Pharmacy LLC; Priority Care Professional Staffing LLC; Medpoint Inc.; Medpoint LLC; Medpoint Advantage LLC; and Professional Healthcare Staffing LLC.

The Individual Defendants[2] incorporate the Corporate Defendants' motion to dismiss and seek dismissal of the Amended Complaint under largely the same arguments: failure to state a claim pursuant to Rule 12(b)(6) or plead with particularity under Rule 9(b). Several of the Individual Defendants add an additional ground for dismissal: lack of personal jurisdiction pursuant to Rule 12(b)(2). In the interest of efficiency, the court addresses all twelve motions to dismiss in this single Memorandum Opinion.

Plaintiffs filed two responses: one to the Corporate Defendants' motion to dismiss, (Doc. 133), and one to the eleven Individual Defendants' motions to dismiss, (Doc. 141). The Corporate Defendants filed a reply brief, (Doc. 140), and most of the Individual Defendants filed a consolidated reply brief, (Doc. 151), with Defendant William H. Austin filing separately, (Doc. 150), and Defendants Kimberly P. Carson and Samuel Phillip Carson filing separately, (Doc. 152). The court also allowed Plaintiffs to file a surreply brief to the Corporate Defendants' reply brief. (Doc. 149.) The motions are now ripe for review.

## I. Background

### Roche's Business

Roche, as part of its multi-national healthcare and medical products business, manufactures blood-glucose test strips, sold under its Accu-Chek brand. The test strips help diabetic patients monitor their blood sugar. To use an Accu-Chek test strip, a patient places a drop of blood on a strip, then inserts the strip into a meter, which provides a blood glucose reading.

---

[2] The 11 Individual Plaintiffs are Konie Minga, Phillip Minga, Wesley Minga, Christopher Daniel Knotts, Daniel Baker, William Austin, Sammy Carson, Kimberly Carson, Geneva Oswalt, Melissa Sheffield, and Ashley Tigrett.

In the United States, most Accu-Chek test strips are covered by health insurance or government programs. Two main insurance payment methods exist: (1) pharmacy benefit insurance, which is the same type of coverage used for prescription drugs; and (2) medical benefit, which is the type of coverage used for products, such as wheelchairs and catheters. Test strips covered by *medical* benefit insurance are known as not-for-retail (NFR) strips; NFR strips are distributed through providers, normally mail-order distributors, pursuant to specific contracts with Roche, and are *not* distributed by retail pharmacies. Conversely, retail pharmacies sell retail test strips that feature different markings and product-identifying codes, known as the National Drug Codes, than those on NFR test-strip boxes. Roche typically sells its pharmacy-bound retail test strips to authorized wholesalers—not directly to independent pharmacies—that in turn sell the strips to pharmacies.

When a retail pharmacy dispenses test strips to patients, the strips are almost invariably paid for by health insurance under a pharmacy benefit. The pharmacies then "receive reimbursement directly from the payer, such as a health insurance company or its pharmacy benefit manager (PBM)." (Doc. 90 at 16.) To receive the reimbursement, the pharmacy must submit the insurance claim; this process is known as "adjudication." The insurance claim includes information demonstrating that the patient and the product are covered by the particular insurance policy.

After paying the pharmacies for the adjudicated test strips, the insurers and PBMs recoup some of the cost by submitting rebate requests to Roche—pursuant to contracts Roche maintains with each insurer or PBM. Once Roche gets this information, it pays rebates to the insurance companies and PBMs. Roche receives the information in batches—normally months after the pharmacies submit insurance claims and receive reimbursements—and not in real time.

According to the Amended Complaint, the "prices that wholesalers pay to Roche for retail test strips, and the reimbursement rates that insurance companies pay to the pharmacies under pharmacy-benefit insurance plans, are substantially higher than the net price Roche receives for the test strips." (Doc. 90 at 17.) The comparative profit Roche takes in between retail and NFR test strips roughly equalizes after Roche pays administrative fees and rebates to the insurance companies and PBMs that pay for the strips.

Roche does not pay rebates for NFR test strips.

<u>Priority Care's Business</u>

Priority Care, also known as Corporate Defendants, is an association of pharmacies and entities with overlapping ownership and officers. The Priority Care entities are mainly located in Alabama and Mississippi, with one location in Arkansas. According to Plaintiffs, Priority Care includes both brick-and-mortar pharmacies and shell entities—pharmacies that solely exist on paper or that locate only nominally in a premises.

Priority Healthcare Corporation is a Delaware holding company wholly owned by Konie Minga, founded in 2014 by Ms. Minga and Kimberly Carson. PHC either owns or is affiliated with the other Priority Care pharmacies. Ms. Minga and Ms. Carson allegedly had no prior business experience or relevant background in the healthcare, pharmaceutical, or insurance industries. Phillip Minga and Sammy Phillip Carson, their respective husbands, allegedly did have experience in the relevant industries and actively participated in PHC's management.

The registered address for PHC is 1678 Montgomery Highway, Suite 344, Birmingham, Alabama, 35216. This address is a mailbox in a strip mall UPS Store, rented by Ms. Minga. The bulk of the offices and mail-order storage and fulfillment work is located in Amory, Mississippi.

In 2015, PHC and/or Ms. Minga allegedly began purchasing existing, but unsuccessful, brick-and-mortar pharmacies in Mississippi and Alabama. According to Roche, PHC's office exercised control over the pharmacists and other employees at these pharmacies. These storefront pharmacies appear to be independent, with separate bank accounts, distinct market presences, and placement of their own orders for prescription drugs and retail products. These pharmacies have their own relationships with PBMs and distinct customer bases. The pharmacies also retain the names they had before they were purchased by PHC and/or Ms. Minga. The pharmacies do not note their relation to other pharmacies in the alleged PHC network. According to Roche, these pharmacies individually are "generally unprofitable." (Doc. 90 at 21.)

Roche alleges that pharmacists from the Alabama Priority Care pharmacies estimated that, before Priority Care bought them out, they prescribed only a "negligible number of blood-glucose test strips." (Doc. 90 at 21.)

According to the Amended Complaint, the Priority Care pharmacies' business expanded greatly once the pharmacies became part of the Priority Care network. For example, Vincent Pharmacy, Inc., when it was an independent pharmacy in 2014, purchased 28 boxes of Roche's retail test strips and adjudicated claims for 20 of those boxes (a box contains 50 test strips). In 2015, after its acquisition by Priority Care, that same pharmacy adjudicated claims for 28,000 boxes of Roche's retail test strips. As Roche noted, the number of claims Vincent Pharmacy adjudicated in 2015 was "14 times the population of Vincent, Alabama." (Doc. 90 at 22.)

In depositions, three Alabama-based Priority Care pharmacists explained that they use a legal, "central filling" practice regarding the test strips. (Doc. 140 at 12.) Specifically, "Amory-based PHC pharmacy technicians upload digitized copies of test-strip prescriptions to a centralized database. These employees then transmit by e-mail or fax a list of mail-order

prescriptions to Priority Care pharmacists for each pharmacist to 'check' by accessing the database." (Doc. 90 at 22.) The pharmacists allegedly do not verify: (1) the identity of the patients; (2) the identity of the doctors; and/or (3) what product is shipped to the patients. After the pharmacist checks the prescription, workers at the central filling location in Amory, Mississippi affix a return-address label with the name and address of the checking pharmacist's location. They then ship the test strips to patients around the country. (Doc. 90 at 23.)

Beyond purchasing and incorporating existing pharmacies into the Priority Care system, PHC establishes new LLCs and registers them as healthcare providers with the Center for Medicare and Medicaid Services, as well as the National Council for Prescription Drug Programs. These registrations provide each new entity with its own taxonomic code, which PBMs and insurers can use to keep track of adjudications. Many of these entities appear to exist nominally, possessing only an LLC registration and a set of identifying codes. Four unique Priority Health entities, for example, allegedly share a single building, located at 1600 Highland Drive in Amory, Mississippi. (Doc. 90 at 24–25.)

Between 2013 and 2018, this combination of storefront and shell entities adjudicated approximately 750,000 boxes of Roche's test strips to insurance companies and PBMs across the United States. Every claim included a statement that the pharmacy had shipped a box or boxes of Roche retail test strips. In each case, the insurance company or PBM reimbursed the pharmacy, and then Roche would pay a rebate back to the insurance company or PBM. Although records show that Priority Care pharmacies submitted claims for 750,000 retail boxes, their own purchase orders reveal that they procured only 322,000 boxes of retail strips while buying 410,000 boxes of NFR test strips. (Doc. 90 at 29–34.)

Priority Care begrudgingly gave these records to Roche in 2018, following a lengthy series of attempts that included several rounds of unresponsive letters, subpoenas, orders to show cause, and court-ordered sanctions. (*Id.*). Roche also procured adjudication numbers from insurance companies and PBMs. These data showed Priority Care pharmacies shifted the bulk of their adjudications away from their established entities and toward the newly created ones as the PBMs and insurance companies stopped working with Priority Care pharmacies one by one over concerns of fraud. (Doc. 90 at 39–43.)

Although Priority Care apparently purchased most of Roche's test strips on the secondary market, Roche directly sold Priority Care about 158,000 NFR boxes in 2016. The sale included a contractual provision that Priority Care *could not sell* the strips to pharmacies or dispense them to patients whose insurance paid for the test strips with a pharmacy benefit and would be eligible for a rebate. Of these 158,000 NFR boxes, Priority Care's records indicate that its pharmacies processed only 182 as NFR boxes. The rest, presumably, Priority Care falsely adjudicated as retail test strips to insurers under pharmacy benefit. (Doc. 90 at 37.)

The result, Roche contends, is that Priority Care—through its corporate entities and the eleven Defendants who manage and direct it—bilked Roche out of tens of millions of dollars. Some of the ill-gotten gain derives from the difference between the prices at which Roche sells its retail versus NFR strips, and the rest from the unwarranted rebates Roche paid to insurance companies and PBMs; if Priority Care entities processed the NFR strips properly (through medical benefit rather than pharmacy benefit), then insurers and PBMs would neither pay the pharmacies the higher, pharmacy-benefit rate nor submit rebate requests to Roche to subsidize the price differential.

Simply stated, Roche alleges an indirect-benefit scheme in which it paid rebates to the PBMs and insurers that had paid Defendants' fraudulent pharmacy benefit claims.

## II. Standards of Review

### Rule 12(b)(2)

A Rule 12(b)(2) motion attacks the court's jurisdiction over the defendant's person. In determining whether personal jurisdiction exists, a federal court sitting in diversity undertakes a two-step inquiry: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). "The plaintiff bears the burden of establishing personal jurisdiction over the defendant [but] 'need only make a prima facie showing.'" *S & Davis Intern., Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1303 (11th Cir. 2000) (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990)). The court must accept the allegations in the complaint as true. *Id.*

### Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)). A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47). It does, however, "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings that contain nothing more than "a formulaic recitation of the elements of a

cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified two working principles for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pled factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, under prong one, the court determines the factual allegations that are well-pled and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pled facts. That task is "context-specific" and, to survive the motion, the allegations must permit the court based

on its "judicial experience and common sense . . . to infer more than the mere possibility of misconduct." *Id.* If the court determines that well-pled facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed. *Id.*

Shotgun Pleading

A "shotgun" style complaint exists when "each count . . . adopts the allegations of all preceding counts. Consequently, allegations of fact that may be material to a determination of count one, but not count four, are nonetheless made a part of count four. . . . [I]t is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Paylor v. Hartford Fire Ins.*, 748 F.3d 1117, 1126 (11th Cir. 2014) (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).

The purpose of Rule 8 is to provide a defendant notice of the claim and the facts supporting it. *Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 610 (11th Cir. 2008) ("The point [of Rule 8] is to give the defendant fair notice of what the claim is and the grounds upon which it rests."). Rule 10 works in conjunction with Rule 8 by requiring each claim "founded on a separate transaction or occurrence to be stated in separate counts if needed for clarity." *Id.* "These rules work together so that [the plaintiff's] adversary can discern what he is claiming and frame a responsive pleading." *Id.*

### III. Discussion

Among the twelve motions to dismiss, Defendants raise various arguments why the court should dismiss this case. The arguments fall into three general categories: (1) the court lacks personal jurisdiction over some of the Individual Defendants under Rule 12(b)(2); (2) the complaint is a shotgun pleading contrary to Rule 8; and (3) each count fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). In the interest of efficiency, the court

addresses each category of argument and breaks down the analysis by count and by defendant as appropriate.

### a. Personal Jurisdiction

Seven of the Individual Defendants—William H. Austin, Ashley Tigrett, Christopher Daniel Knotts, Geneva Oswalt, Wesley Minga, Melissa Sheffield, and Phillip Anthony Minga—contend that the court lacks personal jurisdiction over them and must dismiss them from the case pursuant to Rule 12(b)(2).

A plaintiff who files a complaint in federal court against a nonresident defendant "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of [personal] jurisdiction." *Mazer*, 556 F.3d at 1274. When evaluating a challenge to personal jurisdiction, the court typically undertakes a two-step inquiry: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.* But in Alabama, "the two inquiries merge, because Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007). So the court considers whether the exercise of personal jurisdiction in this case would violate the Due Process Clause.

Two forms of personal jurisdiction exist: general and specific. General jurisdiction exists when the defendant is at home in the forum state—*i.e.*, he is domiciled here. *See Daimler AG v. Bauman*, 571 U.S. 117 (2014); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (explaining that "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile," and for a corporation, it is the state of incorporation and principal place of business).

Roche does not assert facts to support general jurisdiction for any of the Individual Defendants challenging personal jurisdiction. Instead, Roche relies on the individuals' involvement in the alleged activities to confer specific jurisdiction over them.

Specific jurisdiction arises "out of a party's activities in the forum state that are related to the cause of action alleged in the complaint." *Sloss Indus. Corp.*, 488 F.3d at 925 (quoting *McGow v. McCurry*, 412 F.3d 1207, 1214 n.3 (11th Cir. 2005)). To satisfy specific jurisdiction, the defendant's contacts with the forum must meet three criteria. The first is that the contacts must be related to or have given rise to the cause of action. "Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum. . . . Third, the defendant's contacts with the forum must be such that the defendant should reasonably anticipate being haled into court there." *U.S. S.E.C. v. Carrillo*, 115 F.3d 1540, 1542 (11th Cir. 1997) (quotation and ellipses omitted).

Roche asserts the same two theories to support the court's specific personal jurisdiction over these seven individuals: (1) the Individual Defendants participated in a conspiracy that included overt acts within the forum state, and (2) the Individual Defendants personally participated in torts that occurred in Alabama.

Under the conspiracy theory of personal jurisdiction, "a defendant who otherwise may not be subject to personal jurisdiction might be [brought] into court if the plaintiff 'plead[s] with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'" *In re Blue Cross Blue Shield Antitrust Litig.*, 225 F. Supp. 3d 1269, 1302 (N.D. Ala. 2016) (quoting *Ex parte McInnis*, 820 So. 2d 795, 806–07 (Ala. 2001)). But the Alabama Supreme Court noted that the conspiratorial activity must be "aimed at an *Alabama* plaintiff." *Ex parte Alamo Title Co.*, 128 So. 3d 700, 713 (Ala. 2013) (emphasis added). And neither Roche

Diagnostics Corporation nor Roche Diabetes Care, Inc.—the targets of the alleged conspiracy—is a citizen of Alabama. (Doc. 90 at 6.) So the court cannot have personal jurisdiction over these Individual Defendants under a conspiracy theory of jurisdiction because neither Plaintiff is an Alabama plaintiff.

Alternatively, Roche asserts that this court has personal jurisdiction over the Individual Defendants under the tortious conduct theory. Under Alabama law, "[a] corporate agent who personally participates, albeit in his or her capacity as such agent, in a tort is personally liable for the tort." *Sieber v. Campbell*, 810 So. 2d 641, 645 (Ala. 2001). The corporate agent who personally participates in the tort is subject to personal jurisdiction in the forum state where that tort is litigated; however, the personal jurisdiction of a corporation does *not* automatically give the state personal jurisdiction over the corporation's officers or agents. *See id.* ("[C]orporate-agent status does not insulate the agent from the personal jurisdiction of a state court for the litigation of those torts, or any other claims pendent to that lawsuit"); *Candy H. v. Redemption Ranch, Inc.*, 563 F. Supp. 505, 513 (M.D. Ala. 1983) ("[P]ersonal jurisdiction over corporate officers and employees in their individual capacity may not be predicated merely upon personal jurisdiction over the corporation itself; rather, a court must look to the individual and personal contacts, if any, of the officers and employees with the forum state.").

In this case, portions of the alleged insurance fraud scheme took place in Alabama. Six of the brick-and-mortar pharmacies purchased by PHC are in Alabama. (Doc. 90 at 20.) And those pharmacies allegedly are filling the prescriptions and communicating with the fulfillment center in Amory, Mississippi to prepare records for adjudication. (*Id.* at 21.) Without these transmissions of the prescriptions for the test strips back to Mississippi, PHC could not submit adjudication claims to the insurance companies and PBMs that in turn seek rebates from Roche.

So the very heart of these insurance claims originates from the pharmacies in Alabama. (*Id.* at 23.) These actions were not, as the Individual Defendants suggest, "mere untargeted negligence." *See Calder v. Jones*, 465 U.S. 783, 789 (1984). PHC sought out Alabama pharmacies to purchase and incorporate into its tangled web of deception. The newly acquired Alabama pharmacies then submitted allegedly fraudulent prescriptions for adjudication via PHC's filling center in Amory.

But the Individual Defendants contend that the tortious conduct does not give rise to their personal jurisdiction in Alabama because the harm was not directed at the State of Alabama or its residents and because the "operational nexus" of the allegedly illegal activity was in Mississippi. (Doc. 106 at 11.) The Individual Defendants are correct.

Just as with the conspiracy theory of personal jurisdiction, tortious conduct must intentionally harm the forum state or its residents before personal jurisdiction attaches. The Eleventh Circuit notes that the *Calder* effects test of personal jurisdiction by tortious conduct requires "the commission of an intentional tort, expressly aimed at a specific individual *in the forum* whose effects were suffered *in the forum*." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008) (emphasis added). Roche was not in Alabama, and the effects were not suffered in Alabama. The effects were suffered in Indiana—where Roche Diagnostics Corporation is incorporated and has its principal place of business, and where Roche Diabetes Care, Inc. has its principal place of business—and Delaware, where Roche Diabetes Care, Inc. is incorporated. (Doc. 90 at 6.) So Roche's tortious conduct via corporate agency theory for personal jurisdiction also fails.

Because Roche did not allege sufficient facts to plead personal jurisdiction over Mr. Austin, Ms. Tigrett, Mr. Knotts, Ms. Oswalt, Wesley Minga, Ms. Sheffield, or Phillip Anthony Minga, the court will GRANT their motions to dismiss for lack of personal jurisdiction. (Docs.

106, 108, 109, 110, 111, 112, 114.) The court will DISMISS Mr. Austin, Ms. Tigrett, Mr. Knotts, Ms. Oswalt, Wesley Minga, Ms. Sheffield, and Phillip Anthony Minga from this case.

At this point, the remaining Defendants who do not challenge this court's jurisdiction are all 29 Corporate Defendants and four of the original 11 Individual Defendants: Konie Minga, Daniel Baker, Sammy Carson, and Kimberly Carson.

### b. Shotgun Pleading

The Corporate Defendants contend that the Amended Complaint presents a shotgun pleading that violates Rule 8. In particular, Corporate Defendants point to Roche's references to "the Defendants" generally, without specifying to which entities Roche refers in each count. Defendants also note that Roche lists the bulk of the facts in the Statement of Facts and then adds a general statement incorporating by reference all previous paragraphs—including previous counts—into each count.

Rule 8 states that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Eleventh Circuit has defined what "short and plain" means, and what is too short and too plain: "Shotgun pleadings are those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006). Such a pleading "wreak[s] havoc on the judicial system" by "divert[ing] already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently." *Id.* (quoting *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001)).

In arguing that the Amended Complaint is a shotgun pleading, the Corporate Defendants ignore the practical difficulties of this case. With 44 separate defendants, the court cannot possibly expect Roche to individually list each defendant every time it refers to the defendants in

the complaint. Such an expectation would create an unwieldly and cumbersome complaint. The Corporate Defendants implicitly recognize this difficulty, as they also do not individually list each entity and each individual in their motions to dismiss. And the court has little difficulty understanding to which defendants Roche refers, because in the heading for each count, Roche lists each defendant against which it makes the claim.[3] For example, Roche frequently refers to "the RICO Defendants," and under the Count One claim of RICO, Roche explains that those defendants are PHC, Ms. Minga, Phillip Minga, Mr. Carson, Mr. Austin, and Ms. Sheffield. (Doc. 90.)

The Corporate Defendants also contend that this complaint reads like a shotgun pleading because each count contains a statement that incorporates by reference all previous paragraphs, and the bulk of the facts are only in the Statement of Facts section. Again, the Corporate Defendants ignore the reality of this complex complaint. To ask Roche to re-explain the detailed fraudulent scheme it alleges before each count would turn this 72-page complaint into a thousand-page tome. And though the bulk of the facts appears in the Statement of Facts section,

---

[3] Roche categorizes all non-natural-person defendants as "Corporate Defendants." (Doc. 90 at 12.) The Amended Complaint further breaks down the Corporate Defendants into three groups: "Storefront Pharmacies" (*id.* at 20–24), "Shell Pharmacies" (*id.* at 24–26), and "Medpoint Advantage, LLC" (*id.* at 26). This distinction matters because Counts Three and Four (common-law and statutory fraud) apply to the Storefront Pharmacies but not the Shell Pharmacies or Medpoint Advantage, LLC. The Amended Complaint does not unambiguously define which Corporate Defendants fall into each category. In its factual explanation of the Storefront Pharmacies, Roche describes three defendants: Vincent Priority Care Pharmacy, Bowie's Priority Care Pharmacy, and Vickers Priority Care Pharmacy. Yet later, under the first claim, Roche describes eight entities as Storefront Pharmacies (*id* at 57)*. This number *excludes* Bowie's Priority Care Pharmacy but includes Vincent Priority Care Pharmacy; Vickers Priority Care Pharmacy; Priority Care Pharmacy; Priority Care Pharmacy at Cotton Gin Point; B&K Priority Care Pharmacy; Priority Care Pharmacy 2; Medical Park Discount Pharmacy; and Burns Discount Drug Store. For the purposes of Counts Three and Four, the court ascertains these eight entities—those listed under the First Count—as Storefront Pharmacies; all other Corporate Defendants but Medpoint Advantage, LLC are considered Shell Pharmacies.

Roche does re-allege specific facts beneath each count sufficient to provide Defendants notice of the specific allegations against them.

Although the statement incorporating all previous paragraphs by reference is a poor—albeit extremely common—practice, that fact alone is insufficient to make a complaint a shotgun pleading when the plaintiff does re-allege appropriate specific facts in each count. If mass incorporation by reference is strictly forbidden, perhaps the Corporate Defendants would consider the eleven Individual Defendants' motions to dismiss "shotgun motions" because they all incorporate by reference the Corporate Defendants' motion to dismiss.

Because the Amended Complaint provides sufficient factual information in each count to identify all Defendants targeted in the count—and which specific facts support that count—this complaint is not a shotgun pleading. The court will DENY the Corporate Defendants' motion to dismiss on the shotgun pleading grounds. (Doc. 103.)

### c. Failure to State a Claim

Defendants argue that each count of the Amended Complaint should be dismissed for failure to state a claim. The court addresses each count in turn.

### i. Count One: Violation of RICO, 18 U.S.C. § 1962(c)

Roche alleges that PHC, Konie Minga, Phillip Minga, Sammy Phillip Carson, William Austin, and Melissa Sheffield violated RICO, 18 U.S.C. § 1962(c). As previously discussed, this court lacks personal jurisdiction over Phillip Minga, Mr. Austin, and Ms. Sheffield, and the court will dismiss those individuals from the case. So the court only considers the motions to dismiss Count One pursuant to Rule 12(b)(6) as to the three RICO defendants: PHC, Konie Minga, and Mr. Carson. (Docs. 103, 104, 113.)

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or unlawful collection of debt." In all, the claim requires four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

Defendants allege that Roche failed to state a claim for violation of RICO § 1962(c) because Roche inadequately pled the second and fourth elements of the claim: that Defendants engaged in an (2) enterprise pertaining to a (4) racketeering activity.

Also, the court notes that one sentence in Corporate Defendants' Motion to Dismiss alleges that Roche did not meet the first element—that of conduct. (Doc. 103 at 10.) Defendants mention the argument again in their reply brief. (Doc. 140 at 18.) So to be thorough, the court briefly addresses the conduct element.

The U.S. Supreme Court has held that "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)). Looking at the face of the Amended Complaint—and especially at putative facts acknowledged later in this section—Roche's allegations sufficiently state that the three RICO Defendants indeed participated directly in the operation and management of the alleged enterprise. To the extent that Defendants seek dismissal of the RICO claim based on a lack of conduct, that contention lacks merit.

As for the second element, the RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). When interpreting this definition, the U.S. Supreme Court explained that the "enumeration of included enterprises is obviously broad, encompassing '*any* group of individuals associated in fact.' The term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted).

To constitute an enterprise, a group "must function as a continuing unit" and must "pursue a course of conduct." *Id.* at 948. Although the group need not have a hierarchy or assigned roles and jobs, the association must have interpersonal relationships, a common interest, and some longevity to participate in racketeering activity. *Id.* at 946.

Defendants maintain that Roche failed to allege the existence of an enterprise because the RICO Defendants are all employees or subsidiaries of one company—PHC. Defendants rely on the Eleventh Circuit's holding that "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016).

This isolated quote oversimplifies the holding in *Ray* and fails to account for the difference between an "enterprise" and a "person"—the latter of which is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). The court in *Ray* explained that a RICO claimant "must establish a distinction between the defendant 'person' and the 'enterprise' itself. . . It does not make sense for a person to employ or associate

with himself. Thus, an enterprise may not simply be a 'person' referred to by a different name."
*Ray*, 836 F.3d at 1356 (citation omitted).

In *Ray*, the plaintiffs alleged that the criminal enterprise—comprised of Spirit Airlines, two Spirit officers, three software consultants, and a public relations consultant—acted together to defraud plaintiffs by portraying Spirit's Passenger Usage Fee as a government-imposed fee. 836 F.3d at 1340. The Eleventh Circuit held that the Spirit employees named as defendants were merely acting in their official capacities for Spirit Airlines. *Id.* at 1355. As such, they could not be distinct entities from Spirit Airlines for the purpose of RICO because Spirit Airlines, as a nonhuman entity, can only act through its employees and agents. *Id.*

The Eleventh Circuit in *Ray* noted that distinguishing persons from enterprises, though sometimes difficult, is not merely "an exercise in sophistry." *Id.* at 1356. The U.S. Supreme Court in *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001)—a case discussed at length by the Eleventh Circuit in *Ray*—provides perhaps the clearest explanation on the difference between the two. In *Kushner*, boxing promoter Don King allegedly conducted the business of Don King Productions—a corporation of which he was sole shareholder and president—in a manner that violated RICO.

The Supreme Court recognized two foundational principles to guide its analysis. The first is that a corporation and its owners or employees are legally distinct entities. Secondly, legislators designed RICO to protect legitimate enterprises from becoming vehicles through which persons commit unlawful activities. The Supreme Court held that a "corporate employee who conducts the corporation's affairs through an unlawful RICO pattern of activity uses that corporation as a vehicle whether he is, or is not, its sole owner" and concluded that Don King

Productions and the natural person Don King were two separate entities under RICO. *Id.* at 164–65.

Although the distinction appears to present somewhat of a chicken-or-egg conundrum, the Eleventh Circuit explains that the essential difference between "person" and "enterprise" lies in who the initial alleged wrongdoer is and who is acting through whom:

> When an individual defendant acts through a corporation, he may have formed an association-in-fact with an entity distinct from himself. In that situation, the rule announced in *Cedric Kushner* makes sense. In contrast to an individual, a corporation cannot act except through its officers, agents, and employees. Thus, a corporate defendant acting through its officers, agents, and employees is simply a corporation. Labeling it as an enterprise as well would only amount to referring to the corporate "person" by a different name.

*Ray*, 836 F.3d at 1357.

Succinctly stated, if the "person" who allegedly violates RICO *is* the corporation, the distinctiveness requirement is not met. But when a separate person acts illicitly through a corporation, they become two distinct entities for RICO purposes.

Put another way, the Eleventh Circuit explained that the "prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000). Furthermore, "[t]o find that a defendant cannot be *part* of the enterprise would undermine the purposes of the RICO statute. Indeed, RICO requires that the person be employed by or associated with the enterprise." (*Id.*) (internal citations omitted).

RICO's purpose is preventing legitimate entities from being used to conduct unlawful activities. *See Ray*, 836 F.3d at 1356 ("RICO was designed to protect legitimate enterprises from becoming vehicles through which unlawful activities are committed."). Clearly distinguishing the persons and the enterprise involved here, Roche alleges the exact type of unlawful behavior

described in *Kushner* and *Ray*. The Amended Complaint asserts that Ms. Minga—through PHC, which she co-founded with Ms. Carson—acquired legitimate, pre-existing pharmacies and helped create false-front pharmacies to conduct her scheme of submitting false test strip claims for adjudication; Mr. Carson, meanwhile, allegedly helped Ms. Minga operate Priority Care with his pharmacy business knowledge. In other words, Ms. Minga created a corporate entity to both acquire other legally distinct entities and to create or affiliate itself with new ones. The entire enterprise, then, allegedly constituted a funnel through which she could channel unlawful activities, with the help of Mr. Carson and others. The court finds that Roche adequately differentiates between the persons and the enterprise, as required by *Ray*.

Defendants also rely on an Eastern District of New York case, *Abbott Laboratories v. Adelphia Supply USA*, No. 15-CV-5826, 2017 WL 57802 (E.D.N.Y. Jan. 4, 2017). The facts of *Abbott Labs* are strikingly similar to the facts in this case: the plaintiff, a trio of corporate entities that owned a family of trademarks on FreeStyle diabetes test strips, sued a number of pharmacies, distributors, importers, and online sellers of the international version of Abbott's test strips within the United States. Abbott raised RICO claims, contending that the pharmacies created a scheme to scan boxes of domestic test strips, while actually dispersing boxes of international test strips, and then submitting the scans of the domestic boxes for adjudication. In *Abbott Labs*, Judge Amon found that the plaintiffs failed to plead the existence of an enterprise because the plaintiffs merely stated in conclusory fashion that "[a]ll Defendants participated in the operation and management of the enterprise." *Id.* at *3 (quoting the underlying complaint).

Judge Amon found that the plaintiffs failed to demonstrate that the defendants shared either an interpersonal relationship or a common interest; instead, the defendants appeared to be acting independently. *Abbott Labs*, 2017 WL 57802, at *4. Even if Abbott could allege that each

distributor worked with a network of pharmacies to conduct the alleged fraudulent scheme, such an enterprise would merely be "a series of hub-and-spoke entities." *Id.* at *5. And "[t]he parallel conduct of a number of 'spokes,' even through a central 'hub,' is not a RICO enterprise without more—that is, without a 'rim' that connects the spokes." *Id.*

The plaintiffs in *Abbot* alleged a scheme of 300 defendants, in which "[e]ach distributor would sit at the hub of one alleged enterprise, surrounded by the importer from which it bought and the (typically many) pharmacies to which it sold international test strips." *Abbott Labs*, 2017 WL 57802, at *5. No interpersonal relationship or common interest existed, the court said, because each alleged hub-and-spoke unit acted in self-interest, independently of all other units. "Especially fatal" to the claim, the court said, was plaintiff's "failure to allege any facts showing cooperation or connection . . . since the alleged co-conspirators are, in fact, competitors." *Id.* at 6. "*Boyle* [*v. United States*, 556 U.S. 938, 946 (2009)] expressly stated that this kind of uncoordinated parallel conduct does not create a RICO enterprise." *Id.*

Defendants' reliance on *Abbott* is misplaced, as Roche describes a totally different scenario. The Amended Complaint alleges that three entities—two natural persons operating through PHC—conducted a coordinated scheme that featured a well-defined common interest, interpersonal relationships, and longevity.

Specifically, Roche defines the common interest as "enrichment by fraud." (Doc. 149 at 3.) The Eleventh Circuit held that "an association's devotion to 'making money from repeated criminal activity' demonstrates an enterprise's 'common purpose of engaging in a course of conduct.'" *United States v. Church*, 955 F.2d 688, 698 (11th Cir. 1992) (quoting *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir.), *cert. denied*, 464 U.S. 856 (1983)). More generally, Roche alleges that the three RICO Defendants operated "for the purpose of obtaining medical

products, including blood-glucose test strips, as cheaply as possible; selling them at maximum profit, regardless of legality; and concealing the nature of this scheme from insurance companies, PBMs, and manufacturers like Roche." (Doc. 90 at 57.)

In furtherance of this common purpose, Roche contends that over the last approximately five years, Ms. Minga co-founded and co-owned PHC, reviewed invoices of glucose test strips, signed the checks to pay for the strips, coordinated procurement of gray-market strips, and created bank accounts for allegedly shell-entity pharmacies. It further alleges that Mr. Carson associated himself with PHC and the Priority Care enterprise from its inception, working as its first Director of Pharmacy Services and helping establish its first two pharmacies. He furthermore allegedly founded and oversaw the Amory, Mississippi central-filling operation, a position in which he sent prescription lists and test-strip shipments to Priority Care pharmacies while submitting false claims about those shipments to insurance companies and PBMs.

These facts provide ample support for the elements of both interpersonal relationships and longevity. Proving a relationship "is not a particularly demanding task," and can be met by alleging facts indicating the existence of an agreement among defendants. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068 (11th Cir. 2017). And longevity is met if sufficient time has passed to allow defendants a chance to pursue the common purpose. *Boyle,* 556 U.S. at 939.

Roche alleges that for five years, Ms. Minga and Mr. Carson engaged in an ongoing agreement to defraud Roche through PHC. At the motion to dismiss stage, the facts Roche provides to bolster these assertions sufficiently meet the *Boyle* criteria of interpersonal relationship, common interest, and longevity.

Defendants next argue that Roche failed to adequately plead RICO's fourth element: the presence of racketeering activity. In particular, Defendants assert that Roche's allegations are

based on dubious math and missing invoices, not plausible and particularized facts. The result, Defendants conclude, is that Roche failed to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).

Defendants rightly posit that Rule 9(b) is the appropriate pleading standard for this claim. "Civil RICO claims, which are essentially a certain breed of fraud claims, must be pled with an increased level of specificity." *Ambrosia Coal & Const. Co. v. Pages Morales,* 482 F.3d 1309, 1316 (11th Cir. 2007). To meet the Rule 9(b) standard, "RICO complaints must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." *Id.* at 1316–17 (ellipses omitted) (citing Fed. R. Civ. P. 9(b)). "Put more pithily, the complaint must describe the who, what, when, where, and how of each element of a fraud claim, except scienter." *United States ex rel. Creighton v. Beauty Basics Inc*., No. 2:13-CV-1989-VEH, 2016 U.S. Dist. LEXIS 83573, at *6 (N.D. Ala. June 28, 2016). *See also Lawrie v. Ginn Dev. Co., LLC*, 656 F. App'x 464, 474 (11th Cir. 2016) (requiring a RICO plaintiff to "plead the who, what, when, where, and how.")

For the *who*, the three RICO Defendants are PHC, Konie Minga, and Sammy Carson. The court already discussed the RICO Defendants' alleged involvement as part of the association-in-fact enterprise analysis, *supra*. In short, Roche specifically alleges Ms. Minga's intimate involvement in the Priority Care apparatus, from founding and owning PHC, to acquiring gray-market test strips, to handling the organization's finances. Mr. Carson, meanwhile, allegedly managed the Amory, Mississippi central-filling location and personally submitted false adjudications to insurance companies. So allegations about Amory,

Mississippi—the putative epicenter of PHC's operation that spanned across 31 named locations in Mississippi, Alabama, and Arkansas—provide the *where.*

Concerning the *how*, *what*, and *when* elements, Defendants argue that "Roche refuses to state in the Amended Complaint the claims that it is placing in controversy." (Doc. 103 at 19.) Yet Roche alleges at least 252,000 instances in which the RICO Defendants represented to insurance companies and PBMs that they had shipped retail units when, in fact, they had shipped something else. The appendix accompanying the Amended Complaint breaks down the annual numbers of adjudications proffered by sixteen Corporate Defendants associated with or owned by PHC. Beyond the adjudications themselves, Roche further alleges payments to gray-market suppliers for NFR strips, registration of taxonomic identification numbers, emails and faxes of prescription lists to pharmacies, registrations of false-front corporations and LLCs, and mailed shipments of fraudulently adjudicated test strips.

Defendants note that Roche cannot allege *which* of the hundreds of thousands of claims were actually false, by factors such as adjudication dates and the accompanying patient names or addresses. This contention may be true, but Roche's failure to specify these facts is not fatal because Rule 9(b) does not require such specificity in all cases. *See Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988).

For example, Rule 9(b) does not require a plaintiff to allege the time and content of every fraudulent statement in the event of a "prolonged multi-act scheme," or if the fraud took place over an extended period of time. *U.S. ex rel. Clausen v. Laboratory Corp. of Amer., Inc.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002); *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3, *4 (11th Cir. Aug. 15, 2003). Furthermore, when defendants have

access and control over these details, the Eleventh Circuit has instructed district courts to apply Rule 9(b) less stringently. *Id.* at *3.

The facts of the current case lend themselves to an "alternative means" of Rule 9(b) satisfaction. *See Durham,* 847 F.2d at 1512. Roche alleges a prolonged, multi-act scheme in which almost all the information—except that which Defendants produced pursuant to court order—rests in the hands of Defendants (and possibly those of insurance companies and PBMs). Requiring Roche to specifically allege dates and patient names or addresses, aside from creating potentially problematic medical-privacy repercussions, is practically untenable. The court finds that Roche's Amended Complaint satisfies the salutary purpose of Rule 9(b), which is to "ensure that fraud allegations are not spurious and that the complaint alerts the defendant to the precise misconduct that the plaintiff alleges against him." *Riggins v. P. I. & I. Motor Express, Inc.*, No. 2:17-CV-1084-KOB, 2018 WL 1964570, at *3 (N.D. Ala. April 26, 2018). In short, after reading Roche's allegations, each Defendant should possess a clear understanding of the RICO allegations leveled against him or her.

Lastly, Defendants argue that Roche's RICO allegations fail to "nudge[] the[] claims across the line from conceivable to plausible." (Doc. 103 at 10, citing *Twombly,* 550 U.S. at 570.) This lack of plausibility, they assert, stems from the fact that Roche bases its claim "on nothing more than a discrepancy between (1) the purchases of retail test strips shown on existing invoices and (2) the number of adjudications." (Doc. 103 at 16.)

Pursuant to court order, Defendants produced documents showing they submitted approximately 750,000 adjudications for retail test strips and 182 adjudications for NFR strips. Defendants also submitted records showing they shipped to patients approximately 322,000 retail test strips and approximately 252,000 not-for-retail strips; about 58,000 shipped strips were not

designated either way. Roche also has records showing Defendants purchased roughly 158,000 NFR units directly from Roche. Defendants argue that this discrepancy may be because of missing data and that Roche's numbers are "an unreasonable extrapolation that fails the plausibility standard." (Doc. 103 at 16.)

This argument fails to persuade. Defendants' apparent contention is that they lost hundreds of thousands of documents that, if found, could conclusively defeat this claim. (And even taking Defendants' records at face value, at least 252,000 adjudications appear to be fraudulent.) In comparison, Roche's alleged scenario seems not only conceivable, but more plausible, than what Defendants describe.

For these reasons, the court will DENY the motions to dismiss Count One by PHC, Mr. Carson, and Ms. Minga. (Docs. 103, 104, 113.)

### ii. Count Two: Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

The court has already denied motions to dismiss substantive RICO claims filed by PHC, Ms. Minga, and Mr. Carson. For these three Defendants, the facts that Roche alleged regarding the underlying cause of action animate the RICO conspiracy claim. Because, as explained below, RICO conspiracy is often a derivative offense that stems from a substantive RICO violation, the court will DENY the motions to dismiss Count Two filed by Ms. Minga, Mr. Carson, and PHC. (Docs. 103, 104, 113.)

Additionally, Individual Defendants Daniel Baker and Kimberly Carson and all the Corporate Defendants except PHC also moved to dismiss Count Two. Roche alleges that these Defendants (who constitute all Defendants over whom this court has personal jurisdiction) conspired to violate RICO in violation of § 1962(d). To state a violation of this section, the

plaintiff must "allege facts to support an agreement to violate a substantive provision of the RICO statute." *Carter v. MGA, Inc.*, 189 F. App'x 893, 895 (11th Cir. 2006).

Defendants' reasons supporting dismissal are threefold. First, they argue that conspiracy to commit RICO is a derivative claim of RICO itself, so absent a cognizable RICO claim against all Defendants, the RICO conspiracy claim necessary fails. Second, they contend that the alternative explanations of parallel conduct and routine business relationships are more plausible than the existence of a conspiracy. Third, Individual Defendants Kimberly Carson and Daniel Baker contend that Roche did not satisfy Rule 9(b) particularity in alleging how they specifically contributed to the alleged conspiracy. In sum, Defendants cite *Aeropower, Ltd. v. Matherly*, 511 F. Supp. 2d 1139, 1153 (M.D. Ala. 2007) for the proposition that a "conclusory allegation that the defendants conspired with each other is insufficient to survive a motion to dismiss as [the plaintiff] alleged no facts to show or to create a reasonable inference that the defendants made an agreement." (Doc. 103 at 24.)

On the first point, Defendants are partially correct, because conspiracy to commit RICO under 18 U.S.C. § 1962(d) mandates that Defendants agreed to violate RICO. *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1269 (11th Cir. 2004) ("[W]hat is required to support a claim of RICO conspiracy is that plaintiffs allege an illegal agreement to violate a substantive provision of the RICO statute.").

Conspiracy to commit RICO contains fewer elements than RICO itself. For example, the conspiracy statute does not require an overt act. This means that the "conspiracy offense reaches a wider range of conduct. A defendant may be guilty of conspiracy even if he did not commit the substantive acts that could constitute violations" of an underlying RICO count. *United States v.*

*Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007) (citing *United States v. Alonso*, 740 F.2d 862, 871–72 (11th Cir. 1984) and *United States v. Harriston*, 329 F.3d 779, 785 (11th Cir. 2003)).

But even if a valid RICO claim also exists, a plaintiff who alleges conspiracy to commit RICO must provide evidence that all defendants "necessarily must have known that the others were also conspiring to participate in the same enterprise." *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007). This evidence can take the form of "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005) (internal quotation marks and citation omitted).

Here, Roche provides significant inferences—based on Defendants' conduct and circumstantial evidence—that Corporate Defendants' minds were unified regarding racketeering activity. The heart of the Amended Complaint sets out a lengthy series of factual allegations, including a CVS/Caremark audit of Bowie's Pharmacy discovering more than $3 million in discrepant claims (Doc. 90 at 39); Priority Care 2 pharmacist Roger Hall's testimony concerning several PBM audits and the subsequent fallout, as well as PHC's involvement with Burns Discount Drug Store and Ozark Family Pharmacy (*id.* at 39, 44); Caremark, OptimumRx, and Humana cutting off Vincent Priority Care Pharmacy from service (*id.*); numerical evidence showing drastic shifts in adjudications filed from Vickers Priority Care Pharmacy, B&K Priority Care Pharmacy, Tombigbee Pharmacy, Main Street Drugs, Medical Park Discount Pharmacy, Priority Care Pharmacy Services, Priority Care Pharmacy, Amory Priority Care Pharmacy, Priority Express Care Pharmacy, and Medical Park Discount Pharmacy after their affiliation with Priority Care (*id.* at 40–42); and the series of coincidences surrounding the opening of Amory Discount Pharmacy, such as the fact that Konie Minga's daughter (who is also Christopher

Daniel Knotts' wife) filed the state Certificate of Formation and listed the new LLC's address in the same building as PHC's headquarters (*id.* at 44).

But the Amended Complaint mentions some of the Corporate Defendants only in passing, such as the mere asserted fact that Defendant Yellowhammer Pharmacy Services is owned and directed by the Individual Defendants. (*Id.* at 13, 42.) The court is sympathetic to Defendants' Rule 9(b) argument that the Amended Complaint lacks specificity vis-à-vis certain Corporate Defendants such as, presumably, Yellowhammer Pharmacy Services. But at the motion to dismiss stage, the court hesitates to try to unravel the tangled web that connects the Corporate Defendants, especially considering the body of alleged facts that includes Defendants' repeated and diligent efforts to conceal the extent of their operations and each Defendant's relationship within it. Taking the Amended Complaint's allegations as true, the court finds that the "inferences from [Defendants'] conduct" and "circumstantial evidence of a scheme" sufficiently provide "evidence that each defendant necessarily must have known that the others were also conspiring to participate in the same enterprise." *Silvestri*, 409 F.3d at 1328; *Browne*, 505 F.3d at 1264.

Defendants next argue that the RICO conspiracy count should be dismissed because the dealings among Defendants were "routine businesses relationships" that evinced mere "parallel conduct," as described by *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 653 (N.D. Ohio 2012) and *Solomon v. Blue Cross Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1292 (S.D. Fla. 2008). But as the court explained regarding the RICO count, Roche appears to allege neither parallel conduct nor routine business relationships among Corporate Defendants. Roche's asserted facts regarding Corporate Defendants do not depict independent entities engaging in

normal, competitive business practices, but rather a large-scale plan to defraud and profit and violate 18 U.S.C. § 1962(d).

As for the remaining two Individual Defendants—Kimberly Carson and Daniel Baker—Roche alleges sufficient facts concerning both of them. Roche contends that Ms. Carson, for instance, is married to Defendant Sammy Carson; that she co-founded PHC and Medpoint Pharmacy with Konie Minga; that she worked as PHC's treasurer and vice president; that she was a managing member of Priority Care Medical Supply; that she established bank accounts for several Priority Care entities; and that she received payments for her work from Konie Minga. Taken at face value, the court finds these alleged facts sufficient to support a claim for conspiracy to violate 18 U.S.C. § 1962(c).

Roche posits relatively fewer facts regarding Defendant Daniel Baker, noting only that he is a citizen of Alabama and resides in Hoover; is married to Heather Minga, Defendants Phillip and Konie Minga's daughter; and works as the director at Amory Discount Pharmacy, one of PHC's ostensibly false-front entities. Roche further alleges that Mr. Minga opened Amory Discount Pharmacy in April 2018, with Mr. Minga's other daughter—Kristen Knotts—filing for the LLC. Roche further alleges that Ms. Knotts used the PHC headquarters as her address and her father's email address as contact information. These facts support a plausible inference that Amory Discount Pharmacy is closely affiliated with the Priority Care apparatus. Considering Priority Care's alleged *modus operandi* of employing a network of family members to further its scheme and the necessary involvement of a director over the entity he directs, Roche presents a plausible assertion that Mr. Baker conspired to violate RICO.

For these reasons, the court will DENY the motions to dismiss filed by Corporate Defendants, Konie Minga, Daniel Baker, Sammy Carson, and Kimberly Carson concerning Count Two. (Docs. 103, 104, 105, 107, 113.)

### iii. Counts Three, Four, & Six: Common Law Fraud, Statutory Fraud and Deceit, and Negligent Misrepresentation

Roche's third, fourth and sixth claims are common law fraud, statutory fraud and deceit, and negligent misrepresentation. The remaining Defendants for these counts over whom the court has personal jurisdiction are PHC, the eight Storefront Pharmacies, Main Street Drugs, Tombigbee Pharmacy, Konie Minga, and Sammy Carson. Roche also raises Count Six against all remaining Defendants, which are those listed here, plus the Shell Pharmacies,[4] Kimberly Carson, and Daniel Baker. Because, as explained below, the elements among the various types of fraud are the same (except Ala. Code § 6-5-104's scienter requirement), the court's analysis applies equally to the Shell Pharmacies, Kimberly Carson, and Daniel Baker to the extent Roche alleges fraud in Count Six.

This court recently noted that "[a]ll legal roads in which an Alabama plaintiff claims 'general' fraud, 'legal' fraud, or 'misrepresentation' lead back to the same place, Alabama Code § 6-5-101, which defines one particular way to prove the fraud cause of action. Section 6-5-101

---

[4] The Shell Pharmacies include Amory Priority Care Pharmacy LLC; Priority Care Pharmacy Services LLC; Priority Express Care Pharmacy LLC; Priority Care Pharmacy Solutions LLC; Amory Discount Pharmacy LLC; Jasper Express Care Pharmacy LLC; Vincent Priority Care Pharmacy LLC; Carbon Hill Express Care Pharmacy LLC; Bowie's Priority Care Pharmacy LLC; Bowie's Express Care Pharmacy LLC; B&K Express Care Pharmacy LLC; Tombigee Pharmacy LLC; Main Street Drugs LLC; Yellowhammer Pharmacy Services Corporation; Ozark Family Pharmacy LLC; Priority Care Professional Staffing LLC; Medpoint Inc.; Medpoint LLC; and Professional Healthcare Staffing LLC.

appears to define a cause of action with many names but a single and identical set of elements." *Riggins v. P. I. & I. Motor Express, Inc.*, No. 2:17-CV-1084, 2018 WL 1964570, at \*3 (N.D. Ala. Apr. 26, 2018); *see also Bryant Bank v. Talmage Kirkland & Co.,* 155 So. 3d 231, 235 (Ala. 2014) ("A negligent misrepresentation constitutes legal fraud"); *Billy Barnes Enters., Inc., v. Williams*, 982 So. 2d 494, 499 (Ala. 2007) ("legal fraud"); *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007) ("fraud"); *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 422–23 (Ala. 1997) ("misrepresentation"); *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 463 (Ala. 2000) ("fraudulent misrepresentation").

Fraud in Alabama requires "[m]isrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party." Ala. Code § 6-5-101. Roche's single statutory fraud count—Count Four—refers to both § 6-5-101 and § 6-5-104. Subsections 101 and 104 are functionally similar, yet the latter describes an intentional tort and raises the required mental state from statements "made by mistake" to those made "willfully." Subsection 104 also more readily supports claims for punitive damages. Behavior that violates Subsection 104, then, necessarily violates 101. *See Ford Motor Co. v. Sperau*, 708 So. 2d 111, 116 n.1 (Ala. 1997) (noting that a "defendant's intent to deceive or mislead, or 'scienter,' has been the standard prerequisite for imposing punitive damages in fraud cases. In addition, § 6–5–104(a) which defines the tort of fraudulent deceit, [proscribes] 'willfully deceiv[ing] another with intent to induce him to alter his position to his injury'" (internal citations omitted)).

Considering the practical equivalence among Counts Three, Four, and Six (and the fact the Parties lumped the counts together in their motions and briefing), the court combines them into a single analysis of fraud.

To bolster its fraud claim, Roche cross-applies the same facts from its RICO count. Relying on these facts, Roche contends that Defendants "knowingly and intentionally made and caused to be made hundreds of thousands of false insurance reimbursement claims to insurance companies and PBMs. These insurance reimbursement claims falsely stated that Defendants had sold Roche's retail blood-glucose test strips to patients when in fact they had not." (Doc. 90 at 62.)

In their motions to dismiss Roche's fraud allegations, Defendants proffer the following three[5] contentions: (a) Roche did not reasonably rely on Defendants' statements; (b) Roche cannot allege fraud for a putative breach of contract; and (c) Alabama's statute of limitations bars Roche's fraud claims. The court addresses each argument in turn.

*(a) Reasonable Reliance*

The doctrine of reasonable reliance holds that a plaintiff cannot maintain a fraud-based claim unless—as the name of the doctrine suggests—he reasonably relied on the putative misrepresentation. A plaintiff who claims reliance on a misrepresentation must have believed the statement to be true. "If it appears that he was in fact so skeptical as to its truth that he placed no confidence in it, it cannot be viewed as a substantial cause of his conduct." *Smith v. J.H. Berry Realty Co.*, 528 So. 2d 314, 316 (Ala. 1988) (internal citations omitted). Reasonable reliance is a "practicable standard" that provides "flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Foremost*, 693 So. 2d at 421.

---

[5] Defendants also presented another Fed. R. Civ. P 9(b) defense on this claim, but the court finds no reason to re-tread that ground.

Defendants contend that

> Roche was aware of facts that should have put a multi-billion-dollar pharmaceutical giant on notice of discrepancies in the Defendants' reimbursement policies. Roche was put on notice because it investigated concerns, ceased selling mail-order strips to Defendants in late 2016, and communicated its concerns about the discrepancies to Defendants in February 2017. These facts evidence Roche's unwillingness to accept the Defendants' representations regarding their reimbursement practices and undercuts its claim that it reasonably relied on them. . . . [t]herefore, it could not have reasonably relied upon them in continuing to do business with Defendants.

(Doc. 103 at 30.)

Such a depiction of the relationship among the Parties mischaracterizes Defendants' dealings with Roche. Except for Roche's sale of approximately 157,680 NFR test strips in 2016, Roche had no direct dealings with any Defendants and so could not have "continue[d] to do business with Defendants." Relevant to this case, Roche primarily transacted business with the insurance companies and PBMs that sought rebates from Roche based on the payments they made to Defendants. The plaintiff-defendant relationship in this case is atypical of fraud claims in that Roche was not dealing with any of the Defendants directly but was instead reimbursing intermediaries who paid Defendants' allegedly fraudulent insurance claims and sought rebates from Roche.

The crux of the supposed misrepresentation lies in the false product codes—known as National Drug Codes—that Defendants presented to insurers. "In each insurance claim," Roche alleges,

> the Priority Care enterprise represented to insurance companies and PBMs that box or boxes of Roche-made retail test strips had been dispensed to a patient with insurance. . . . In reliance on these representations, the insurance companies and PBMs reimbursed Priority Care according to their reimbursement rate for these retail test strips. In most cases, Roche then proceeded to rely on Priority Care's representations by paying rebates to insurance companies.

(Doc. 90 at 28.) Roche argues that a "reasonable manufacturer has no choice but to rely upon information pharmacies submit to PBMs and insurers because this payment system is the industry standard." (Doc. 133 at 27.)

The court finds Roche's argument persuasive. Roche's compliance with this industry standard, coupled with the contention that Defendants surreptitiously concealed the extent of their allegedly fraudulent network, indicates that Roche acted reasonably under the circumstances.

*(b) Fraud and Contract Claims*

Defendants next assert that Roche "cannot maintain its fraud-based claims that are based on a breach of contract." (Doc. 103 at 31.) To support this position, Defendants rely on Justice Houston's concurring opinion in *Hunt Petroleum Corp. v. State*, 901 So. 2d 1 (Ala. 2004); Justice Houston stated that "to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud." *Id.* at 10–11.

The only state-court majority opinion cited by Defendants on this issue is *McAdory v. Jones*, 71 So. 2d 526, 528 (Ala. 1954), which states that a "mere breach of a contract is not sufficient to support a charge of fraud." Yet this excerpted quote fails to note that, one sentence beforehand, the court expounded on the meaning of "mere" by explaining that a plaintiff *can* recover under both fraud and contract theories, such as when he can "allege and prove that at the time the contract was made the covenantor had no intention of complying with his obligation." *Id.*

This court recently recognized that "[n]o Alabama Supreme Court case holds that a fraud and breach of contract claim cannot coexist any time 'the fraud and breach of contract claim arise out of the same set of facts.' . . . In fact, the Alabama Supreme Court has said the opposite: 'a single transaction can support an award of damages for both breach of contract and fraud.'" *Riggins*, No. 2:17-CV-1084, 2018 WL 1964570, at *4 (quoting *Deupree v. Butner*, 522 So. 2d 242, 244 (Ala. 1988)).

Here, only a relatively small percentage of the alleged fraudulent claims arose from the contractual relationship between Roche and the Defendants. Both parties agree that Roche directly sold Defendants about 157,000 boxes of test strips, which is less than twenty-one percent of the alleged 750,000 total claims. But more importantly, even applying Justice Houston's reasoning, Roche has not alleged any contractual claims in this suit, and even if it had—for reasons such as the striking discrepancy between the Defendants' purchases and sales of retail test strips—the Amended Complaint's asserted facts independently support a fraud claim.

### (c) Statute of Limitations

Defendants contend that Alabama's two-year statute of limitations for fraud-related causes of action at least partially bars Roche's fraud claims. *See* Ala. Code § 6-2-38. Granted, the two-year statute of limitations applies to claims based on fraud or deceit. *Parsons Steel, Inc. v. Beasley*, 522 So. 2d 253, 256 (Ala. 1988). But the statute does not begin to run "until the discovery by the aggrieved party of the fact constituting the fraud." *Sellew v. Terminix Int'l Co., LP*, No. 2:17-CV-01926, 2018 WL 2670050, at *4 (N.D. Ala. June 4, 2018). A plaintiff may "discover" the fraud through either actual awareness or by "becom[ing] privy to facts that would provoke inquiry in a reasonable person that, if followed up, would lead to the discovery of the

fraud." *Dickinson v. Land Developers Constr. Co.*, 882 So. 2d 291, 298 (Ala. 2003) (referencing *Auto-Owners Ins. Co. v. Abston*, 822 So. 2d 1187, 1195 (Ala. 2001)).

Defendants correctly point out that Roche had at least some level of notice of the alleged deceit as far back as September 2016, when "Roche ceased selling mail-order test strips to PHC based on concerns about the large number of retail adjudications at the Priority Care pharmacies whose existence had been disclosed to Roche by Priority Care." (Doc. 90 at 40.) Although Roche corroborates this fact, the court cannot say as a matter of law that, because Roche terminated its relationship with PHC in 2016, Roche necessarily possessed sufficient knowledge of all the relevant facts to file a fraud claim at that time.

The court reaches this conclusion for two reasons. The first is that a defendant's fraudulent concealment of facts pertaining to a potential claim tolls the statute of limitations until the plaintiff discovers the relevant facts. Ala. Code § 6-2-3; *DGB, LLC v. Hinds*, 55 So. 3d 218, 224 (Ala. 2010). As the Alabama Supreme Court explained regarding a precursor of § 6–2–3, tolling "applies to a fraudulent concealment of the existence of a cause of action from the party in whose favor the cause of action exists. A party cannot profit by his own wrong in concealing a cause of action against himself until barred by limitation. The statute of limitations cannot be converted into an instrument of fraud." *Hudson v. Moore,* 194 So. 147, 149 (1940) (overruled on other grounds by *Ex parte Sonnier,* 707 So. 2d 635 (Ala. 1997)). To qualify for tolling under § 6–2–3, a plaintiff must allege the time and circumstances surrounding his discovery of the fraud. "The complaint must also allege the facts or circumstances by which the defendants concealed the cause of action or injury and what prevented the plaintiff from discovering the facts surrounding the injury." *DGB*, 55 So. 3d 218 at 226 (internal citation omitted).

Here, Roche alleges the circumstances by which the Defendants concealed their fraud and what prevented Roche from discovering the relevant facts. *See DGB*, 55 So. 3d at 226. The Amended Complaint alleges that in the summer of 2017, Roche subpoenaed several defendants regarding records of their adjudication practices and received no reply. (Doc. 90 at 29–30.) Roche sent follow-up letters and received non-responsive replies. (*Id.* at 30.) Roche served additional subpoenas in February 2018, without response. (*Id.*) In April and May 2018, in response to court orders, certain Defendants failed to produce required documents and instead sent (to incorrect addresses) additional non-responsive letters. (*Id.* at 31.) In May of 2018, the United States District Court for the Northern District of Mississippi sanctioned certain defendants for refusing to comply with the court's orders. (*Id*.) And on June 27, 2018, following Defendants' production of its invoices, Roche *finally* received information from which it comprehended the depths of Defendants' alleged fraud. (*Id.*) Roche filed the instant case two-and-a-half months later.

The second reason why Defendants' statute of limitations argument fails is that the Alabama Supreme Court has warned against hastily depriving plaintiffs of the opportunity for juries to determine the plaintiffs' reasonableness in detecting fraudulent activity; this caution is especially acute at the motion to dismiss stage. *See Liberty Nat. Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997) (holding that the "question of when a party discovered or should have discovered the fraud is generally one for the jury.").

Although subsequent evidence may result in a different determination in the instant case, Roche's complaint plausibly demonstrates that it behaved reasonably by investigating Defendants' fraud prior to filing suit. The fact that Roche does not typically sell directly to pharmacies, coupled with Defendants' alleged "shell game" of concealing which entities were

affiliated with them, bolsters Roche's assertion that it did not know the breadth of Defendants'

operation until fewer than twenty-four months before filing suit.

Based on these two reasons, the tolling provisions apply here because Roche alleges

sufficient facts for the court to find that Roche behaved reasonably and Defendants perpetually

concealed the extent of their fraud. *See Travis v. Ziter,* 681 So. 2d 1348, 1351 (Ala. 1996)

("[D]ismissal based on the statute of limitations is proper only if, from the face of the complaint,

it is apparent that the tolling provisions do not apply.") The court finds that Defendants' statute

of limitations argument lacks merit.

Because Defendants' contentions regarding reasonable reliance, contract/fraud

concurrence, and statutes of limitations fail to persuade the court, the court will DENY all

remaining Defendants' motions to dismiss Counts Three, Four, and Six. (Docs. 103, 104, 105,

107, 113.)

### iv.   Count Five: Civil Conspiracy to Commit Fraud

Roche brings its civil conspiracy to commit fraud claim against all remaining Defendants.

Alabama law defines civil conspiracy as "a combination of two or more individuals to

accomplish an unlawful purpose or to accomplish a lawful end by unlawful means." *McLemore*

*v. Ford Motor Co.,* 628 So. 2d 548, 550 (Ala. 1993). Defendants offer two arguments to support

dismissing this claim. Defendants contend that no underlying claim exists—which attacks the

unlawful-means element—and that the intra-corporate conspiracy doctrine applies—which

attacks the multiple-actors element.

As for the first contention, the court recognizes that conspiracy, standing alone, provides

no cause of action. *Allied Supply Co. v. Brown,* 585 So. 2d 33, 36 (Ala. 1991). So a conspiracy

claim fails if the underlying act would not support an independent claim. *Triple J Cattle, Inc.,*

621 So. 2d at 1225. *See also Callens v. Jefferson Cty. Nursing Home*, 769 So. 2d 273, 280 (Ala. 2000) ("A plaintiff alleging a conspiracy must have a valid underlying cause of action."). Here, the court recognized an underlying cause of action for fraud under Counts Three, Four, and Six, so Defendants' first contention gets them nowhere.

Defendants' second argument contends that the intra-corporate conspiracy doctrine precludes the possibility of conspiracy. The intra-corporate conspiracy doctrine holds that "just as it is not legally possible for an individual person to conspire with himself, it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). In simple terms, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.* Defendants argue that the doctrine applies in this case because "none of the [forty] defendants are outside of the PHC umbrella." (Doc. 103 at 35.)

The intra-corporate conspiracy doctrine applies to corporations and distinct legal entities, not umbrellas. And here, Roche has specifically alleged that most Defendants are discrete legal entities. Furthermore, when defendants maintain a confusing corporate web and reclusively seek to conceal the entities spun within it, plaintiffs should be permitted to use discovery to untangle the web of entities and ascertain who relates to whom. *See Sirmon v. Wyndham Vacation Resorts, Inc.*, No. 7:10-CV-2717-LSC, 2012 WL 4341819, at *7 (N.D. Ala. 2012).

Beyond alleging Defendants' distinct legal statuses (Doc. 90 at 6–14), Roche argues that Defendants "operate[] through a complex and deliberately opaque network of corporate entities, and has a demonstrated history of concealing information, even in the face of court orders." (Doc. 90 at 5.) In light of these allegations, the court finds Defendants' intra-corporate

conspiracy doctrine wanting and will DENY all remaining Defendants' motions to dismiss Count Five. (Docs. 103, 104, 105, 107, 113.)

v. **Counts Seven & Eight: Unjust Enrichment and Money Had and Received**

Roche's seventh and eighth claims are for unjust enrichment and money had and received—two claims the Alabama Supreme Court routinely considers as a single cause of action. *See, e.g.*, *State Farm Fire & Cas. Co. v. Evans*, 956 So. 2d 390, 400 (Ala. 2006) (treating the two claims as the same); *Funliner of Alabama, L.L.C. v. Pickard*, 873 So. 2d 198, 209 (Ala. 2003) (combining the two into a single cause of action and describing it as "a claim of unjust enrichment or money had and received"). This court likewise contemplates the two theories together.

Taken together, "[t]he essence of the theories of unjust enrichment or money had and received is that a plaintiff can prove facts showing that defendant holds money which, in equity and good conscience, belongs to plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." *Hancock–Hazlett Gen. Constr. Co. v. Trane Co.,* 499 So. 2d 1385, 1387 (Ala. 1986). Put another way, a plaintiff alleging unjust enrichment must show that "(1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Matador Holdings, Inc. v. HoPo Realty Investments, L.L.C.*, 77 So. 3d 139, 145 (Ala. 2011).

Here, Defendants proffer two reasons for why Roche's unjust enrichment claim fails as a matter of law. First, because Roche and Defendants dealt with one another primarily through PBMs and insurance intermediaries, "Roche has not alleged any benefit received by Defendants from Roche." (Doc. 103 at 37.) Second, Federal Rule of Civil Procedure 9(b) applies to unjust

enrichment claims based on fraud, and Roche has failed to sufficiently plead this claim with particularity.

Taking Defendants' initial point—that "Roche seeks money delivered to insurers, rather than the Defendants" (Doc. 103 at 37)—the court as an initial matter notes the natural law foundations of unjust enrichment. As the Alabama Supreme Court explained, this cause of action is

> founded upon the equitable principle that no one ought [un]justly to enrich himself at the expense of another, and is maintainable in all cases where one has received money under such circumstances that in equity and good conscience he ought not to retain it because in justness and fairness it belongs to another. A cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money which belongs to the plaintiff.

*Jewett v. Boihem*, 23 So. 3d 658, 661 (Ala. 2009) (citations and ellipses omitted).

A defendant unjustly benefits if (1) the donor of the benefit acted under a factual mistake or in misreliance of a duty or right, *or* (2) the defendant engaged in unconscionable conduct, "such as fraud, coercion, or abuse of a confidential relationship." *Matador Holdings*, 77 So. 3d at 146 (citation and ellipses omitted). Directly contradicting Defendants' contention, moreover, the plaintiff does *not* need to prove that "money belonging to the plaintiff was actually and physically given to, and received by the defendant, as it is sufficient to show that the defendant has received the benefit indirectly." *Jewett,* 23 So. 3d at 662 (quotations and ellipses omitted).

Here, Roche alleges an indirect-benefit scheme in which it paid reimbursement funds to PBMs and insurers that had already paid Defendants based on fraudulent adjudication claims. As a result, Roche avers that it "suffered damages in the form of its lost profits. For each false claim, Roche's damages are equal to the difference between the price at which it sells its retail strips and the price at which it sold the not-for-retail strips to distributors." (Doc. 90 at 54.) At bottom,

Roche alleges that Defendants possess tens of millions of dollars that rightly belong to Roche. Because the presence of intermediaries between the parties is immaterial to "the abstract justice of th[is] case," the court declines to adopt Defendants' argument. *See Jewett,* 23 So. 3d at 661.

Defendants also contend that the Amended Complaint does not allege "who made any particular statements, much less the specific time or place," failing to meet the particularity requirement of Rule 9(b). (Doc. 103 at 38.) As a preliminary matter, the court is uncertain whether 9(b) applies in the instant case. A sister court noted that "[b]y its terms, Rule 9(b) extends to assertions of 'mistake,' but its applicability to claims of unjust enrichment is less clear. It appears to be the rule that a claim for unjust enrichment is subject to Rule 9(b) only if it is premised on fraud." *United States v. Gericare Med. Supply Inc.*, No. CIV.A.99-0366, 2000 WL 33156443, at *10 (S.D. Ala. 2000) (quotation omitted).

Assuming *arguendo* that Rule 9(b) applies, Roche appears to allege that the *who* and *where* are all 40 defendants, at their stated places of business (and channeled through the Amory, Mississippi headquarters) (Doc. 90 at 6–14, 66–68); the *particular statements* are the adjudication claims—made to insurance companies and PBMs—that the NFR test strips were actually retail test strips (*id.* at 66–67); and the *time* was January 2013 through September 2018, as numerically detailed in Exhibit A (*id.* at 33–34, Exhibit A). The court previously noted both the sufficiency of the pled facts regarding PHC and the Individual Defendants, as well as Roche's lack of specific factual allegations concerning several Corporate Defendants, some of which are not even listed in Exhibit A's breakdown of adjudications by year.

For these other Corporate Defendants, Roche alleges a web of pharmacies that often share names or parts of names, as well as addresses and incorporators. It also alleges the exact statements—false adjudication claims—that the Corporate Defendants made. It further alleges

repeated and denied attempts—both with and without the imprimatur of court order—to ascertain more about these entities beyond what is available via public record. Taken together, these alleged facts do not indicate that Roche has taken a proverbial fishing trip with its claim of unjust enrichment. *See Ala. Teachers Credit Union v. Design Build Concepts, Inc.*, 334 F. Supp. 3d 1171, 1199 (N.D. Ala. 2018) ("Rule 9(b) exists to prevent complainants from crying 'fraud' only to go on a fishing expedition during discovery to try to find some evidence of fraud."). Because Rule 9(b) is relaxed "when specific factual information about the fraud is peculiarly within the defendant's knowledge or control," *Hill*, 2003 WL 22019936, at \*3, the court finds that Roche's alleged facts supporting its unjust enrichment claim satisfy the public policy purpose of Rule 9(b), as each Corporate Defendant is sufficiently apprised of the plausible charge alleged against it.

The court therefore will DENY all remaining Defendants' motions to dismiss Counts Seven and Eight. (Docs. 103, 104, 105, 107, 113.)

## IV. Conclusion

For the reasons discussed above, the court will DENY in full the motions to dismiss filed by the Corporate Defendants, Sammy Carson, Kimberly Carson, Daniel Baker, and Konie Minga. (Docs. 103, 104, 105, 107, 113.)

The court will GRANT the motions to dismiss for lack of personal jurisdiction filed by William Austin, Ashley Tigrett, Christopher Daniel Knotts, Geneva Oswalt, Wesley Minga, Melissa Sheffield, and Phillip Anthony Minga, and will DISMISS THESE DEFENDANTS WITHOUT PREJUDICE. (Docs. 106, 108, 109, 110, 111, 112, 114.)

The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 27th day of September, 2019.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE