FILED

2020 May-08  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ROCHE DIAGNOSTICS CORP., et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:18-CV-01479-KOB** |
| | ) | |
| **PRIORITY HEALTHCARE CORP.,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on seven motions to dismiss filed by Defendants Phil

Minga (Doc. 371); Konie Minga and 34 Corporate Defendants[1] (Doc. 372); William Austin

---

[1] Doc. 372 purports to be a motion to dismiss filed on behalf of Konie Minga and 37 Corporate
Defendants, as follows: Priority Healthcare Corporation d/b/a Priority Care; Priority Care
Pharmacy, LLC; Priority Care Medical Supply, LLC; Amory Priority Care Pharmacy, LLC;
Priority Care Pharmacy Services, LLC; Priority Care Pharmacy Solutions, LLC; Amory
Discount Pharmacy, LLC; Priority Care Pharmacy at Cotton Gin Point, LLC; Priority Care
Pharmacy 2, LLC; Jasper Express Care Pharmacy, LLC; Vincent Priority Care Pharmacy, LLC
d/b/a The Medicine Chest; Vincent Express Care Pharmacy, LLC; Vickers Priority Care
Pharmacy, LLC; Carbon Hill Express Care Pharmacy, LLC; Bowie's Priority Care Pharmacy,
LLC d/b/a Bowie's Discount Pharmacy; Bowie's Express Care Pharmacy, LLC; B&K Priority
Care Pharmacy, LLC; B&K Express Care Pharmacy, LLC; Monroe Pharmacy Corporation;
Tombigbee Pharmacy, LLC; Main Street Drugs, LLC; Medical Park Discount Pharmacy, LLC;
Medical Park Pharmacy, Inc.; Burns Drugstore, Inc.; Burns Discount Drug Store, LLC; Burns
Discount Drug Store, LLC; Ozark Family Pharmacy, LLC; Ozark Family Pharmacy, LLC;
Medpoint Advantage, LLC; Medpoint Pharmacy Benefit Managers, LLC d/b/a Medpoint
Pharmacy; Professional Healthcare Staffing, LLC; Razorback Pharmacy Services, Inc.; Priority
Express Care Pharmacy, LLC; Yellowhammer Pharmacy Services Corporation; Priority Care
Professional Staffing, LLC; Medpoint, Inc.; and Medpoint, LLC. But Roche's Second Amended
Complaint only names 34 Corporate Defendants. The three apparent non-parties that make an
appearance in this motion to dismiss are Medical Park Pharmacy, Inc.; Burns Drugstore, Inc.;
and Priority Care Medical Supply, LLC. The docket sheet shows that two of these three
Defendants—Medical Park Pharmacy, Inc. and Burns Drugstore, Inc.—were terminated on
November 11, 2019, because Roche did not include them in the Second Amended Complaint.
Priority Care Medical Supply should also have been terminated for this same reason, as noted by

(Doc. 373); Capital Asset Management, LLC (Doc. 374); KJM Holdings, LLC (Doc. 375); Minga Investments, LLC (Doc. 376)[2]; and Daniel Baker, Heather Baker, Kristen Knotts, Wesley Minga, Geneva Oswalt, Melissa Sheffield, and Ashley Tigrett (Doc. 377). The motions ask the court to dismiss the Second Amended Complaint filed by Plaintiffs Roche Diagnostics Corporation and Roche Diabetes Care, Inc. (collectively "Roche"), which are divisions of a multi-national healthcare and medical products business that manufactures, among other things, the blood-glucose test strips that are at issue in this case.

The essence of Roche's Second Amended Complaint remains unchanged from its first two complaints. Roche contends that for about five years, thirteen people based in Amory, Mississippi, along with three asset-holding LLCs and more than 30 pharmacies and pharmacy-related entities located in Mississippi, Alabama, and Arkansas, ran a complex and fraudulent scheme. Roche alleges that Defendants billed insurance companies and pharmacy benefit managers (PBMs) for millions of dollars in claims for Roche's test strips that had different product codes, different price structures, and different eligibilities for insurance reimbursement than the test strips Defendants actually sold to patients. Roche contends that Defendants' fraud cost Roche more than $30 million in rebates that it paid to insurers and PBMs that, in turn, reimbursed the Defendants pursuant to their deceitful reimbursement claims. To recover its losses, Roche initially brought eight fraud- and conspiracy-related claims against Defendants.

---

one of Defendants' motions to dismiss. (Doc. 372 at 10.) Beyond the 34 "Corporate Defendants" enumerated above, Roche breaks all the other Defendants down into two other groups: the 13 "Individual Defendants" (Konie Minga, Phil Minga, Wesley Minga, Christopher Knotts, Kristen Knotts, Daniel Baker, Heather Baker, William Austin, Sammy Carson, Kim Carson, Geneva Oswalt, Melissa Sheffield, and Ashley Tigrett) and three "Asset-holding Defendants" (KJM Holdings, LLC; Minga Investments, LLC; and Capital Asset Management, LLC).

[2] Docket entries 374, 375 and 376 are identical documents—one motion for each of the three Asset-holding Defendants represented by the same counsel.

When ruling on 12 motions to dismiss Roche's First Amended Complaint, the court found that Roche plausibly alleged all eight of its claims, but the court also found that Roche had not sufficiently demonstrated that the court had personal jurisdiction over seven of the Individual Defendants. (Doc. 212.) The court dismissed those seven Defendants from the suit. After Roche filed its Second Amended Complaint to properly plead personal jurisdiction, Defendants filed the seven instant motions to dismiss. The seven motions present similar—and in some cases identical—arguments to those the court already rejected in its previous Memorandum Opinion. (Doc. 212.) For this reason—and other reasons explained in more detail below—the court will DENY all motions to dismiss.

**Background**

Although the court extensively addressed Roche's business model in a previous Memorandum Opinion (Doc. 212), a partial restatement of the relevant facts is necessary here. Roche's Second Amended Complaint explains that in the United States, most diabetic test strips, such as those that Roche makes, are covered by health insurance or government programs. As discussed in a prior opinion,

> [t]wo main insurance payment methods exist: (1) pharmacy benefit insurance, which is the same type of coverage used for prescription drugs; and (2) medical benefit, which is the type of coverage used for products, such as wheelchairs and catheters. Test strips covered by *medical* benefit insurance are known as not-for-retail (NFR) strips; NFR strips are distributed through providers, normally mail-order distributors, pursuant to specific contracts with Roche, and are *not* distributed by retail pharmacies. Conversely, retail pharmacies sell retail test strips that feature different markings and product-identifying codes, known as the National Drug Codes, than those on NFR test-strip boxes. Roche typically sells its pharmacy-bound retail test strips to authorized wholesalers—not directly to independent pharmacies—that in turn sell the strips to pharmacies.
>
> When a retail pharmacy dispenses test strips to patients, the strips are almost invariably paid for by health insurance under a pharmacy benefit. The pharmacies then receive reimbursement directly from the payer, such as a health insurance company or its . . . PBM. To receive the reimbursement, the pharmacy must submit the insurance claim; this process is known as "adjudication." The insurance claim

includes information demonstrating that the patient and the product are covered by the particular insurance policy.

After paying the pharmacies for the adjudicated test strips, the insurers and PBMs recoup some of the cost by submitting rebate requests to Roche—pursuant to contracts Roche maintains with each insurer or PBM. Once Roche gets this information, it pays rebates to the insurance companies and PBMs. Roche receives the information in batches—normally months after the pharmacies submit insurance claims and receive reimbursements—and not in real time. . . .

[T]he prices that wholesalers pay to Roche for retail test strips, and the reimbursement rates that insurance companies pay to the pharmacies under pharmacy-benefit insurance plans, are substantially higher than the net price Roche receives for the test strips. The comparative profit Roche takes in between retail and NFR test strips roughly equalizes after Roche pays administrative fees and rebates to the insurance companies and PBMs that pay for the strips. Roche does not pay rebates for NFR test strips.

(Sept. 27, 2019 Memorandum Opinion, Doc. 212 at 4–5 (internal citations omitted)).

Roche alleges that between 2013 and 2018, Defendants adjudicated approximately 750,000 boxes of Roche's test strips to insurance companies and PBMs across the United States. (Doc. 306 at 41.) Each adjudication claim included a statement that the Defendant pharmacy had shipped Roche's retail test strips. In each case, the insurance company or PBM reimbursed the pharmacy, and Roche paid a rebate back to the insurance company or PBM. But Roche alleges that only a tiny fraction of the 750,000 boxes of Roche's strips that Defendants sold and adjudicated were actually retail test strips, resulting in a net loss for Roche of more than $30 million.

To recover its losses, Roche filed the instant suit on September 11, 2018 and alleged eight counts: (1) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c); (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (3) common law fraud; (4) statutory fraud and deceit under Ala. Codes §§ 6-5-101, 6-5-104; (5) civil conspiracy to commit fraud; (6) negligent misrepresentation; (7) unjust enrichment; and (8) money had and received.

Importantly for the purposes of the instant motions, Roche's First Amended Complaint provided the following reasons why the court should exercise personal jurisdiction over the Individual Defendants, most of whom are citizens of Mississippi:

> The Court has personal jurisdiction over the Defendants because Defendants have their principal place of business in Alabama; own or exercise control over businesses operating in Alabama; perpetrate fraudulent activities in, and through businesses operating in, Alabama; and/or knowingly participate in a fraudulent scheme employing pharmacies and pharmacists operating in Alabama.

(Doc. 90 at 14.) This paragraph composed the First Amended Complaint's entire treatment of the matter of personal jurisdiction.

Roche's response brief expounded on these arguments and contended that this court possesses personal jurisdiction over the Individual Defendants based on either of two theories: (1) the Individual Defendants participated in a conspiracy that included overt acts within Alabama; and/or (2) the Individual Defendants personally participated in torts that occurred in Alabama. (Doc. 141 at 34–38.) Although the RICO statute provides an independent source for personal jurisdiction over defendants anywhere in the United States, nowhere in its First Amended Complaint or briefing did Roche assert the RICO statute as a basis for jurisdiction over the Defendants.

In their motions to dismiss Roche's First Amended Complaint, seven Individual Defendants—William Austin, Ashley Tigrett, Christopher Daniel Knotts, Geneva Oswalt, Wesley Minga, Melissa Sheffield, and Phil Minga—argued that neither of Roche's theories applies and asked the court for dismissal based on lack of personal jurisdiction. The other Individual Defendants—Sammy Phillip Carson, Kimberly Carson, Daniel Baker, and Konie Minga—waived the issue by failing to raise the matter of personal jurisdiction in their motions to dismiss Roche's First Amended Complaint.

When ruling on Defendants' motions to dismiss on September 27, 2019, the court considered both the conspiracy and tortious conduct theories and determined that neither theory subjected the seven Individual Defendants to personal jurisdiction in this court. (Doc. 212 at 12–16.) Although the court found that Roche pled plausible and specific claims pursuant to Federal Rules of Civil Procedure 8(a) and 9(b) as to all other Defendants, the court dismissed the seven Individual Defendants from the case without prejudice but allowed the suit to proceed against all Defendants who failed to challenge personal jurisdiction. (Doc 213.)

Four days after the court dismissed the seven Individual Defendants from the case, Roche filed a motion to reconsider on the issue of personal jurisdiction. (Doc. 215.) Roche argued, for the first time, that the RICO statute provides an independent basis for jurisdiction. The relevant statute states that "[a]ll other process in any action or proceeding under this [RICO] chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). The court did not address the merits of whether this statute conferred jurisdiction over the Defendants. Instead, on October 11, 2019, the court denied the motion and held that because Roche failed to present the statutory personal jurisdiction argument prior to the court's ruling on Defendants' 12 motions to dismiss, Roche waived the issue. (Doc. 234.)

On October 25, 2019, Roche filed a motion to amend its complaint (Doc. 270), which the court granted. (Doc. 304.) Roche filed its Second Amended Complaint on November 20, 2019. (Doc. 306.) The new complaint adds two Individual Defendants, Heather Minga Baker and Kristen Minga Knotts, and substitutes several Corporate Defendants. (*Id.* at 8–17.) The Second Amended Complaint also adds a significant number of newly discovered facts, a new state-law

claim for fraudulent transfers, and, perhaps most importantly, a new basis for nationwide personal jurisdiction found in the RICO statute.

The Second Amended Complaint alleges the following nine counts: (1) violation of RICO, 18 U.S.C. § 1962(c); (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d); (3) common law fraud; (4) statutory fraud and deceit under Ala. Codes §§ 6-5-101, 6-5-104; (5) civil conspiracy to commit fraud; (6) negligent misrepresentation; (7) unjust enrichment; (8) money had and received; and (9) fraudulent transfers under Ala. Code § 8-9A.

The Defendants began filing motions to dismiss in mid-January, 2020 as follows: Phil Minga (Doc. 371); Konie Minga and all Corporate Defendants (Doc. 372); William Austin (Doc. 373); Capital Asset Management, LLC (Doc. 374); KJM Holdings, LLC (Doc. 375); Minga Investments, LLC (Doc. 376); and Daniel Baker, Heather Baker, Kristen Knotts, Wesley Minga, Geneva Oswalt, Melissa Sheffield, and Ashley Tigrett (Doc. 377). Defendants Kimberly Carson and Sammy Carson filed a joint answer to Roche's Second Amended Complaint (Doc. 368), but neither filed any motions concerning Roche's Second Amended Complaint. *Pro se* Defendant Christopher Knotts has filed neither an answer nor a motion regarding Roche's Second Amended Complaint. Roche filed a consolidated response to all seven motions to dismiss (Doc. 393), to which Defendants replied. (Docs. 397, 398, 399, 400, 401.)

Among the seven instant motions to dismiss, Defendants emphasize four primary arguments, pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 12(b)(7): (1) Roche already waived the RICO-jurisdiction issue, so the court should not entertain the personal jurisdiction argument now; (2) even if the court considers personal jurisdiction under the RICO statute, the interests of justice do not demand that this court maintain jurisdiction over the Defendants; (3) Roche failed to plead the RICO and fraud claims with particularity under Federal

Rule of Civil Procedure 9(b); and (4) Roche failed to add necessary parties to the suit. The court addresses each of these arguments, and all of Defendants' other arguments, below.

**Standards**

*Rule 12(b)(2)*

Federal Rule of Civil Procedure 12(b)(2) permits defendants to move for dismissal based on lack of personal jurisdiction. Where, as here, the basis for personal jurisdiction derives from a statute, courts analyzing 12(b)(2) motions must first determine whether the statute potentially confers jurisdiction over the defendant; if so, the court next ascertains whether the exercise of jurisdiction infringes on the defendant's Fifth Amendment due process rights. *Sun Bank, N.A., v. E.F. Hutton & Co., Inc*., 926 F.2d 1030, 1033 (11th Cir. 1991). Under the Fifth Amendment analysis, the court considers "a defendant's aggregate contacts with the nation as a whole rather than his contacts with the forum state." *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997). "[W]hen a defendant resides within the United States, courts must ensure that requiring a defendant to litigate in plaintiff's chosen forum is not unconstitutionally burdensome. . . . [but] it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.*

*Rule 12(b)(6)*

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)). A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (quoting *Conley*, 355 U.S. at 47). It does, however, "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified two working principles for the district court to use in applying the facial plausibility standard. First, in evaluating motions to dismiss, the court must assume the veracity of well-pled factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, under prong one, the court determines the factual allegations that are

well-pled and assumes their veracity, and then proceeds, under prong two, to determine the

claim's plausibility given the well-pled facts. That task is "context-specific" and, to survive the

motion, the allegations must permit the court based on its "judicial experience and common

sense . . . to infer more than the mere possibility of misconduct." *Id.* If the court determines that

well-pled facts, accepted as true, do not state a claim that is plausible, the claim must be

dismissed. *Id.*

*Rule 12(b)(7)*

Federal Rule of Civil Procedure 12(b)(7) permits a defendant to move for dismissal based

on a plaintiff's failure to add indispensable parties to the suit, pursuant to Federal Rule of Civil

Procedure 19. Rule 19 states, in relevant part, that if joinder of a person will not deprive the court

of subject-matter jurisdiction, the person must be joined if, "in that person's absence, the court

cannot accord complete relief among existing parties," or if the person "claims an interest

relating to the subject of the action and is so situated that disposing of the action in the person's

absence may . . .  impair or impede the person's ability to protect the interest; or leave an existing

party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

obligations because of the interest." Fed. R. Civ. P. 19(a). The moving party bears the burden to

show that an entity is necessary. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330,

1347 (11th Cir. 2011).

Under Rule 19(a), the court must first determine whether a party is indispensable. If so,

the court will allow litigation to continue only if principles of "equity and good conscience"

permit the suit to proceed. *See* Fed. R. Civ. P. 19(b) (outlining a set of factors for a court to

consider when a weighing whether a case should proceed in the absence of an essential party.) A

court's analysis on whether a party is essential "must be based on stated pragmatic

considerations, especially the effect on parties and on litigation." *In re Torcise*, 116 F.3d 860, 865 (11th Cir. 1997).

**Analysis**

Defendants present four main arguments in their motions to dismiss: (1) Roche waived the RICO-jurisdiction issue, so the court lacks personal jurisdiction; (2) even if the court considers whether it holds personal jurisdiction over Defendants pursuant to the RICO statute, the interests of justice preclude the court from maintaining personal jurisdiction; (3) Roche failed to plead its fraud-related claims with particularity under Rule 9(b); and (4) Roche failed to add necessary parties to the suit. The Defendants also bring several ancillary arguments. The court addresses each argument below.

    A. *Personal Jurisdiction*

Although all seven motions to dismiss contend that this court lacks personal jurisdiction over at least some of the Defendants, they disagree on the reason why. One group of Defendants[3] argues that Roche waived the issue of jurisdiction and should not be allowed to argue it now; this faction of Defendants does not engage with the RICO statute's jurisdiction-conferring provision. The other group[4] concedes that the RICO statute applies but contends that invoking jurisdiction under this statute violates Defendants' due process rights. Neither group is correct.

*Approach one: Roche waived the jurisdiction argument.*

The Waiver Defendants contend that because the court dismissed seven Defendants for lack of personal jurisdiction pursuant to the First Amended Complaint and then denied Roche's

---

[3] The "Waiver Defendants" include Phil Minga, Konie Minga, William Austin, and the 34 Corporate Defendants.
[4] The "Due Process Defendants" include the three Asset-holder Defendants, Geneva Oswalt, Melissa Sheffield, Ashley Tigrett, Heather Baker, Daniel Baker, Kristen Knotts, and Wesley Minga.

motion for reconsideration on the matter, the court should not permit Roche to "circumvent the result of the denial of the motion to reconsider by filing an amended pleading." (Doc. 371 at 7.) The motions that employ this argument altogether avoid addressing statutory jurisdiction. *See* Doc. 371 at 4 n.1 ("Mr. Minga will not engage in analysis of a waived argument"); Doc. 372 at 17 (stating in a footnote that, "[f]or the reasons stated in the other defendants' motion to dismiss, Roche cannot argue that jurisdiction is broader due to its RICO claims.")

To support the argument that Roche cannot assert statutory jurisdiction in an amended complaint, Defendants cite to *Foman v. Davis,* 371 U.S. 178, 182 (1962), for the proposition that "*repeated* failure to cure deficiencies by amendments previously allowed is another valid reason for a district court to deny a party leave to amend" (emphasis added). Defendants also quote *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008), which held that "motions to amend should generally be denied in instances of . . . *repeated* failure to cure deficiencies by amendments previously allowed" (emphasis added). By citing to these cases—both of which contemplate motions to amend, not motions to dismiss—Defendants miss the point. In this case, the court *already granted* Roche leave to amend (Doc. 304), at least impliedly, because Roche did not repeatedly fail "to cure deficiencies by amendments previously allowed," and has filed only its Second Amended Complaint. (Doc. 306); *see Burch,* 551 F.3d at 126. By arguing at this point that the court should not have allowed Roche to amend its complaint, Defendants swing at a pitch already in the mitt.

Defendants cite to no law, from within the Eleventh Circuit or elsewhere, to suggest that a plaintiff waives the issue of jurisdiction for the remainder of a case if he fails to adequately plead jurisdiction in the original complaint. The reason for this absence of case law is simple. An amended complaint necessarily includes or excludes information that distinguishes it from

previous iterations. That is what makes an amended complaint an amended complaint. *See generally* Fed. R. Civ. P. 15 (establishing the procedures for amended complaints). Defendants' "waiver" argument therefore fails.

The Defendants who argue that Roche waived the statutory jurisdiction argument fall back on the contention that Roche has not alleged facts to support a finding of personal jurisdiction under a traditional contacts and harm analysis. *See, e.g.,* (Doc. 371 at 11–18); (Doc. 374 at 10–15.) This argument fails for the simple reason that Roche has primarily alleged personal jurisdiction pursuant to the federal RICO statute and not—as Roche did in its First Amended Complaint—specific personal jurisdiction under Alabama's long-arm statute.

*Approach two: Defendants challenge statutory jurisdiction on due process grounds.*

The Due Process Defendants argue, under Rule 12(b)(2), that invoking the RICO statute's personal jurisdiction provision violates their Fifth Amendment rights. Courts use a two-part test to analyze motions to dismiss for lack of personal jurisdiction under Rule 12(b)(2) when plaintiffs invoke statutory personal jurisdiction. First, the court determines whether the applicable statute potentially confers jurisdiction over the defendant; second, the court ascertains whether the exercise of jurisdiction violates the defendant's Fifth Amendment due process rights. *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) (citing *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989)).

Here, the answer to the first question is straightforward. The applicable statute in this case provides that "[a]ll other process in any action or proceeding under this [RICO] chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). As the Eleventh Circuit explained, "Section 1965(d) of the RICO statute provides for service in any judicial district in which the defendant is

found. When a federal statute provides for nationwide service of process, it becomes the

statutory basis for personal jurisdiction." *Republic of Pan.*, 119 F.3d at 942. A plaintiff properly

invokes statutory jurisdiction if he alleges a "colorable" claim pursuant to a statute that includes

such a provision. *See id.* at 942 (holding also that if "an asserted federal claim is not wholly

immaterial or insubstantial, a plaintiff is entitled to take advantage of the federal statute's

nationwide service of process provision.")

      In this case, no Defendant has argued that Roche failed to serve him process "in any

judicial district in which [he] is found." *See* 18 U.S.C. § 1965(d). And by declining to dismiss

Roche's RICO claims as to multiple Defendants when considering the last round of motions to

dismiss, the court already determined that Roche's RICO claims are "not wholly immaterial or

insubstantial." *See Republic of Pan.*, 119 F.3d at 942. Because Roche properly served all

Defendants with a complaint that included a colorable RICO claim, the RICO statute's

jurisdiction-conferring provision applies.

      The court must next determine whether applying the RICO statute's nationwide service-

of-process provision infringes on Defendants' Fifth Amendment due process rights. Under this

analysis, "[t]he burden is on the defendant to demonstrate that the assertion of jurisdiction in the

forum will make litigation so gravely difficult and inconvenient that he unfairly is at a severe

disadvantage in comparison to his opponent." *Republic of Pan.*, 119 F.3d at 948 (citations

omitted). Defendants have not met that burden.

      Defendants argue that "the burden imposed in being forced to defend in an out-of-state

forum where neither they nor . . . Roche itself has any meaningful connection or interest . . .

preclude the Court's exercise of personal jurisdiction." (Doc. 377 at 4–5.) According to the

Second Amended Complaint, all five of these Defendants are citizens of Mississippi who reside

either in or around the town of Amory, located about 20 miles west of the Mississippi/Alabama border. (Doc. 306 at 15–17.) A "defendant's contacts with the forum state play no magical role in the Fifth Amendment analysis. . . . [S]tate lines cannot provide an accurate measure of the burdens that would be imposed on a defendant by requiring him to defend an action in a particular forum. There is nothing inherently burdensome about crossing a state line." *Republic of Pan.,* 119 F.3d at 946.

Although "inconvenience may at some point become so substantial as to achieve constitutional magnitude," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 484 (1985), the instant case does not present such an example. The court finds that the burden Defendants allege—approximately a two-hour drive between Amory, Mississippi and Birmingham, Alabama—does not infringe on Defendants' Fifth Amendment rights or prevent the court from maintaining personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(d).

Beyond the two arguments analyzed above, the three Asset-holding Defendants also argue that because Roche has not asserted a material or substantial RICO claim (Count I) against them, RICO's jurisdiction provision should not apply to them. (Doc. 374 at 6–9.) Although Roche did not allege that the three Asset-holding Defendants violated RICO itself, Roche *did* allege that the Asset-holding Defendants *conspired* to commit RICO (Count II). (Doc. 306 at 83.) Because the RICO statute provides jurisdiction pursuant to "any action or proceeding under this chapter"—which includes conspiracy actions—the Asset-holding Defendants' analysis misses the mark, and statutory jurisdiction applies to them as well. *See* 18 U.S.C. § 1965(d).

 Furthermore, Geneva Oswalt, Melissa Sheffield, Ashley Tigrett, Heather Baker, Daniel Baker, Kristen Knotts and Wesley Minga also cite to 18 U.S.C. § 1965(b) and out-of-circuit caselaw for the proposition that the court must engage in an "ends of justice" calculus before

conferring statutory personal jurisdiction. *See, e.g.*, (Doc. 377 at 5.) Section 1965(b) states that RICO claims brought "in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned." 18 U.S.C. § 1965(b). Although courts in several other circuits do, in fact, employ 1965(b) as the primary jurisdiction-conferring provision under RICO and conduct an "ends of justice" analysis (*see, e.g. Cory v. Aztec Steel Bldg., Inc.*, 468 F.3d 1226, 1230 (10th Cir. 2006)), the Eleventh Circuit has made clear that courts in this circuit should apply subsection (d), not subsection (b), when determining whether personal jurisdiction exists over RICO defendants. *Republic of Pan.*, 119 F.3d at 942. So Defendants' § 1965(b) argument is inapplicable to this case.

But even if the court applied Section 1965(b), the ends of justice favor maintaining jurisdiction over all Defendants in this forum. "[T]he ends of justice is a flexible concept uniquely tailored to the facts of each case," *Cory*, 468 F.3d at 1232, and RICO's provisions should be "liberally construed to effectuate its remedial purposes," *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1227 (11th Cir. 2014). In this case, because Defendants have offered no compelling reasons why jurisdiction in this forum is unjust, Defendants' § 1965(b) argument also fails on its merits.

The court also notes that in a footnote of Konie Minga's reply to Roche's response to her motion to dismiss, Konie Minga states that "[i]t is unclear whether Alabama law actually should apply to Roche's claims" because Roche is headquartered in Indiana. (Doc. 399 at 7.) A similar footnote appeared in Konie Minga's motion to dismiss Roche's First Amended Complaint. (Doc. 113 at 1.) But because no party has presented any substantive arguments to the court why Alabama law should not apply, the court will continue to apply Alabama common law. *See Sun*

*Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1208 (11th Cir. 2018) ("[A] party waives its opportunity to rely on non-forum law where it fails to timely provide—typically in its complaint or the first motion or response when choice-of-law matters— the sources of non-forum law on which it seeks to rely.") *See also Mitchell Co. v. Campus*, No. 07-0177-KD-C, 2008 U.S. Dist. LEXIS 137324, at *8 (S.D. Ala. June 4, 2008) and *Anderson v. McAllister Towing & Transp. Co.*, 17 F. Supp. 2d 1280, 1285 n.6 (S.D. Ala. 1998) (holding that choice of law is a waivable issue if not raised in a timely fashion by the parties.)

Finally, pertaining to jurisdiction, several Defendants also argue that "[b]ecause Roche's federal claims are due to be dismissed, the court lacks supplementary jurisdiction over Roche's remaining state law claims." (Doc. 377 at 16.) This argument assumes that the court is dismissing Roche's federal claims—RICO and conspiracy to commit RICO. Because the court is not dismissing Roche's two RICO claims, the court maintains supplemental jurisdiction over all 50 Defendants and all seven of Roche's claims brought under Alabama law. *See generally* 28 U.S.C. § 1367(a).

For each of these reasons, the court finds that the RICO statute's jurisdiction-conferring provision applies, and the court properly exerts personal jurisdiction over all Defendants. The court will DENY Defendants' motions to dismiss on lack-of-jurisdiction grounds and will apply Alabama common law wherever appropriate.

### B.  *Failure to join indispensable parties*

Konie Minga, William Austin, and the Corporate Defendants argue, under Rule 12(b)(7), that the court should dismiss Roche's Second Amended Complaint for failure to join certain insurance companies and PBMs to the suit. (Docs. 372 at 18–25; 373 at 13.) Defendants argue that these third parties' interests, as well as Defendants' own interests, will be jeopardized if the

court allows the case to proceed without the third parties' involvement. Defendants ask the court

to dismiss the case because (a) the third parties are essential to the suit, and (b) the third parties

cannot feasibly be added to the suit.

Federal Rule of Civil Procedure 19(a) sets out the relevant rule; it states that

A person who is subject to service of process and whose joinder will not deprive
the court of subject-matter jurisdiction must be joined as a party if:
 (A) in that person's absence, the court cannot accord complete relief among
 existing parties; or
 (B) that person claims an interest relating to the subject of the action and is
 so situated that disposing of the action in the person's absence may:
  (i) as a practical matter impair or impede the person's ability to
  protect the interest; or
  (ii) leave an existing party subject to a substantial risk of incurring
  double, multiple, or otherwise inconsistent obligations because of
  the interest.

Fed. R. Civ. P. 19(a). The moving party bears the burden to show that an entity is necessary.

*Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1347 (11th Cir. 2011).

Under Rule 19(a), the court must first determine whether a party is indispensable. If so,

the court will allow litigation to continue only if principles of "equity and good conscience"

permit the suit to proceed. *See* Fed. R. Civ. P. 19(b) (outlining a set of factors for a court to

consider when weighing whether a case should proceed in the absence of an essential party.) The

order of these steps is important. To say a "court must dismiss in the absence of an indispensable

party and that it cannot proceed without him puts the matter the wrong way around: a court does

not know whether a particular person is indispensable until it has examined the situation to

determine whether it can proceed without him." *In re Torcise*, 116 F.3d 860, 866 (11th Cir.

1997). A court's analysis of whether a party is essential "must be based on stated pragmatic

considerations, especially the effect on parties and on litigation." *Id.* at 865.

Here, Defendants provide three reasons why the insurance companies and PBMs are essential to the case. First, because Roche was in privity of contract with the insurers and PBMs, Roche should be seeking recovery against the third parties, not the Defendants. Second, the insurers and PBMs created the rules that Defendants allegedly violated. Third, if the insurers and PBMs are not joined, Defendants may face duplicative liabilities for the same allegedly fraudulent activities. The court addresses each argument in turn.

Konie Minga, William Austin, and the Corporate Defendants first argue that the insurers and PBMs are necessary parties to this suit because Roche's contractual obligations apply to the third parties, not the Defendants. Defendants offer this argument pursuant to Fed. R. Civ. P. 19(a)(1)(A), which holds that an entity is necessary if, in the entity's absence, "the court cannot accord complete relief among existing parties." According to Defendants, the PBMs and insurers may "be the only entities from which Roche could recover the bulk of its claimed damages, because Roche paid the reimbursements at issue to those absent parties, not to any of the current defendants." (Doc. 372 at 20–21). Defendants cite to *Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1319 (11th Cir. 2017), where the Eleventh Circuit found a certain party indispensable to a case in part because privity existed between the plaintiff and the indispensable party. (Doc. 372 at 20.)

Although the court duly notes—and appreciates—Defendants' ostensible concern that Roche recover its losses, *Thermoset Corp.* is inapposite to the instant facts. The relevant issue is not the presence or lack of privity between a plaintiff and a potentially essential party; the germane question, spelled out in the text of Rule 19, is whether the "court can[] accord complete relief" to the plaintiff in the absence of the non-joined entity. Fed. R. Civ. P. 19(a)(1)(A). Unlike the situation presented in *Thermoset Corp.*, where the court, based in part on the parties' privity,

enumerated several "plausible ways in which [a party's] absence could prevent [the plaintiff] from receiving complete relief (or any relief at all)," Defendants in this case have not presented *any* plausible hypotheticals under which the absence of the PBMs or insurance companies would impede Roche's ability to recover.

Roche's Second Amended Complaint adequately alleges claims under which the court could grant the precise remedy Roche seeks. The fact that the PBMs and insurance companies acted as intermediaries between Roche and Defendants is insignificant for Rule 19 purposes. For fraud-related claims in Alabama, "a stranger to a transaction . . . may recover against the one who made possible the damages to him by practicing the deceit in the first place." *Thomas v. Halstead*, 605 So. 2d 1181, 1184 (Ala. 1992). Here, while Roche was a stranger to the thousands of allegedly deceitful adjudications between the Defendants and the PBMs and insurance entities, this fact has no bearing on Roche's likelihood of recovering the damages it seeks. The intermediaries did not knowingly participate in Defendants' scheme to defraud, and these Defendants are "the one[s] who made possible the damages to [Rocche] by practicing the deceit in the first place." *See id.* For these reasons, the court rejects Defendants' argument that the PBMs and insurance companies are necessary parties because they were in privity with Roche.

Defendants' second argument concerns the putative interests of the PBMs and insurance companies. These entities "are necessary parties," Defendants explain, "because their participation in the transactions giving rise to the lawsuit is critical to the disposition of the important issues in this litigation." (Doc. 372 at 23.) The "rules allegedly violated by the defendants were set by the PBMs and insurers . . . [which] have significant interests in the resolution of Roche's allegations," and "but for these guidelines . . . the defendants' alleged conduct would not even be possible." (Doc. 372 at 21, 22, and 23.)

20

Defendants cite to *Hardy v. IGT, Inc.*, No. 2:10-CV-901, 2011 U.S. Dist. LEXIS 90852, at *14–*18 (M.D. Ala. Aug. 15, 2011), in which the court found that the Poarch Band of Creek Indians was an essential party to a suit filed by a plaintiff seeking damages from a bingo machine manufacturer whose products appeared in the Tribe's casinos. In that case, the Tribe was an essential party because the plaintiff's attempt to recover from the manufacturer would alter or void the Tribe's contracts with both the manufacturer (to, presumably, install, use, and maintain the machines in the casinos) and the plaintiff (because "casino-style wagering is at minimum a contract between the casino and its patrons.") *Hardy v. IGT, Inc.*, No. 2:10-CV-901, 2011 U.S. Dist. LEXIS 90852, at *14. The relevant takeaway from *Hardy* is that "a party to a contract is necessary, and . . . indispensable to litigation *seeking to decimate that contract*." *Id.* at 16 (emphasis added).

In this case, by contrast, no one is seeking to decimate or alter any contract. And if Roche attains the relief it seeks, the court sees no reason why Roche's contractual relationships with insurance companies and PBMs should not continue undisturbed.

Furthermore, Roche represents that no PBM or insurance entity has asserted any claims related to Defendants' allegedly fraudulent activity. (Doc. 393 at 21.) The provision of Rule 19 regarding the interests of non-parties states that the non-party must be joined if "that person *claims an interest* relating to the subject of the action." Fed. R. Civ. P. 19(a)(1)(B) (emphasis added). The purpose of this Rule is to avoid prejudice to the absent party. *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999).

As the *Hardy* court explained, this subsection means that "[i]t is the party's *claim* of a protectible interest that makes its presence necessary." *Hardy v. IGT, Inc.*, No. 2:10-CV-901, 2011 U.S. Dist. LEXIS 90852, at *14 (quoting *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d

1015, 1024 (9th Cir. 2002)); *see also Lacroix v. Lee Cty.*, No. 2:18-cv-143, 2018 U.S. Dist. LEXIS 126946, at *5 (M.D. Fla. July 29, 2018) (holding that the next subsection, Rule 19(b), "applies only to parties that affirmatively claim an interest in the action" under 19(a)). The apparent lack of claimed interest by the insurance companies and PBMs in this case further demonstrates that they are non-essential to Roche's suit.

Doubling down on this argument, however, Defendants filed a supplemental brief with the court contending Roche's contracts with PBMs—which include provisions for Roche to dispute rebates—provides "further evidence that the PBMs are necessary parties who have a central role in the prescription supply chain and whose interests are directly affected by this action." (Doc. 413 at 5.) The court agrees that Defendants have successfully illustrated that the PBM and insurer intermediaries are central in the prescription supply chain. But beyond repeating the proposition that the intermediaries' interests will be harmed if this suit progresses in PBMs' and insurers' absence, the only ostensible interest that Defendants mention is that intermediaries "establish their own rules and procedures for adjudication." (Doc. 372 at 22.) But the mere presence of rules and procedures does not mean that any interests are jeopardized, and Defendants provide no reason why the court must interfere with any party or non-party's rules, procedures, or contracts. In short, Defendants seem to improperly equate the presence of a legally cognizable interest with mere involvement in a supply chain.

Defendants cite to several cases for the proposition that an entity should be added to a suit if the disposition of the suit would directly harm the entity's interests. But each case clearly articulates the entity's actual and jeopardized interest. In *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999), for example, the Eleventh Circuit determined that an entity was a necessary defendant because if the plaintiff prevailed in its claims, the court must

necessarily find that the absent entity engaged in behavior for which it could lose its business license. The court also found the entity was a necessary party because plaintiff alleged that the entity conspired with a defendant already named in the suit. *Id.* Here, Roche has not alleged that the PBMs or insurers did anything but send rebates to Defendants in accordance with their standard business practices. And the court could grant Roche precisely the relief it requests without implicating any of the intermediaries' interests.

Third, Defendants argue that unless the insurers and PBMs are joined, Defendants may be forced into duplicative or inconsistent obligations for their alleged wrongdoings. (Doc. 372 at 24.) Defendants argue that if Roche wins the suit, then the PBMs and insurers could later bring a suit pursuant Defendants' same allegedly fraudulent behavior. Or, if Roche loses the instant case and then files suit against the insurers and PBMs and wins, the "insurers and PBMs might then seek to recover their losses in a suit against" Defendants. (*Id.* at 24.)

Defendants raise this argument pursuant to Fed R. Civ. P. 19(a)(1)(B)(ii), which states that an entity should be joined if its absence "leave[s] an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." The court first notes that this provision also requires the third party to claim an interest implicated by the ongoing action. *See* Fed R. Civ. P. 19(a)(1)(B). But the PBMs and insurance companies have asserted no such interests here.

Roche also persuasively argues that Defendants' 19(a)(1)(B)(ii) argument misconstrues the essence of Roche's allegations. Roche alleges that it paid millions of dollars in rebates to the PBMs and insurers based on Defendants' false claims to the PBMs and insurance companies; the intermediaries then passed along Roche's rebate funds to Defendants as reimbursements. This means that any possible losses that the PBMs and insurance companies encountered due to

23

Defendants' alleged fraud would be separate and apart from the funds that Roche seeks to recover. Put differently, Roche seeks to recover the funds *it* indirectly paid Defendants through the intermediaries; if the intermediaries have any claims against the Defendants, "their damages would be reduced by the amount of rebates they received from Roche . . . [and] the PBMs and insurers would only be able to recover their own losses," not the funds they merely passed along. (Doc. 393 at 23.)

Defendants' reply briefs contest Roche's narrative that the PBMs and insurance companies act as mere pass-throughs for rebates and reimbursements. Defendants argue that the reimbursements they received from the intermediaries are different from the rebates that Roche pays because the reimbursements are smaller, happen at a different time, and are negotiated separately from the rebates. (Doc. 399 at 7.) Defendants conclude that these three distinctions, coupled with the fact that the PBMs and insurance companies act as middlemen in a complex supply chain between drug manufacturers and consumers, means that "[i]t cannot be reasonably disputed that Roche's claims are dependent on the third-party payer's participation in the rebate and reimbursement process." (*Id.* at 4.)

But Roche does *not* dispute that its claims are independent of the PBMs or insurance companies. Nor does it need to. The court recognizes that perhaps a question of fact exists regarding Roche's potential damages in light of the numerical differences between the rebates and reimbursements and the actual out-of-pocket losses Roche may have incurred caused by Defendants' alleged fraud. But neither this price differential nor the insurance companies' and PBMs' status as important and involved intermediaries in the pharmaceutical chain of distribution affects the Rule 19 question. In the context of 19(a)(1)(B)(ii), the critical inquiry is not the degree of a third party's involvement in the facts giving rise to a claim; it is whether the

24

absence of the third party in the case will create a substantial risk that the defendant will incur double, multiple, or otherwise inconsistent obligations. In this case, Defendants have offered no reason why the intermediaries' involvement in the overall drug-supply apparatus creates such a risk.

Defendants further argue, apparently also pursuant to Rule 19(a)(1)(B)(ii), that the intermediaries are necessary parties because Roche filed an unjust enrichment claim against Defendants. (Doc. 399 at 7.) Because "the money paid by Roche is in the possession of the PBMs and insurers," Defendants contend, the intermediaries "are the only entities from which Roche can recover its claimed damages." *Id.* at 7–8. Defendants emphasize that because Roche paid the PBMs and insurers, rather than Defendants themselves, "no part of the money paid by Roche is in the [Defendants'] possession." (Doc. 413 at 3.) This argument lacks merit.

Regardless of the complexity of the process through which reimbursements result in rebates, all parties appear to agree that a causal connection exists between the two types of transactions. *See* Doc. 399 at 6 (featuring a chart, provided by Defendants, that illustrates the intermediary role that PBMs and insurance companies play in the overall drug-distribution scheme.) Roche further contends that Defendants' fraudulent reimbursement claims—*i.e.*, adjudication claims—directly caused millions of dollars' worth of unwarranted rebates Roche paid to the PBMs and insurers that, in turn, paid Defendants. (Doc. 306 at 76.)

Defendants argument appears to confuse the tort of unjust enrichment with the tort of conversion. Whereas conversion requires that a plaintiff seeking to recover money show that a defendant possesses particularized, identifiable funds, *Gillis v. Benefit Tr. Life Ins. Co.*, 601 So. 2d 951, 952 (Ala. 1992), unjust enrichment features no such requirement. Roche does not bring a conversion claim.

As the court explained in a previous Memorandum Opinion, unjust enrichment is a cause of action that asks whether a defendant possesses or holds money that, in equity and good conscience, belongs to the plaintiff, regardless of how the defendant wound up with the money. *See Hancock–Hazlett Gen. Constr. Co. v. Trane Co.,* 499 So. 2d 1385, 1387 (Ala. 1986). A plaintiff who brings an unjust enrichment claim bears no responsibility to prove that "money belonging to the plaintiff was actually and physically given to, and received by the defendant, as it is sufficient to show that the defendant has received the benefit indirectly." *Jewett v. Boihem*, 23 So. 3d 658, 662 (Ala. 2009) (quotations and ellipses omitted). And Roche has plausibly alleged that Defendants indirectly received money that, in equity and good conscience, belongs to Roche.

Ultimately, then, because the insurance companies and PBMs have asserted no claims pertaining to this suit, and because any claims they could theoretically assert would arise from different obligations than those contemplated in this case, the court finds that Defendants face no "substantial risk of incurring double, multiple, or otherwise inconsistent obligations." *See* Fed. R. Civ. P. 19(a)(1)(B)(ii). For all of these reasons, the court finds that the PBMs and insurance companies are not necessary parties to the suit and will DENY Defendants' motions to dismiss on the grounds of Roche's failure to add indispensable parties.

### C.  Fed. R. Civ. P. 9(b)

All Defendants except Phil Minga argue that at least one of Roche's claims fails for lack of specificity pursuant to Federal Rule of Civil Procedure 9(b), which holds that a plaintiff "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). (*See* Docs. 372 at 25–27; 373 at 10–12, 14–17; 374 at 16–19; 377 at 7–21). All nine of Roche's claims assert some type of fraud, fraud-like activity, or conspiracy to commit fraud: *See* Doc.

306 (alleging (1) violation of RICO, 18 U.S.C. § 1962(c); (2) conspiracy to violate RICO, 18

U.S.C. § 1962(d); (3) common law fraud; (4) statutory fraud and deceit under Ala. Codes §§ 6-5-

101, 6-5-104; (5) civil conspiracy to commit fraud; (6) negligent misrepresentation; (7) unjust

enrichment; (8) money had and received; and (9) fraudulent transfers under Ala. Code § 8-9A).

At least five of these nine claims fall squarely within the ambit of Rule 9(b). *See Am. United Life

Ins. Co. v. Martinez*, 480 F.3d 1043, 1064–68 (11th Cir. 2007) (holding that all fraud-related

claims, including civil RICO and conspiracy to commit RICO, must be pled with specificity

under Rule 9(b)).

Four claims possibly fall outside Rule 9's purview: civil conspiracy, negligent

misrepresentation, money had and received, and unjust enrichment—the latter two of which are

the same cause of action in Alabama. *See State Farm Fire & Cas. Co. v. Evans*, 956 So. 2d 390,

400 (Ala. 2006). As one court noted, "[b]y its terms, Rule 9(b) extends to assertions of 'mistake,'

but its applicability to claims of unjust enrichment is less clear. It appears to be the rule that a

claim for unjust enrichment is subject to Rule 9(b) only if it is premised on fraud." *United States

v. Gericare Med. Supply Inc.*, No. CIV.A.99-0366, 2000 WL 33156443, at *10 (S.D. Ala. 2000)

(quotation omitted); *see also Mukamal v. GE Capital Corp.,* 517 B.R. 310, 322 n.6 (Bankr. S.D.

Fla. 2013) ("Courts have reached varying conclusions regarding whether Rule 9(b) applies to

negligent misrepresentation claims" (ellipses omitted)); *Grubbs v. Medtronic, Inc.*, No. 2:18-cv-

01468, 2019 U.S. Dist. LEXIS 121216, at *14 (N.D. Ala. July 22, 2019) (applying Rule 9(b) to a

negligent misrepresentation claim under Alabama law); *J & M Assocs. v. Callahan*, No. 07-

0883-CG-C, 2008 U.S. Dist. LEXIS 137149, at *26 (S.D. Ala. Nov. 7, 2008) (holding that

conspiracy claims are subject to Rule 9(b) if the conspiracy is premised on fraud.). But even

assuming Roche must plead all nine counts pursuant to Rule 9(b), Roche has met its burden.

As an initial matter, the court already determined that Roche adequately pled all its claims against Konie Minga, Kimberly Carson, Daniel Baker, Sammy Carson, and all Corporate Defendants (except the two Corporate Defendants added in the Second Amended Complaint, Monroe Pharmacy Corp. and Razorback Pharmacy Corp). (Doc. 212 at 47.) Because the Second Amended Complaint only enhances the factual specificity that existed in the First Amended Complaint, the court finds, as it did in September of 2019, that Roche has adequately pled all claims against Konie Minga, Kimberly Carson, Sammy Carson, Daniel Baker, and all but the two Corporate Defendants added in the Second Amended Complaint; the court will DENY these Defendants' motions to dismiss on the grounds of lack of specificity under Rule 9(b).

For the same reasons explained in the previous Memorandum Opinion, the court likewise finds that Roche has provided enough specificity to satisfy Rule 9(b) for its claims against all other Defendants. Because Roche alleges nine fraud-related—or conspiracy-to-commit-fraud—causes of action, the same basic facts support all its claims. For the purposes of Rule 9(b), claims based in fraud must include "the who, what, when, where, and how of the allegedly false statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

In this case, Roche alleges that the *who* are the 50 Defendants; the *when* is January 2013 through September 2018; and the *where* is Amory, Mississippi, the putative epicenter of PHC's operation, as well as 34 corporate locations in Mississippi, Alabama, and Arkansas—for which Roche provides the names and addresses. The *what* are false statements to various government entities, PBMs, insurance companies, and Roche itself, regarding the essence of PHC and its relationships with other Defendants, what Defendants shipped in hundreds of thousands of boxes, as well as related statements in furtherance and concealment of the allegedly fraudulent

activity. The *how* is all types of communication, including letters, faxes, emails, and telephone calls.

Defendants contend that Roche should be required to re-plead or file a separate, more detailed RICO case statement because Roche has "lumped" Defendants together, and Defendants "are entitled to information sufficient to show their involvement in the alleged fraud." (*See, e.g.*, Doc. 372 at 27.) The court finds that requiring Roche to allege anything else at this point is unnecessary, as the following allegations about each Defendant satisfy the specificity requirement of Rule 9(b).

Roche alleges that William Austin was, at various times, the Director of Pharmacy Services at PHC and the director of several Defendant Pharmacies, including Amory Priority Care Pharmacy, Jasper Express Care Pharmacy, Carbon Hill Express Care Pharmacy, Bowie's Priority Care Pharmacy, Bowie's Express Care Pharmacy, B&K Express Care Pharmacy, Tombigbee Pharmacy, Main Street Drugs, Monroe Pharmacy Corporation, and Yellowhammer Pharmacy Services Corporation. (Doc. 306 at 16.) Mr. Austin also owns or partially owns Yellowhammer Pharmacy Services Corporation and Medical Park Discount Pharmacy.

> Among his duties in operating and managing the racketeering enterprise were checking the test strips sent out under Alabama pharmacies' names; regularly communicating with and visiting Alabama pharmacies; evaluating and interviewing candidates for positions in Alabama pharmacies; signing and submitting PBM applications and agreements on behalf of Alabama pharmacies; and engaging in correspondence on behalf of and in the name of Alabama pharmacies.

(*Id.* at 20.)

Roche alleges that Mr. Austin "drafted, edited, reviewed, and approved letters" sent to PBMs denying any wrongdoing on Defendants' part. (*Id.* at 53.) Roche includes a copy of such a letter—signed by Mr. Austin—with the Second Amended Complaint. (*Id.* at 54.) Roche further

contends that Mr. Austin inspected boxes of test-strips for shipment (*id.* at 73) and filled out PBM applications—including one that featured an allegedly digitally altered photograph of a vacant storefront doctored to appear like a functioning pharmacy—that falsely claimed that non-existent or shell pharmacies were, in fact, "walk-in," brick-and-mortar operations.

Roche alleges that Melissa Sheffield, the chief operating officer of PHC, "communicated regularly with Priority Care's Alabama pharmacies to coordinate the logistics of the scheme and direct Priority Care's responses to PBM audits of Alabama pharmacies. . . . She also visited Alabama pharmacies—including Bowie's Priority Care Pharmacy—to oversee the response to in-person audits." (*Id.* at 20.) Roche alleges that Ms. Sheffield "arrange[d] for and approve[d] the computer systems and logistics that permit[ted] the remote checking of prescriptions central to the scheme" (*id.* at 74) and worked with Mr. Austin as they "drafted, edited, reviewed, and approved letters," sent in response to PBM audits. (*Id.* at 53.)

Roche alleges that the three Asset-holding Defendants (KJM Holdings, LLC; Minga Investments, LLC; and Capital Asset Management, LLC), which are wholly owned and controlled by Konie and Phillip Minga, received about $30 million dollars from the fraudulent enterprise between January 2013 and September 2018. Roche alleges that the Asset-holding Defendants acted as co-conspirators as the Mingas surreptitiously funneled their ill-gotten gain into these three "vehicles for concealing enterprise assets." (Doc. 306 at 65.)

Roche alleges that the two new Corporate Defendants, Monroe Pharmacy Corporation (directed by William Austin) and Razorback Pharmacy Services, Inc., own five other Corporate Defendants. (Doc. 306 at 11, 12.) Roche alleges that PHC created these new entities to further the overall scheme of defrauding Roche and dispensing and delivering NFR test strips. (*Id.* at 59, 62.)

Roche alleges that Geneva Oswalt acted as the Chief Operations Officer of Defendant
Medpoint Advantage, an entity that helped funnel patients into the PHC system. Roche also
alleges that Ms. Oswalt incorporated and directed two other Corporate Defendants, Burns
Discount Drug Store and Ozark Family Pharmacy. (Doc. 306 at 17.) Roche contends that when
PHC began using alternative names for their new corporations to conceal the extent of the
enterprise, Ms. Oswalt "agreed to incorporate and serve as an officer of Ozark Family Pharmacy
. . . with the understanding that this was an entity created as a contingency in the event that Burns
Discount Drug Store was exposed as a Priority Care pharmacy." (*Id*. at 62.) Roche also alleges
that Ms. Oswalt sent false spreadsheets to PBMs and used an alias to register a fictitious
pharmacy to acquire a new pharmacy taxonomic code in furtherance of the scheme. (*Id.* at 73.)

The Second Amended Complaint alleges that Ashely Tigrett, the director of quality
assurance, licensing, and credentialing at PHC, communicated regularly with PHC's Alabama
pharmacies to coordinate their licenses and registrations with commercial and government
databases. (*Id.* at 20.) In this capacity, Roche alleges, Ms. Tigrett prepared the pharmacies' PBM
applications, which "falsely stated that [the] pharmacies were completely independent and had
no common ownership and that they were not mail-order pharmacies," and she also submitted
false addresses and other inaccurate information to government databases to conceal the scope of
PHC's operation. (*Id.* at 35, 53.)

Roche alleges that Kristen Knotts, Phil and Konie Minga's daughter, was a PHC
employee and shareholder of Defendant Medpoint, Inc. (*Id.* at 16.) The Second Amended
Complaint alleges that Ms. Knotts "assisted Priority Care in gathering prescriptions that were
shipped from Mississippi but attributed to the Alabama pharmacies" and opened a new PHC-
related pharmacy with Defendant Daniel Baker. (*Id.* at 61.) Furthermore, Ms. Knotts allegedly

"participat[ed] in the process of gathering patients and prescriptions for the mail-order operation funneled through storefront pharmacies" in 2016 and 2017; she then stopped working for PHC but continued receiving thousands of dollars each month from PHC—totaling about $400,000. (*Id.* at 75.)

Roche alleges that Heather Baker, Phil and Konie Minga's daughter and Daniel Baker's wife, was never employed by PHC or any PHC-related entity. (Doc. 306 at 75.) Unlike the other Defendants, Roche does not contend that Heather Baker engaged in any fraudulent or conspiratorial activity; instead, Roche brings two counts—unjust enrichment and money had and received—against Heather Baker and alleges that she holds money that rightly belongs to Roche. To support these two claims, Roche asserts that "she has directly received at least $430,000 from Priority Care's business accounts . . . [but] performed no work for these payments." (*Id.*)

Roche alleges that Wesley Minga, the Mingas' son, supervised and directed the PHC central warehouse in Amory, Mississippi that shipped hundreds of thousands of fraudulent packages. (*Id.* at 15.) For most of these packages, the contents clearly indicated that test strips were not for retail, but Wesley Minga allegedly affixed labels that stated the contents were retail strips. Roche also alleges that Wesley Minga travelled to Alabama with Konie Minga to open bank accounts for PHC's pharmacies (*id.* at 19) and owned one of the PHC pharmacies (*id.* at 64).

Examining the body of Roche's allegations, the court recognizes that the allegations regarding some of these Defendants are somewhat thinner than may be permissible in simpler, more straightforward cases. But at this stage of the proceedings, the court is reluctant to untangle the web of 50 Defendants when Roche plausibly alleges all Defendants' repeated and diligent efforts to conceal the extent of their operation—and each Defendant's role within it.

Taking the Second Amended Complaint's allegations as true, which the court must do at this procedural stage, the court finds that the "inferences from [Defendants'] conduct" and "circumstantial evidence of a scheme" sufficiently provide "evidence that each defendant necessarily must have known that the others were also conspiring to participate in the same enterprise," *United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005); *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007), and that each Defendant participated in the fraudulent scheme as a whole. Rule 9(b) is therefore satisfied. The court reaches this conclusion for three reasons.

First, Rule 9(b) is not a completely rigid standard that requires uniform and exhaustive specificity in all cases. *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1512 (11th Cir. 1988). For example, Rule 9(b) does not require a plaintiff to allege the time and content of every fraudulent statement in the event of a "prolonged multi-act scheme," or if the fraud took place over an extended time period. *U.S. ex rel. Clausen v. Laboratory Corp. of Amer., Inc.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002); *Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *3, *4 (11th Cir. Aug. 15, 2003). In this case, Roche alleges a complex scheme that lasted more than five years and involved hundreds of thousands of false statements.

Second, when defendants maintain access and control over the facts and details surrounding allegedly fraudulent statements, the Eleventh Circuit has instructed district courts to apply Rule 9(b) less stringently. *Id.* at *3. The facts of the instant case lend themselves to a more lenient application of Rule 9(b). *See Durham,* 847 F.2d at 1512. Roche has alleged that much of the relevant information, except that which Defendants have produced pursuant to court order or in early discovery, either rests in the hands of Defendants (and possibly those of insurance companies and PBMs) or has disappeared into the mailboxes and onto the front porches of

33

diabetes patients around the country. As the court noted in its September 27, 2019 Memorandum

Opinion, requiring Roche to specifically allege dates and patient names or addresses, aside from

creating potentially problematic medical-privacy repercussions, is entirely untenable.

Furthermore, the practical realities of this case are such that Roche cannot be reasonably

expected to provide more information, as the Second Amended Complaint already features 98

pages of factually dense allegations.

Third, the court finds that Roche's Second Amended Complaint satisfies the salutary

purpose of Rule 9(b), which is to "ensure that fraud allegations are not spurious and that the

complaint alerts the defendant to the precise misconduct that the plaintiff alleges against him."

*Riggins v. P. I. & I. Motor Express, Inc.*, No. 2:17-CV-1084-KOB, 2018 WL 1964570, at *3

(N.D. Ala. April 26, 2018). *See also Ala. Teachers Credit Union v. Design Build Concepts, Inc.*,

334 F. Supp. 3d 1171, 1199 (N.D. Ala. 2018) ("Rule 9(b) exists to prevent complainants from

crying 'fraud' only to go on a fishing expedition during discovery to try to find some evidence of

fraud."). The Eleventh Circuit has made clear that Rule 9(b) "must be read in conjunction with

Federal Rule of Civil Procedure 8's directives that a complaint need only provide a short and

plain statement of the claim," and district courts considering motions to dismiss for failure to

plead fraud with particularity "should always be careful to harmonize the directives of [R]ule

9(b) with the broader policy of notice pleading found in Rule 8." *Hill*, 2003 U.S. App. LEXIS

27956 at *9. (citations and internal quotation marks omitted).

Ultimately, after reading Roche's allegations, each Defendant should have a clear

understanding of Roche's allegations against him or her. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (requiring a plaintiff to plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.") The court finds that Roche has

alleged plausible claims against all Defendants. *See also* Doc. 212 at 31–32, 46–47 (featuring the court's distillation of additional facts that further demonstrate the plausibility of Roche's claims.)

For these reasons, the court finds that Roche has adequately stated with "particularity the circumstances constituting [Defendants'] fraud." *See* Fed. R. Civ. P. 9(b). The court will DENY all Defendants' motions to dismiss on lack-of-specificity grounds.

### D.  Reliance on fraud

Multiple Defendants argue that the court should dismiss Roche's fraud and misrepresentation claims because Roche did not rely on Defendants' allegedly fraudulent statements. (Docs. 373 at 6–10; 377 at 18–19.) Defendants correctly assert that reliance is an element of fraud. *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 4 (Ala. 2004) ("[R]eliance in the form that the misrepresentation is acted on by the opposite party is an essential element of fraud in Alabama") (citation omitted). As this court has noted, "Alabama law does recognize a fraud claim even though the defendant makes a false representation to a third party rather than to the plaintiff. But Alabama law does not excuse a plaintiff from the requirement of establishing his reliance upon that misrepresentation." *Bennett v. CIT Bank, N.A.*, No. 2:18-CV-00852, 2019 U.S. Dist. LEXIS 13030, at *17–18 (N.D. Ala. Jan. 28, 2019) (citing *Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887, 899 (Ala. 2004)).

Regarding the allegedly false statements that Mr. Austin sent to PBMs, for instance, Mr. Austin argues that the Second Amended Complaint does "not allege that Plaintiffs had any knowledge of those statements. There is certainly no allegation that Plaintiffs relied on those alleged misrepresentations. Indeed, it appears that Plaintiffs did not learn of the statements alleged in those paragraphs until they acquired documents from the PBMs via subpoenas in the present litigation." (Doc. 373 at 9.)

Defendants wrongly conflate specific knowledge of a statement with reliance on a statement. As this court explained in a previous memorandum opinion (Doc. 212), and as Defendants acknowledge in their briefs (Doc. 373 at 8), fraud can exist even when a defendant directs his misleading statements to a third party, outside the presence of the plaintiff. *Sims v. Tigrett*, 229 Ala. 486, 491 (1934). The law of fraud requires a plaintiff's reliance, not omniscience.

The Alabama Supreme Court describes reliance as the causation element of fraud. *See Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So. 2d 601, 607 (Ala. 1980) ("[I]n cases of fraud[,] proximate cause is often articulated as a requirement of reasonable reliance where but for the misrepresentation or concealment it is likely the plaintiff would not have acted in the transaction in question.") Put differently, "reliance on an alleged misrepresentation must induce the allegedly defrauded party to act or change its course of action." *Sandoz, Inc. v. State*, 100 So. 3d 514, 533 (Ala. 2012).

Roche's Second Amended Complaint plainly alleges that but for Defendants' repeated and false representations to governments, PBMs, insurance companies, and diabetes patients, Roche would not have paid more than $30 million in rebates. Because Roche has alleged that it relied on Defendants' allegedly false statements, the court will DENY Defendants' motions to dismiss on lack-of-reliance grounds.

### E.   Civil conspiracy to commit fraud claims

William Austin and the three Asset-holding Defendants argue that the court should dismiss Roche's conspiracy to commit fraud claim because Roche's fraud claims are insufficiently pled. (Doc. 374 at 17); (Doc. 373 at 12.) Defendants present this argument based on the proposition that, in Alabama, "liability for civil conspiracy rests upon the existence of an

36

underlying wrong, and if the underlying wrong provides no cause of action, then neither does the conspiracy." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1196 (Ala. 2008). "Given that Plaintiffs' underlying tort claims are due to be dismissed," Mr. Austin concludes, "the conspiracy claim should be dismissed as well." (Doc. 373 at 12.)

This argument runs into the same problem as Defendants' supplemental jurisdiction contention discussed above—namely, a faulty premise that generates a spurious conclusion. Because the court is not dismissing Roche's fraud claims, the conspiracy claim cannot be dismissed on grounds that an underlying wrong does not exist.

The Asset-holding Defendants also push the argument one step further, contending that the conspiracy to commit fraud claim fails because Roche "does not set forth allegations regarding the Asset-Holder Defendants['] involvement in any alleged conspiracy" or any "actual agreement" among the Defendants. (Doc. 374 at 17.) Defendants contend that they merely engaged in parallel "lawful, independent conduct," and that an "obvious alternative explanation" exists regarding Roche's conspiracy claims. (Doc. 400 at 5.)

Beyond the fact that Defendants do not propose what the "obvious alternative explanation" might be, the court already explained in the Rule 9(b) analysis, *supra*, that Roche has provided all that is necessary at this procedural posture: "inferences from [Defendants'] conduct" and "circumstantial evidence of a scheme" that provides "evidence that each defendant necessarily must have known that the others were also conspiring to participate in the same enterprise" *See Silvestri*, 409 F.3d at 1328 and *Browne*, 505 F.3d at 1264. *See also Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988) ("By its very nature, the existence of a [civil] conspiracy must often be inferred from circumstantial evidence and the relationship of the parties, as opposed to direct evidence"); (Doc 212 at 32–33) (addressing other Defendants'

allegedly independent and parallel conduct); (Doc. 287) (granting Roche's motion for a preliminary injunction to freeze Defendants' assets and explaining in detail the Asset-holding Defendants' relationship with the Mingas and overall involvement in the PHC enterprise.).

For these reasons, the court will DENY Defendants' motions to dismiss Roche's conspiracy claims on the grounds that Roche failed to sufficiently plead its conspiracy and underlying fraud claims.

### F.   Unjust enrichment & money had and received claims

Several Defendants, including the Asset-holding Defendants and William Austin, argue that Roche's unjust enrichment/money had and received claims fail because Roche does not allege that certain Defendants have any money that rightfully belongs to Roche. *See, e.g.,* (Doc. 374 at 18; Doc. 398 at 6). This argument is simply incorrect, as Roche's entire case is premised on the idea that all Defendants, especially the Mingas, possess money that, in equity and good conscience, belongs to Roche. For example, Roche alleges that the Mingas transferred more than $30 million in profits to the Asset-holding Defendants—money that derived in large part from Defendants' fraudulent scheme to sell Roche's products under false pretenses. And Roche plausibly alleges that William Austin, the Director of Pharmacy Services at PHC and the director and/or owner or partial owner of several Corporate Defendants, received at least a portion of the windfall generated by PHC's fraudulent scheme.

Mr. Austin appears to contend that because Roche has not pointed to specific payments from Roche that Mr. Austin currently possesses, the court should dismiss Roche's unjust enrichment claim. (Doc. 373 at 11–12.) At the motion to dismiss stage, such a requirement is not necessary. Instead, the court is satisfied that Roche has plausibly alleged that all Defendants possess money that, in equity and good conscience, belongs to Roche. *See Hancock–Hazlett*

38

*Gen. Constr. Co. v. Trane Co.,* 499 So. 2d 1385, 1387 (Ala. 1986). For this reason, the court will DENY Defendants' motions to dismiss on the grounds that Roche has not adequately pled its unjust enrichment claim.

###### G. Fraudulent transfer claim

Count Nine, fraudulent transfers, is the only new claim appearing in the Second Amended Complaint. Roche brings this count against three Defendants: Phil and Konie Minga and Asset-holding Defendant KJM Holdings, LLC. KJM Holdings moves to dismiss the claim.

Alabama Code § 8-9A-4(a) provides that "[a] transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor." The statute defines a *debtor* as a "person who is liable on a claim"; a *creditor* as a "person who has a claim"; and a *claim* as, among other things, a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Ala. Code § 8-9A-1(3).

Pursuant to this statute, Roche alleges that these three Defendants engaged in actual fraud when, about seven days after the Defendants received notice of Roche's suit in September of 2018, the Mingas furtively transferred $9.5 million from KJM Holdings into other Asset-holding Defendant accounts "to shield that money from creditors and especially from eventual judgment in this case." (Doc. 306 at 92.) Although neither Phil nor Konie Minga moves to dismiss this cause of action, KJM Holdings argues that Roche's fraudulent transfer claim is inadequate

"because it fails to allege that the money that was transferred to[5] KJM Holdings, LLC belonged to Roche." (Doc. 374 at 19.) This argument fails.

Although KJM Holdings is a new Defendant and Roche's fraudulent transfers count is a new claim to the Second Amended complaint, KJM Holdings's argument simply re-hashes an issue already determined in the court's Memorandum Opinion and Order that granted Roche's preliminary injunction to freeze certain of Defendants' assets. (Docs. 287 at 9; 288 at 1.) In Roche's motion for an injunction, Defendants argued precisely what KJM Holdings currently contends: that no connection exists between Roche and the funds in the Asset-holding Defendant accounts. (Doc. 276 at 6.) In granting the preliminary injunction, the court found not only that a nexus existed between the accounts and the alleged fraud, but also that Roche had a substantial likelihood of success on the merits of its unjust enrichment claim to recover the money in the Asset-holding Defendant accounts. (Doc. 287 at 3–4.)

For this reason, the court will DENY KJM Holdings's motion to dismiss on the grounds that Roche failed to allege a connection between KJM Holdings's assets and Defendants' alleged defrauding of Roche.

**Conclusion**

For the reasons explained above, the court will DENY in full the motions to dismiss filed by all Defendants (Docs. 371, 372, 373, 374, 375, 376, 377) and will enter a separate Order consistent with this Memorandum Opinion.

---

[5] Strictly speaking, Roche alleges that the Mingas transferred funds *from* KJM Holdings, not *to* KJM Holdings. (Doc. 306 at 92.)

**DONE** and **ORDERED** this 8th day of May, 2020.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE